## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID J. ACKLEY, JR. *et al.*,

        Plaintiffs,

        v.

ISLAMIC REPUBLIC OF IRAN,

        Defendant.

Civil Action No. 20-cv-621 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

This action arises out of the bombing, on June 25, 1996, of the Khobar Towers apartment complex in Dhahran, Saudi Arabia, which housed United States military personnel, including the fifty-one service-member plaintiffs in this case. First Amended Compl. ("FAC") ¶ 1, ECF No. 19; *see also* Pls.' Proposed Findings of Fact and Conclusions of Law at 1-2, ECF No. 28. Nineteen U.S. Air Force personnel were killed, and hundreds more were injured. FAC ¶ 1. Also among the total 159 plaintiffs in this case are: (1) eighty-nine family members of the fifty-one service-member plaintiffs; (2) eighteen immediate family members of injured airmen plaintiffs in *Schooley v. Islamic Republic of Iran*, 17-cv-1376 (BAH), 2019 WL 2717888, at *1 (D.D.C. Jun. 27, 2019); and (3) one immediate family member of an airman whose estate and family were plaintiffs in *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006) ("*Heiser I*") and *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181 (D.D.C. 2008). *Id.* Plaintiffs allege that defendant, the Islamic Republic of Iran ("Iran"), is liable under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, for "providing material support. . . in carrying out the bombing of Khobar Towers… to intimidate and terrorize" plaintiffs. *Id.* ¶ 186. After complying with FSIA's requirements for service on defendant, *see* 28

U.S.C. § 1608(a)(4); Return of Service, ECF No. 13, plaintiffs now seek entry of a default

judgment against defendant as to liability and damages, *see* Pls.' Mot. Judicial Notice Prior

Related Cases Entry Default J. Liability ("Pls.' Mot. Liability"), ECF No. 24; Pls.' Mot. for Final

J. as to Damages ("Pls.' Mot. Damages"), ECF No. 27, since Iran has failed to enter an

appearance or otherwise defend against this action, *see* Clerk's Entry of Default, ECF No. 17.

For the reasons detailed below, plaintiffs' motions are granted.

## I.      BACKGROUND

Several prior decisions of this Court have found defendant liable for the Khobar Towers

bombing:  *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) (Lamberth, J.);

*Heiser I*, 466 F. Supp. 2d at 229 (Lamberth, J.); *Rimkus*, 750 F. Supp. 2d at 163 (Lamberth, J.);

*Akins v. Islamic Republic of Iran* ("*Akins I*"), 332 F. Supp. 3d 1 (D.D.C. 2018) (Howell, C.J.);

*Schooley*, 2019 WL 2717888 (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, No. 19-cv-464

(BAH), 2020 WL 619925 (D.D.C. Feb. 7, 2020) (Howell, C.J.); *Christie v. Islamic Republic of

Iran*, No. 19-cv-1289 (BAH), 2020 WL 3606273 (D.D.C. July 2, 2020) (Howell, C.J.); *Akins v.

Islamic Republic of Iran* ("*Akins II*"), 549 F. Supp. 3d 104 (D.D.C. July 16, 2021) (Howell, C.J.);

*Blank v. Islamic Republic of Iran*, No. 19-3645 (BAH), 2021 WL 3021450 (D.D.C. July 17,

2021) (Howell, C.J.).

In *Blais* and *Heiser I*, the Court heard evidence and witness testimony.  *See Blais*, 459 F.

Supp. 2d at 46 n.4; *Heiser I*, 466 F. Supp. 2d at 250.  In *Heiser I* alone, the offering of evidence

took 17 days, which included examination of witnesses, including seven expert witnesses.  *See*

466 F. Supp. 2d at 250.[1]  *Rimkus*, *Akins*, and *Schooley* concluded that judicial notice of the

---

[1]        The expert witnesses in *Heiser I* were: (1) Louis Freeh, the former Director of the Federal Bureau of
Investigation ("FBI"); (2) Dr. Patrick Clawson, a scholar of Middle Eastern politics who has frequently provided
expert testimony regarding Iran's involvement in sponsoring terrorism; (3) Dr. Bruce Tefft, a founding member of
the CIA's Counterterrorism Bureau and regular consultant on issues of terrorism; (4) Dale Watson, the former

findings of fact in *Blais* and *Heiser I* was appropriate, *see Rimkus*, 750 F. Supp. 2d at 167; *Akins I*, 332 F. Supp. 3d at 9; *Schooley*, 2019 WL 2717888, at *2, and the plaintiffs here request that this Court "take judicial notice of the related records and proceedings from other cases before the District Court for the District of Columbia, where Iran has already been found liable for this same attack" and for providing material support and resources to carry out the Khobar Towers bombing.  Pls.' Mem. Supp. Mot. Judicial Notice Prior Related Cases and for Entry of Default J. as to Liability ("Pls.' Mem. Judicial Notice") at 6-8, ECF No. 24.

Rule 201 of the Federal Rules of Evidence authorizes a court to "judicially notice" adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b).[2]  Rule 201 is used frequently to judicially notice factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendants," *Akins I*, 332 F. Supp. 3d at 11, "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)).  This avoids "the formality of having that evidence reproduced."  *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011)); *see also Oveissi v. Islamic Republic of Iran* ("*Oveissi II*"), 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (finding

---

Deputy Counterterrorism Chief of the FBI, *see Heiser I*, 466 F. Supp. 2d at 260-65; (5) Dr. Thomas Parsons, a medical examiner, *see id.* at 268; (6) Dr. Dana Cable, a licensed psychologist and expert on grief process, *see id.* at 269-70; and (7) Dr. Herman Miller, an economic consultant, *see id.* at 273-74.

[2]      "[A]djudicative facts are simply the facts of the particular case."  *Nat'l Org. for Women, Wash., D.C. Chapter v. Social Sec. Admin.*, 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, J., concurring) (quoting FED. R. EVID. 201, Advisory Committee Note).  The Rule does not govern judicial notice of "legislative facts," FED. R. EVID. 201(a), which are "those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," *Nat'l Org. for Women*, 736 F.2d 727 at 737 n.95 (quoting FED. R. EVID. 201, Advisory Committee Note).

courts permitted "in subsequent related cases to rely upon the evidence presented in earlier

litigation"); *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012)

(taking "judicial notice of the evidence presented in the earlier cases").  Taking judicial notice of

prior findings "does not conclusively establish the facts found in those cases" in the later FSIA

case.  *Foley*, 249 F. Supp. 3d at 191.  Rather, "based on judicial notice of the evidence presented

in the earlier cases[,] . . . courts may reach their own independent findings of fact." *Anderson v.

Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010); *see also Rimkus*, 750 F. Supp.

2d at 172.  In fact, "courts in FSIA litigation have adopted a middle-ground approach that

permits courts in subsequent related cases to rely upon the evidence presented in earlier

litigation—without necessitating the formality of having that evidence reproduced—to reach

their own, independent findings of fact in the cases before them." *Rimkus*, 750 F. Supp. 2d at

172.[3]

    This Court is persuaded that this approach is both "efficient and sufficiently protective of

the absent defendant['s] interests," *Akins I*, 332 F. Supp. 3d at 11, and will therefore grant

plaintiffs' request to take judicial notice of the evidence presented in *Christie*, 2020 WL

3606273, *Aceto*, 2020 WL 619925, *Schooley*, 2019 WL 2717888, *Akins I*, 332 F. Supp. 3d 1,

*Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 (D.D.C. 2010) (Lamberth, J.), *Rimkus*,

575 F. Supp. 2d at 181, *Heiser I,* 466 F. Supp. 2d 229, and *Blais*, 459 F. Supp. 2d 40.  *See Akins

I*, 332 F. Supp. 3d at 11 (stating that factual evidence developed in other cases "involving the

same conduct by the same defendants is . . . admissible and may be relied upon in this case.").

---

[3]     The D.C. Circuit has endorsed the use of judicial notice to establish facts in FSIA terrorism cases.  In *Han
Kim v. Democratic People's Republic of Korea*, the D.C. Circuit held that plaintiffs had "met their burden of
producing evidence 'satisfactory to the court'" to establish subject matter jurisdiction under the FSIA, where the
only evidence linking North Korea to the victim's disappearance was a South Korean court's conviction of a North
Korean agent, of which the district court had taken judicial notice.  774 F.3d 1044, 1049 (D.C. Cir. 2014).

The evidence regarding the Khobar Towers bombing is summarized below, followed by an overview of the procedural history of this case.

### A.  The Attack on Khobar Towers

The Khobar Towers residential complex in Dhahran, Saudi Arabia "housed the coalition forces," including the U.S. military forces, "charged with monitoring compliance with [United Nations] security council resolutions." *Blais*, 459 F. Supp. 2d at 47.  About 10 minutes before 10:00 pm on June 25, 1996, "a large gasoline tanker truck pulled up" and parked "alongside the perimeter wall of the Khobar Towers complex." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 128.  Security guards near the top of one of the towers, Building 131, "started to give warnings about the unusual vehicle location," but the truck exploded "within about 15 minutes." *Heiser I*, 466 F. Supp. 2d at 252; *see also* FAC ¶ 175.  The blast "sheared off the face of Building 131," *Heiser I*, 466 F. Supp. 2d at 252, and "shattered windows more than half a mile away," Compl. ¶ 130.  Subsequent "investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT.  The U.S. Department of Defense said that it was the largest non-nuclear explosion ever up to that time." *Heiser I*, 466 F. Supp. 2d at 252.

### B.  Defendant Iran's Role

Iran "has been designated a state sponsor of terrorism" by the U.S. Department of State "since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47; *see also, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 77 (D.D.C. 2018); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm (last visited July 30, 2022).  Prior proceedings have found that Iran planned and supported the Khobar Towers bombing.[4]  Both the Ayatollah Ali Khamenei, the Supreme leader of Iran at the time, and the Minister of Intelligence and Security

---

[4]      Under the FSIA, Iran is "vicariously liable for the acts of its officials, employees, or agents."  28 U.S.C. § 1605A(c)(4).

"approved" the attack.  *Heiser I*, 466 F. Supp. 2d at 252.  The truck bomb used was "assembled" at a base in Lebanon's Bekaa Valley "jointly operated by the Iranian Revolutionary Guard Corps ("IRGC") and by the terrorist organization known as Hezbollah," with the individuals who carried out the bombing calling themselves "Saudi Hezbollah."  *Id.*

These conclusions are based in part on the testimony of four key expert witnesses in *Blais* and *Heiser I*.  Louis Freeh, who was director of the FBI at the time of the bombing, and Dale Watson, then deputy counterterrorism chief of the FBI, testified in *Heiser I* based on their oversight of the the FBI's "massive and thorough investigation of the attack, using over 250 agents."  *Id.*; *see also id.* at 260-62.  "Based on that investigation, an Alexandria, Virginia, grand jury returned an indictment . . . against 13 identified members of the pro-Iran Saudi Hezbollah organization."  *Id.* at 252.  During its investigation, the FBI interviewed six members of Saudi Hezbollah who "admitted to the FBI their complicity in the attack on Khobar Towers, and admitted that senior officials in the Iranian government provided them with funding, planning, training, sponsorship, and travel necessary to carry out the attack on Khobar Towers."  *Id.* at 253. Both Freeh and Watson testified to their conclusions, based on information gathered in their investigations, that "Iran, [the Ministry of Information and Security ("MOIS")], and IRGC were responsible for the Khobar Towers bombing carried out by Saudi Hezbollah."  *Id.* at 264. Further, Dr. Patrick Clawson provided expert testimony in *Heiser I* that "the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction."  *Id.* at 253.  This conclusion was "based on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject."  *Id.* at 253.  Dr. Bruce Tefft, a former member of the CIA's counterterrorism bureau, supported Clawson's

"expert opinion," based on "publicly available sources that were not inconsistent with classified information known to him from his time at the CIA" that "the Islamic Republic of Iran and the Iranian Revolutionary Guards Corp were responsible for planning and supporting the attack on Khobar Towers." *Id.* at 253-54.

### C. The Instant Plaintiffs

The 159 plaintiffs in this action include fifty-one service members, eighty-nine family members of those service members, eighteen immediate family members of injured airmen plaintiffs in *Schooley*, 2019 WL 2717888, at *1, and one immediate family member of an airman whose estate and family were plaintiffs in *Heiser I*, 466 F. Supp. 2d 229, and *Rimkus*, 575 F. Supp. 2d 181.  The service-member plaintiffs and family-member plaintiffs are described below.[5]

### 1. *David J. Ackley, Jr. and Five Family Members*

On June 25, 1996, David J. Ackley, Jr. was an Airman First Class in the U.S. Air Force quartered in Khobar Towers with his wife, Rita G. Ackley, who is also a plaintiff in this action. Decl. of David J. Ackley, Jr. (Oct. 3, 2021) ("Ackley Jr. Decl.") ¶ 7, ECF No. 29 (sealed), ECF No. 90 (public version).  Ackley seeks relief both as an injured plaintiff and as an immediate family member of his wife, plaintiff Rita Ackley.  FAC ¶ 7.  On the night of the attack, Ackley and his wife were sitting on their bed in Khobar Towers, chatting, when he saw and felt a "bright flash of light and a huge explosion."  Ackley Jr. Decl. ¶ 9.  The blast "violently" shook the

---

[5]     Every plaintiff in this case has submitted a sealed declaration, with supporting documentation containing sensitive personal information, and a redacted, public version.  The docket numbers for both the public and the sealed versions are reflected in the first citation to each plaintiff's declaration, with citations to declarations and exhibits made to the sealed declarations.  Otherwise sealed content referenced in this Memorandum Opinion is unsealed as necessary to explain the Court's reasoning.  *See In re WP Co. LLC*, 201 F. Supp. 3d 109, 116 n.4 (D.D.C. 2016) (citing *United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009); *United States v. Parnell*, 524 F.3d 166, 167 n.1 (2d Cir. 2008) (per curiam)).  Declarations from family groups have been docketed by plaintiffs in single docket entries such that more than one declaration may share the same docket entry number on CM/ECF.

building and shattered the windows, "spraying glass everywhere." *Id.*  Amidst the chaos, Ackley was unsure whether the building was "being bombed or shot," and he feared for his and wife's life. *Id.*  Ackley suffered from lacerations across his entire body from glass shrapnel. *Id.* ¶ 10. In recognition of his efforts and injuries that day, Ackley was awarded a Purple Heart. *Id.* ¶ 11; *Id.*, Ex. 4, Purple Heart Certificate.  He was also awarded the Armed Services Expeditionary Medal for his service in Saudi Arabia.  Ackley Jr. Decl. ¶ 12; *id.*, Ex. 5, Armed Services Expeditionary Medal.  As a result of the attack, Ackley still suffers from nightmares and insomnia, and often startles in response to unexpected loud noises.  Ackley Jr. Decl. ¶ 13.

Five of Ackley's family members are plaintiffs in this action: his wife, Rita G. Ackley; his mother, Jane F. Boyle; his father, David J. Ackley; Sr., his brother, Scott H. Ackley; and his sister, Sherry A. Bessette. *Id.* ¶ 4.  Rita Ackley, also a surviving service-member plaintiff in this action, was sitting on the bed with her husband in their shared room in Khobar Towers when the explosion hit, creating an incredibly loud and "horrific noise."  Decl. of Rita G. Ackley (Oct. 3, 2021) ("Ackley Spouse Decl.") ¶ 8.  Just as Ackley feared for his wife's life, Rita Ackley feared for his as glass "blew into the room and it felt like the entire building . . . could possibly collapse." *Id.* ¶ 8. As she and her husband were evacuating the building after the explosion, "someone yelled [that] 'they' were coming over the fence," which Rita Ackley understood was a reference to the bombers and prompted her and her husband to flee the "area as fast as possible." *Id.* ¶ 10.  Until they were eventually transported to another site on the base, the Ackleys "were together the entire time… before, during and after the bombing." *Id.*  Since the attack, Rita Ackley has seen her husband suffer from "nightmares," "insomnia," and to become "startle[d]" in response to loud sounds. *Id.* ¶ 12.

Jane F. Boyle, David Ackley Jr.'s mother, learned of the attack on the radio while driving home from work "just four days before David's twenty-first birthday." Decl. of Jane F. Boyle (Dec. 6, 2021) ("Boyle Decl.") ¶ 9, ECF No. 29. In that instant, she felt as though her life "came to a screeching halt" and faced her "worst fear[]:" that her son and Rita Ackley, who at that time were just newlyweds, could have been killed. *Id.* ¶¶ 9-10. She was unable to watch television reports about the bombing because it was "completely unbearable" to know the blast occurred so close to her son without "knowing his fate." *Id.* ¶ 12. About four hours after learning about the attack, Boyle finally received a call from her son, who informed her that he and his wife "had survived the bombing and were together." *Id.* ¶ 14. Nevertheless, Boyle "missed work for the next few days trying to pull [herself] together" and "lived on pins and needles, waiting for the day that David and Rita were back on American soil." *Id.* ¶ 15. To this day, Boyle has flashbacks to the time of the attack and is brought "to tears thinking of the many terrible ways [the bombing] could have turned out" for her son and daughter-in-law. *Id.* ¶ 16.

David J. Ackley, Sr., Ackley's father, learned of the attack from a family member, and began "frantic[ally]" seeking out further information about his son and daughter-in-law's condition. Decl. of David J. Ackley, Sr. (Aug. 29, 2021) ("Ackley Sr. Decl.") ¶ 8, ECF No. 29. He called a hotline announced on the TV news but was only told that his son and daughter-in-law were not "on the list," without explaining what that meant regarding their condition. *Id.* It was not until six days after the bombing that David Ackley called his father, which caused Ackley Sr. to become "so choked up" and tearful that he was unable to speak for a few minutes. *Id.* ¶ 9. For Ackley Sr., it was "the best news of [his] life" to hear from his son that "we got banged up pretty good, but we are going to be ok." *Id.* Ackley Sr. experienced nightmares every

night in the months immediately following the attack.  *Id.* ¶ 11.  Even now, the nightmares return when he hears on the news that "something has happened to our soldiers overseas."  *Id.*

Scott H. Ackley, David Ackley Jr.'s brother, learned of the attack while stationed on a U.S. Navy ship, the USS Guam, that was then rerouted towards Saudi Arabia to provide aid following the bombing.  Decl. of Scott H. Ackley (Sept. 17, 2021) ("Scott Ackley Decl.") ¶ 8, ECF No. 29.  He was "in anguish" for days, being unable to contact his family and not knowing of his brother's condition.  *Id.* ¶ 9.  To this date, whenever Scott Ackley hears about the "bombing or similar attacks," he "relive[s]" those moments when he did not know about his brother's fate and struggles while remembering "how close" his brother was from being "taken away from" his family.  *Id.* ¶ 11.

Sherry A. Bessette, David Ackley Jr.'s sister, learned of the attack on the news and was horrified to realize that her brother and sister-in-law were stationed at Khobar Towers.  Decl. of Sherry A. Bessette (Apr. 4, 2022) ("Bessette Decl.") ¶ 9, ECF No. 29.  Bessette found it "excruciating to have to wait to find out if they had survived," and she did not know the extent of their injuries until hours later.  *Id.* ¶ 10.  After the bombing, the dangerous nature of military service became "real" for Bessette, making her "worry more and pray more each day" for her brother and other family members serving in the armed forces.  *Id.* ¶ 12.  She even became afraid of going to sleep at night, terrorized by the possibility about "which loved one would be hurt, or worse," in the next attack.  *Id.*  Learning in the news about other military incidents or a "mass gun shooting," and seeing family members of the victims of those incidents cry on television, usually makes Bessette cry, too, as she remembers the fear and pain she felt while awaiting confirmation that her brother and sister-in-law had survived the Khobar Towers bombing.  *Id.* ¶ 13.

### 2. *Rita G. Ackley and Three Family Members*

On June 25, 1996, Rita G. Ackley was an Airman First Class in the U.S. Air Force and a computer operator with the 10th Intelligence Squadron quartered in Khobar Towers with her husband, David J. Ackley, Jr. who is also a plaintiff in this action.  Decl. of Rita G. Ackley (Oct. 3, 2021) ("Ackley Decl.") ¶ 6, ECF No. 30 (sealed), ECF No. 91 (public version).  Rita Ackley seeks relief both as an injured plaintiff and as an immediate family member of her husband, plaintiff David Ackley.  FAC ¶ 12.  On the night of the attack, Rita Ackley and her husband were chatting and sitting on their bed in Khobar Towers, when they heard an "incredibly loud explosion" that shook the building and sent glass flying around the room.  Ackley Decl. ¶ 10. She feared that the building would collapse, and that she and her husband would be killed.  *Id.* Rita Ackley suffered lacerations from glass shrapnel and was awarded the Purple Heart in recognition of her injuries.  *Id.* at ¶¶ 10, 12; *Id.*, Ex. 5, Purple Heart Certificate.  She was also awarded the Armed Services Expeditionary Medal for her service.  Ackley Decl. ¶ 13; Ex. 6, Armed Services Expeditionary Medal.  Even today, memories of the attack persist such that unexpected loud noises startle and take Rita Ackley "back to the day of the bombing."  Ackley Decl. ¶ 11.

Three of Rita Ackley's family members are plaintiffs in this action: her husband, David J. Ackley, Jr.; her father, Donald Stidham; and her sister, Aleatha C. Harris.  *Id.* ¶ 5.  David J. Ackley, Jr., Rita Ackley's husband and a surviving service-member plaintiff in this action, was sitting on the bed with Rita Ackley in the room they shared in Khobar Towers the night of the attack.  Decl. of David J. Ackley, Jr. (Oct. 3, 2021) ("Ackley Jr. Spouse Decl.") ¶ 8, ECF No. 30. The bomb exploded, causing a "bright flash of light" and shaking the building and furniture, followed by "indescribable amounts of glass" flying around the room.  *Id.*  The immense force of

the blast caused glass to embed in the concrete wall.  *Id.*  Ackley feared for his wife's life, and they both sustained lacerations all over their bodies from glass.  *Id.* ¶¶ 9-10.  Amidst the chaos following the attack, David and Rita Ackley were caught up in "a stampede of military personnel" to flee what they believed was an enemy invasion.  *Id.* ¶ 11.

Donald Stidham, Rita Ackley's father, learned of the attack on the news and was left in shock, fearing for his daughter's life.  Decl. of Donald Stidham (Aug. 31, 2021) ("Stidham Decl.") ¶ 8. ECF No. 30.  He remained "anxious and worried" until he reunited with his daughter approximately three months after the attack.  *Id.*  Since the attack, Stidham has noticed that his daughter has been "more nervous and anxious and distant" and that she suffers from tremors.  *Id.* ¶ 10.  Stidham has taken depression medication "for years" following the bombing, which to this day his daughter still refuses to discuss with him.  *Id.* ¶¶ 9-10.

Aleatha C. Harris, Rita Ackley's sister, learned of the attack on the news and was "[h]orrified" when she "realized that Rita and David were deployed" at Khobar Towers.  Decl. of Aleatha C. Harris (Aug. 31, 2021) ("Harris Decl.") ¶ 10, ECF No. 30.  Although "incredibly relieved that they had survived," Harris continued to worry about her sister and brother-in-law until they returned home months later in September 1996.  *Id.* ¶ 11.  Harris, who was very close to her sister growing up, now sees Rita Ackley "carrying concerns, worries, and an overall weight" that she did not shoulder before the bombing.  *Id.* ¶¶ 9, 12.  Since the attack, Harris herself has become "less trusting and more skeptical of strangers and their motives" and more prone to think about "worst case scenarios"—like whether strangers around her might be carrying bombs.  *Id.* ¶ 13.

### 3. *Two Family Members of Airman Angel Ayala*

Angel Ayala, an Airman First Class in the U.S. Air Force quartered in Khobar Towers at the time of the bombing, was a plaintiff in *Schooley*, 2019 WL 2717888, at *28. He was awarded $6 million as a result of the serious injuries, and concomitant pain and suffering, he suffered in the attack. *Id.* at *28, 75. Two of Ayala's family members are plaintiffs in this action: his brother, Abraham F. Ayala, and his sister, Mariah C. Ayala. Decl. of Abraham F. Ayala (Aug. 30, 2021) ("Ayala Decl.") ¶ 6, ECF No. 31 (sealed), ECF No. 92 (public version); Decl. of Mariah C. Ayala (Dec. 16, 2021) ("Mariah Ayala Decl.") ¶ 4, ECF No. 31.

Abraham Ayala learned of the attack from a friend and had to wait nearly a month to see his brother, Angel, who was seriously injured in the bombing, "sustaining glass shrapnel wounds to his face, neck and abdomen and perforation of his left eardrum." Ayala Decl. ¶¶ 8, 10-11. In the weeks following the attack before he was able to see him, Abraham Ayala was "in a lot of fear" for his brother's health and safety. *Id.* ¶ 11. Abraham Ayala assisted with his brother's caretaking upon his return home and witnessed how his brother now faced "a lot of issues," as to both his physical and mental health, that could be traced directly to the attack. *Id.* ¶ 12. Among other things, Abraham Ayala saw his brother struggle with PTSD, "even in day-to-day interactions," *id.*, and other emotional issues after the attack, all of which eventually led Angel Ayala into a downward spiral that included alcohol abuse, multiple DUIs, jail time, an inability to keep a livable, clean apartment, homelessness, and suicidal depression. *Id.* ¶¶ 16-23. During this period, Abraham Ayala "would always bail Angel out when he needed help" and ultimately found a rehab facility that dramatically improved his brother's life and helped him recover from his substance addiction. *Id.* ¶¶ 18, 24-26. Although his brother is now sober, works as a rehab counselor, and earned both bachelor's and master's degrees, Abraham Ayala "suffered from

depression due to the stress and worry about [his] brother over the years" after the attack, which also "took a major toll" on the rest of their family. *Id.* ¶ 27.

Mariah Ayala, Angel Ayala's sister, learned of the attack on an emergency news broadcast, which sent her into "limbo, calling the [information] hotline for several days." Mariah Ayala Decl. ¶ 11. Although her brother was the "sweetest, most gentle, and popular sibling" growing up, after surgery, rehabilitation, and moving in with her and their mother, Mariah Ayala saw her brother become "immediately a different person" who "began drinking heavily[,] using drugs," and to "express[] a violent and unpredictable temper." *Id.* ¶ 13. When her brother later moved out to live by himself, Mariah Ayala had to climb into his apartment after he attempted suicide and found him "living as a hoarder with trash piled several feet high." *Id.* ¶ 14. Mariah Ayala is still affected—and expects to be affected for the rest of her life—by "the underlying emotional damage" experienced by her brother for years after the bombing. *Id.* ¶ 15.

### 4.  *Andre L. Bedgood and Three Family Members*

On June 25, 1996, Andre L. Bedgood was a Senior Airman in the U.S. Air Force quartered in Khobar Towers. Decl. of Andre L. Bedgood (Dec. 6, 2021) ("Bedgood Decl.") ¶ 6, ECF No. 32 (sealed), ECF No. 93 (public version). Bedgood was in a phone booth placing a call home when the bomb detonated, "the phone booth door flew open," and shards of glass and brick "flew everywhere." *Id.* ¶ 8. Bedgood sustained a cut on his foot and suffered ringing in his ears, the latter of which he continues to experience today. *Id.* ¶¶ 10, 12. In recognition of his injuries, he was awarded a Purple Heart. *Id.* ¶ 11, Bedgood Decl., Ex. 5, Purple Heart Certificate. Bedgood, who was "good friends" with at least six airmen killed in the attack and was acquainted with six others, also "suffered from survivor's remorse for several years" after the

attack.  Bedgood Decl. ¶ 12.  Bedgood has received a 20% disability rating by the U.S. Department of Veterans Affairs ("VA") for the long-term injuries he sustained in the bombing. *Id.* ¶ 13; *see also* Bedgood Decl., Ex. 6, Letter from VA, dated Jun. 24, 2021 at 16.  Three of Bedgood's family members are plaintiffs in this action: his mother, Elizabeth A. Bedgood; his sister, Shondrea R. Bedgood; and his brother, Corey L. Bedgood.  Bedgood Decl. ¶ 4.

Bedgood's mother, Elizabeth A. Bedgood, was "in distress" not knowing about her son's "fate" for nearly two days after a relative informed her of the attack.  Decl. of Elizabeth A. Bedgood (Sept. 10, 2021) ("Elizabeth Bedgood Decl.") ¶ 8, ECF No. 32.  When he was finally able to reach her, Elizabeth Bedgood learned from her son that, had he not gone to the phone booth on the night of the bombing, he could have been killed in the blast.  *Id.*  To this day, she still "thank[s] God he spared" her son's life.  *Id.* ¶ 9.

Bedgood's sister, Shondrea R. Bedgood, learned from a cousin about the attack.  Decl. of Shondrea R. Bedgood (Sept. 10, 2021) ("Shondrea Bedgood Decl.") ¶ 7, ECF No. 32.  It was not until two days later, when Bedgood was able to call the family and assure them of his safety, that Shondrea Bedgood's heart stopped "racing" and she was able to stop "panicking[] and crying." *Id.*  Since the bombing, Shondrea Bedgood has assumed the role of becoming her brother's "protector" and has experienced anxiety and fear "at the thought of losing a loved one" like she almost lost her brother at Khobar Towers.  *Id.* ¶¶ 9-10.

Corey L. Bedgood, Bedgood's little brother, was fourteen years old at the time of the bombing and learned about it from his parents.  Decl. of Corey L. Bedgood (Sept. 10, 2021) ("Corey Bedgood Decl.") ¶ 8, ECF No. 32.  When Bedgood returned home after the attack, Corey Bedgood perceived his older brother to be a "completely different" person and "became depressed watching the difference in him."  *Id.* ¶ 9.  Beginning at that time, Corey Bedgood felt

that although Bedgood was twelve years older than him, their roles had reversed and he now was his big brother's "protector." *Id.* Corey Bedgood has in the years since suffered from nightmares about not being able to see his brother again, *id.*, and continues to recall the days after the attack through "vivid mental images," which compel him to maintain strict awareness of his family's safety and whereabouts, *id.* ¶ 11. Despite his early aspirations to one day join the military, the Khobar Towers bombing drove Corey Bedgood to discard that plan out of fear that "something like that would happen to" him. *Id.* ¶ 12.

### 5. *Sandra J. Beneway and Four Family Members*

On June 25, 1996, Sandra J. Beneway was a Captain and the Chief of Disaster Preparedness in the U.S. Air Force quartered at Khobar Towers. Decl. of Sandra J. Beneway (Dec. 6, 2021) ("Beneway Decl.") ¶ 6, ECF No. 33 (sealed), ECF No. 94 (public version). Beneway was sitting on a couch across from the sliding glass doors to her apartment's balcony when the bomb detonated and "blew in the sliding glass doors and impacted everything in the living room." *Id.* ¶ 8. The explosion made it feel like "a thousand bees" were stinging her, "predominantly on the face, arm, and leg," and a chair that blew across the room hit Beneway in her chest and abdomen. *Id.* Despite her eyes being "pelted" with glass shards from the sliding doors, Beneway tried to shield them from additional harm and used a gym towel as a cover. *Id.* ¶ 9. As she pressed this towel against her face, Beneway felt her left eye stick to the towel and realized that it was out of its socket. *Id.* Beneway was then transported to and treated in a local Saudi hospital. *Id.* ¶ 12. After a CT scan revealed that she had "large foreign body" in her left eye, she underwent surgery for repair and exploration of the left eye orbit, which was "severely injured." *Id.* ¶ 13. While hospitalized, Beneway was able to reach her mother and let her know she had survived the attack. *Id.* ¶ 15. Her mother's "very emotional" reaction made Beneway

feel guilty for putting her mother "in such a state" given that she "had already lost a child" and Beneway's "injuries were an additional trauma for her." *Id.*

After undergoing another surgery to repair a lacerated wrist tendon, doctors chose not to remove shrapnel from Beneway's left eye because they determined it had lost "visual potential." *Id.* ¶ 18.  Beneway was also instructed to "not move around" because she had glass "embedded in several locations in [her] head." *Id.* ¶ 19.  Upon her transfer to the Walter Reed Army Medical Center, where she was ultimately hospitalized for six weeks, Beneway's left eye was surgically removed and replaced with a conformer to maintain the structure of the area. *Id.* ¶¶ 23-24. Doctors also removed six glass fragments from her left eye. *Id.* ¶ 23.  The three consecutive surgeries following the attack and buildup of anesthesia throughout this period caused Beneway to "get physically sick" and experience severe nausea whenever she opened her eye. *Id.* ¶ 24. After nearly a year of wearing a conformer, Beneway's left eye was eventually reconstructed and replaced with a minimally functioning prosthetic following nine additional surgeries. *Id.* ¶¶ 23, 30.  In addition to the loss of her left eye, Beneway has permanent disfiguring facial scars, pain and limited mobility in her left hand, and has suffered from depression and PTSD since the bombing, all of which have harmed her career prospects. *Id.* ¶¶ 33-34.  These injuries forced Beneway to retire from the military sooner than she hoped and, years later, she likewise had to retire earlier than anticipated from her subsequent career with the National Park Service also for medical reasons. *Id.* ¶¶ 31-32.

Due to her injuries, Beneway was awarded a Purple Heart. *Id.*, Ex. 6, Purple Heart Certificate.  The VA has rated Beneway 80% disabled, with 60% attributable to the Khobar Towers bombing: 40% for the loss of her left eye, 10% for scars on the left side of her face, and 10% for depression after surviving the attack.  Beneway Decl. ¶ 34; *Id.* Ex. 9, Oct. 18, 2001

Letter from VA.  Four of Beneway's family members are plaintiffs in this lawsuit: her wife, Mari E. DeLacy; her brother, Marshall L. Beneway; and her sisters, Barbara A. Crocco and Carol Bruns Beneway Smith.  Beneway Decl. ¶ 4.

Beneway's spouse, Mari E. DeLacy, learned of the attack from her sister-in-law and co-plaintiff in this action, Barbara A. Crocco, who told her to "turn on CNN" and that "she thought she had recognized [Beneway's] hand hanging over a hospital stretcher during a news clip." Decl. of Mari E. DeLacy (Dec. 1, 2021) ("DeLacy Decl.") ¶ 14, ECF No. 33.  This call left DeLacy feeling "horrified and desperate for information" about Beneway.  *Id.* When Beneway called DeLacy from the hospital the day after the bombing, Beneway "downplayed her injuries" to not upset her family, so DeLacy was shocked to learn the full extent of Beneway's injuries upon her transfer to Walter Reed.  *Id.* ¶ 20.  DeLacy's relationship with Beneway suffered after the bombing, as Beneway lacked confidence and struggled with her physical appearance.  *Id.* ¶ 22.  To cope with the attack's aftermath and its impact on her spouse, DeLacy turned to alcohol, received medical help for depression, and eventually experienced a nervous breakdown in 2004. *Id.* ¶¶ 22-23.  Since same-sex relationships were not legally recognized at the time of the bombing—and the military's "Don't Ask, Don't Tell" policy precluded DeLacy from disclosing her relationship with Beneway—DeLacy also had to pay out-of-pocket for her weeks out of work to care for Beneway once she was released from the hospital without receiving any assistance from the government.  *Id.* ¶¶ 25-26.  This took both a financial and emotional toll on DeLacy. *Id.* ¶ 26.  Since the attack, DeLacy's and Beneway's finances have continued to suffer because of lost work, and neither is as "trusting or adventurous" as they were before the attack.  *Id.* ¶¶ 27-28.

Like DeLacy, Marshall L. Beneway—Sandra Beneway's brother—learned of the attack from his sister and co-plaintiff, Barbara A. Crocco, and became "shocked and devastated and in fear" for Beneway's life.  Decl. of Marshall L. Beneway (Dec. 13, 2021) ("Marshall Beneway Decl.") ¶ 7, ECF No. 33.  He then had to break the news of the attack to his mother and this was traumatic for both.  *Id.* ¶ 8.  Once his sister arrived at Walter Reed and he could visit her, Marshall Beneway "suffered from seeing how badly injured [she] was" and found it "emotionally too much" to also witness his parents and other family members cope with his sister's condition.  *Id.* ¶ 11.  He has also continued to witness what the injuries from the attack have done to Beneway, which make him "suffer just watching her and worry that one of those old injuries will take her before her time."  *Id.* ¶ 12.  Marshall Beneway to this day feels "helpless" that he is unable to take the "pain and suffering away" from his sister.  *Id.*

Barbara A. Crocco, Beneway's sister, learned of the attack on the news and recognized her sister's hand among the "people being transported on stretchers," which recognition made her feel "shocked and anguished and fear[ful] for Sandra's life."  Decl. of Barbara A. Crocco (Dec. 6, 2021) ("Crocco Decl.") ¶ 8, ECF No. 33.  Upon reuniting with her sister, she was shocked to see the severity of Beneway's injuries and feels resentful at how the bombing changed Beneway's and her own life.  *Id.* ¶ 12.  Crocco misses the activities that she used to enjoy together with her sister "before she suffered all the injuries from the bombing" and worries "all the time" about Beneway and her health.  *Id.* ¶ 13.

Carol Bruns-Beneway Smith, Beneway's half-sister, learned of the attack from her father over the phone.  Decl. of Carol Bruns-Beneway Smith (Dec. 27, 2021) ("Smith Decl.") ¶¶ 5, 9, ECF No. 33.  She considers herself "as close to Sandra as a full sister."  *Id.* ¶ 7.  Even after learning that her sister had survived the bombing, Bruns-Beneway did not feel "at ease" until she

was able to reunite with Beneway during her convalescence at Walter Reed and found it

"devastating that Sandra had lost her eye in the bombing." *Id.* ¶ 10.  Bruns-Beneway has

perceived that, since the bombing, her sister "has lost her lust for adventure and has become very

anxious about different situations." *Id.* ¶ 12.  She believes her sister "will never be the same,"

and because of the health and other problems that "sometimes keep [Beneway] from family

events," misses her "terribly." *Id.* ¶ 13.

### 6.  *One Family Member of Airman Joseph E. Rimkus*

Joseph E. Rimkus was an Airman First Class who died on June 25, 1996 in the Khobar

Towers bombing.  Rimkus's Estate, through his mother, Bridget Brooks, and two of the

decedent's family members, including his brother, James Rimkus, and sister, Anne Rimkus, were

plaintiffs in *Heiser I*, 466 F. Supp. 2d at 229.  The decedent's father, Joseph J. Rimkus, was a

plaintiff in *Rimkus*, 575 F. Supp. 2d at 181.  Chaunda E. Brooks, Rimkus's stepsister, is now a

plaintiff in this case.  Decl. of Chaunda E. Brooks (Aug. 26, 2021) ("Brooks Decl.") ¶ 5, ECF

No. 34 (sealed), ECF No. 95 (public version).  Brooks felt more like a sister than a stepsister to

Rimkus, who joined her family when her father married Rimkus's mother and they "became a

blended family of five kids, all teenagers." *Id.* ¶ 6.  Upon learning of the attack on television,

Brooks waited "in agony" for four days "to hear if [Rimkus] was alright." *Id.* ¶ 17, 19.  After "a

chaplain and a few other men came to the door to confirm" Rimkus's death, Brooks—who was a

rising senior in high school and extremely close to him, even exchanging many letters while he

was stationed abroad —entered a "a cloud of sadness." *Id.* ¶¶ 16, 20-21; *id.*, Ex. 6, Letters

Between Joseph and Chaunda.  Her brother's death caused Brooks "incredible sadness and

strife," especially because his death "pulled [their] family further apart." *Id.* ¶¶ 6-16, 26, 29.  To

this day, Brooks misses her bother "dearly" and often becomes "teary" during holidays like Christmas and Independence Day that especially bring to fore his absence. *Id.* ¶¶ 27-29.

### 7. *Three Family Members of Airman Kyle Brown*

Kyle Brown was an Airman First Class quartered at Khobar Towers at the time of the attack. Brown, a plaintiff in *Schooley*, was "injured quite badly" by glass fragments and "had hundreds of stitches." 2019 WL 2717888, at *41. He was awarded $6 million in damages for the pain and suffering he sustained in the bombing. *Id.* at *41-42. Brown's father, Philip W. Brown; his mother, Karen M. Voie; and his sister, Ingrid K. Simpson are plaintiffs in this case. Decl. of Philip W. Brown (Aug. 28, 2021) ("Brown Decl.") ¶ 4, ECF No. 35 (sealed), ECF No. 96 (public version).

Brown's father, Philip W. Brown, learned about the bombing while listening to radio. *Id.* ¶ 10. He was "distraught" waiting for further information about his son's condition, and upon learning that Brown "had been injured quite badly," his life turned into "a rollercoaster of emotions." *Id.* ¶¶ 11-12. His blood pressure thereafter "went off the charts" and required medication. *Id.* ¶ 12. Philip Brown was also unable to sleep well and "would wake up in a cold sweat from dreaming of [his son] being blown up." *Id.* Since the attack, Philip Brown has seen his only son develop PTSD and become a "withdrawn" person who is not as sociable, happy, and relaxed as he was before. *Id.* ¶ 17. Philip Brown remains concerned about his son "every day" when he is "reminded of senseless act of bombing Khobar Towers" and can perceive the "stress" that his son continues to experience because of the attack. *Id.* ¶¶ 18-19.

Karen M. Voie, Brown's mother, also learned of the bombing while listening to the radio. Decl. of Karen M. Voie (Aug. 29, 2021) ("Voie Decl.") ¶¶ 4, 9, ECF No. 35. Waiting to hear about her son's condition over the next several hours, Karen was "in shock and in fear for

[Brown's] life," and remained "in a daze," "extremely anxious," and "desperate for more information" until she was finally reunited with him in July 1996. *Id.* ¶¶ 10-11. Voie was "shocked to see the scars from where he had been cut by broken glass, and to learn how badly he had been injured." *Id*. ¶ 11. Today, Voie continues to be concerned for her son's well-being, and every time she recalls the period following the bombing, feels "anguish and worry." *Id.* ¶ 12.

Ingrid K. Simpson, Brown's sister, was fourteen years old at the time of the bombing. Decl. of Ingrid K. Simpson (Aug. 30, 2021) ("Simpson Decl.") ¶ 10, ECF No. 35. Upon realizing that the brother was stationed at Khobar Towers when a news crews arrived at her house to interview her family, she was terrified that she would never see him again. *Id.* When she finally reunited with her brother, Simpson was "shocked by the severity of his injuries and to see the scars all over his head and scalp." *Id*. Although Simpson remains close to her brother, what they can do together after the attack has become limited because Brown is no longer able to comfortably attend events with loud noises or fireworks, cannot go camping, and will not discuss "certain things." *Id*. ¶ 11. In the years since the bombing, Simpson has developed a "generalized fear of losing people I love" and now "find[s] it difficult to form long-lasting relationships." *Id.* ¶ 12. She additionally continues to worry for her brother's well-being because of his injuries and PTSD. *Id.* ¶ 13.

### 8. *Lisa M. Cafiero and One Family Member*

On June 25, 1996, Lisa M. Cafiero was a Chief Master Sergeant in the U.S. Air Force quartered in a civilian complex near Khobar Towers. Decl. of Lisa M. Cafiero ("Cafiero Decl.") (Sept. 20, 2021) ¶ 6, ECF No. 36 (sealed), ECF No. 97 (public version). Cafiero "heard and felt the explosion," and the morning after, witnessed the death and destruction in its wake, including

"patched up, wounded people everywhere." *Id.* ¶¶ 11, 12.  She saw "outlines of what used to be living humans on the walls," "pieces of flesh and partial body parts," and "blood dripping from upper floors to lower floors" in what remained of the towers.  *Id.* ¶ 12.  For five days, Cafiero worked around the clock to ensure that the injured were being helped and supplies were being provided as needed.  *Id.*, Ex. 16, Senior Enlisted Performance Report; Cafiero Decl., Ex. 22, Air Force Achievement Medal Certificate.  In the four months immediately after the attack, until her eventual departure from Saudi Arabia on October 18, 1996, Cafiero led a clean-up of the Khobar Towers area, worked to rebuild living quarters, and ensured that caskets were loaded onto the proper aircraft.  Cafiero Decl. ¶¶ 14-17, 20-39.  She was the "only person" to remain at Khobar Towers for that long after the attack, a period during which she "experienced the maximum possible exposure and felt suppressed pain every moment of every day." *Id.* ¶ 13.

Cafiero "was not prepared for how" she felt during this time, explaining that she experienced "guilt for not protecting those entrusted to [her]" and that to this day it is "emotionally draining, challenging and painful" to recall what she witnessed.  *Id.*  In the years since the bombing, she developed Gulf War Illness (auto-immune deficiencies), chronic fatigue, fibromyalgia, and other challenging illnesses and deficiencies that necessitated her early retirement.  *Id.* ¶¶ 40-46, 49.  Cafiero also suffers from PTSD, extreme anxiety, an inability to sleep due to nightmares, paranoia, agoraphobia, and hypervigilance, and an intolerance of crowds.  *Id.* ¶¶ 41, 42.  She was given an overall disability rating of 100% by the VA, with specific disability ratings of 40% for fibromyalgia, 30% for bronchial asthma, 30% for irritable colon, 20% for intervertebral disc syndrome, 10% for degenerative arthritis of the spine, 10% for limited jaw motion, and 10% for tinnitus.  *Id.* ¶ 50; *Id.* Ex. 23, Letters from VA.  Cafiero is considered totally and permanently disabled.  *See* Ex. 23.  For her service after the attack, Lisa

was awarded the Air Force Achievement Medal for Outstanding Achievement.  Cafiero Decl. ¶ 48; Ex. 22.

Christina L. Mattingly, Cafiero's daughter, is also a plaintiff in this case.  Decl. of Christina Mattingly ("Mattingly Decl.") (Dec. 6, 2021) ¶ 5, ECF No. 36.  Mattingly was fourteen years old at the time of the Khobar Towers bombing and learned of the attack on the news while staying with her aunt in Texas.  *Id.* ¶ 8.  Given her mother's role in the cleanup and closing of Khobar Towers, Mattingly did not reunite with Cafiero until October 20, 1996, almost four months after the bombing.  *Id.* ¶ 9.  By that point, Mattingly "was suffering from such a severe depression and PTSD" that she "was barely speaking or eating."  *Id.* ¶ 10.  Mattingly continues to suffer from PTSD and depression, which has contributed to the breakdown of her personal relationships and withdrawal from daily activities.  *Id.* ¶ 11.  In May 1997, she became the primary caregiver for her mother, who "has needed a progressively increasing level of assistance due to the mental and physical health conditions she suffers as a result of the attack."  *Id.* ¶¶ 11-14.  Mattingly's caregiving responsibilities required that she move across state lines to be closer to her mother and imposed numerous financial challenges.

### 9.  *Zachary J. Capogna and Seven Family Members*

On June 25, 1996, Zachary J. Capogna was a Senior Airman quartered in Khobar Towers.  Decl. of Zachary J. Capogna (Sept. 16, 2021) ("Capogna Decl.") ¶ 6, ECF No. 37 (sealed), ECF No. 98 (public version).  The bomb caused the sliding glass door in Capogna's dormitory to explode, sending glass shards and shrapnel flying across the room.  *Id.* ¶¶ 8-9.  The flying glass and other debris caused cuts all over Capogna's body, including a laceration on his "right thigh almost to the bone, 12 inches long" and his "right knee was opened," with his "left leg . . . peppered with cuts."  *Id.* ¶¶ 9-11.  He also had to undergo surgery to remove a large glass shard

lodged into the back of his head for eight hours after the attack. *Id.* ¶¶ 17-18. Living through the attack left Capogna unable to sleep, suffering from nightmares, and unable "to truly experience joy." *Id.* ¶ 27. He was awarded a Purple Heart for his injuries. *Id.* ¶ 26; *id.*, Ex. 6, Purple Heart Certificate.

Today, Capogna suffers from muscular issues, including weakness, numbness, and spasms in his right thigh, PTSD, short term memory loss; hearing loss; tinnitus; impaired vision, sleep apnea; and changes to his behavior and personality. Capogna Decl. ¶ 29. The VA gave Capogna a 100% disability rating for injuries from the Khobar Towers bombing, including 10% for a traumatic chest wall/rib condition; 30% for chronic residuals of right thigh penetrating muscle and soft tissue injury/lacerations; 30% for obstructive sleep apnea; 30% for PTSD; 10% for tinnitus, and 10% for residuals of right hand soft tissue laceration. *Id.* ¶¶ 30-31; *id.*, Ex. 7 (Letters from VA). Seven of Capogna's family members are also plaintiffs in this action: his wife, Gretchen A. Capogna; his daughter, Mackenzie E. Capogna; his son, Kyle T. Capogna; his father, John H. Capogna; his brothers Chad N. Capogna and Justin A. Capogna; and his sister, Olivia R. Capogna. Capogna Decl. ¶ 4.

Capogna's wife, Gretchen A. Capogna, learned of the bombing on the radio but did not know whether her husband had survived for nearly three hours, during which she worried about how to tell Capogna's mother and their children if he had died. Decl. of Gretchen A. Capogna (Sept. 14, 2021) ("Gretchen Capogna Decl.") ¶¶ 4-9. Gretchen Capogna was her husband's primary caregiver as he recovered from his injuries and took a month off work to be with him. *Id.* ¶ 11. She has seen her husband struggle with both the physical and emotional sequelae of the attack and feels as though the effects of the bombing are "always in the background of their lives." *Id.* ¶¶ 12-13.

Capogna's daughter, Mackenzie E. Capogna, was only two years old when Capogna was injured in the Khobar Towers bombing.  Decl. of Mackenzie E. Capogna (Sept. 22, 2021) ("Mackenzie Capogna Decl.") ¶ 7, ECF No. 37.  The PTSD and traumatic brain injury that her father suffered as a result of the attack "negatively impacted" Mackenzie Capogna's childhood and relationship with her father because they caused his personality to change, making him very strict, unable to relax, and hyper-aware of safety.  *Id.* ¶¶ 8-11.  This attitude made Mackenzie Capogna feel anxious and fearful, and contributed to a persistent strain in the family dynamic. *Id.* ¶¶ 11-12.

Capogna's son, Kyle T. Capogna, was even younger than his sister—just seven months old—when his father was injured in the attack.  Decl. of Kyle T. Capogna (Jan. 10, 2022) ("Kyle Capogna Decl.") ¶ 7, ECF No. 37.  Growing up, he perceived how the "behavioral changes" his father experienced as a result of the bombing made him "a lot stricter and concerned about [his] children's safety than other parents."  *Id.* ¶ 8.  Kyle Capogna also remembers his father being absent from many family gatherings throughout his childhood, explaining that Capogna chose to work long hours and every Fourth of July would leave the festivities early "because the fireworks triggered his memories of the bombing."  *Id.* ¶¶ 9-11.

Capogna's father, John H. Capogna, was unaware about the extent of his son's injuries for weeks after the bombing.  Decl. of John H. Capogna (Sept. 12, 2021) ("John Capogna Decl.") ¶ 7, ECF No. 37.  Although they spoke on the phone "constantly," John Capogna could not reunite with his son until several years after the attack, upon Capogna's transfer to Nell's Air Force Base in Las Vegas, Nevada.  *Id.* John Capogna found it "hard to witness" what his son had gone through during and after the attack and since then has worried about his well-being.  *Id.*

Capogna's twin brother and "roommate[] from before birth," Chad N. Capogna, was "extremely close [with Capogna] and [they] did everything together."  Decl. of Chad N. Capogna (Oct. 6, 2021) ("Chad Capogna Decl.") ¶ 8, ECF No. 37.  In the hours and days following the bombing, Chad Capogna was given conflicting information about his brother's condition and did not know whether he was alive, which was "very traumatic" for him.  *Id.* ¶ 7.  He still remembers how at one time his family was told Capogna was alive, at another time that he had been killed, and on yet another occasion that they did not have any information about his condition.  *Id.*  Although they remain close, Chad Capogna never talks about the Khobar Towers bombing out of "fear of triggering" his twin brother.  He is also "still stressed about" the attack and has found it "extremely disturbing" to see his brother live with his long-lasting "physical and emotional injuries."  *Id.*  Chad Capogna perceives that he, his brother, and their entire family has changed in the decades since the attack.  *Id.*

Capogna's half-brother, Justin A. Capogna, grew up in the same home as Capogna and was only eight years old at the time of the bombing.  Decl. of Justin A. Capogna (Sept. 11, 2021) ("Justin Capogna Decl.") ¶¶ 8-9, ECF No. 37.  In the attack's aftermath, Justin Capogna saw his brother's behavior change and their "relationship became more distant."  *Id.* ¶ 9.  He attributes this straining of their relationship to Capogna's decision to "focus on his career and the security of his family" as a mechanism to cope with the trauma caused by the attack.  *Id.*  Although they continue in touch through this day, Justin Capogna believes that, "if not for the bombing," he would enjoy "an even closer relationship" with his older brother.  *Id.*

Capogna's half-sister, Olivia R. Capogna, was only five months old when the Khobar Towers were bombed.  Decl. of Olivia R. Capogna (Dec. 6, 2021) ("Olivia Capogna Decl.") ¶¶ 4-7, ECF No. 37.  Although she could not appreciate the full significance of the attack as a child,

as she grew older, Olivia Capogna became increasingly aware of the impact it had on her

brother: how he became "more serious and regimented," "hyper-protective," and ever more

"vigilant about ensuring the security of himself and [his] family." *Id.* ¶ 7.  This has all

contributed to an "emotional distance" in their relationship that makes Olivia Capogna "sad" and

which she regards as a "direct effect" of what her brother lived through at Khobar Towers.

### 10. *Jason D. Carley*

On June 25, 1996, Jason D. Carley was a Senior Airman in the U.S. Air Force quartered

in Khobar Towers.  Decl. of Jason D. Carley (Jan. 19, 2022) ("Carley Decl.") ¶ 5, ECF No. 38

(sealed), ECF No. 99 (public version).  When the bomb detonated, Carley was thrown across the

room into a concrete wall and a sliding glass door shattered on him, leaving him unconscious.

*Id.* ¶ 8.  He sustained a concussion, "head to toe lacerations and contusions," bleeding from his

ears, and nearly lost an eye.  *Id.*  In the days after the bombing, Carley assisted the FBI in the site

clean-up process and witnessed gruesome scenes, such as body parts strewn in the rubble.  *Id.*  ¶

9.  Carley was awarded a Purple Heart for his injuries.  *Id.* ¶ 13; *id.*, Ex. 6., Purple Heart

Certificate, ECF No. 38.  Since the attack, Carley has continuously struggled with PTSD—which

he believes contributed to his divorce—notwithstanding attempts to treat the condition with

medication and extensive counseling.  Carley Decl. ¶ 10.  In addition, he has undergone various

eye treatments to remove glass and shrapnel in an effort to rehabilitate his vision, but

nevertheless still suffers from some permanent vision loss and blurred vision.  *Id.* ¶¶ 11-12.

Carley received a 100% combined disability rating from the VA for injuries incurred at Khobar

Towers and individual ratings of 70% for PTSD and traumatic brain injury; 10% for right lower

extremity femoral nerve radiculopathy; 30% for migraine and variants; 10% for lateral

subluxation of the right knee with instability; 10% for lumbosacral strain; 10% for macular scar

right eye; 10% for tinnitus; and 10% for lateral collateral ligament sprain right ankle. *Id.* ¶ 15; *id.*, Ex. 7, Letter from VA.

### 11. *Manuel J. Carrasco and One Family Member*

On June 25, 1996, Manuel J. Carrasco was a Staff Sergeant in the U.S. Air Force quartered in Khobar Towers.  Decl. of Manuel J. Carrasco (Dec. 7, 2021) ("Carrasco Decl.") ¶ 7, ECF No. 39 (sealed), ECF No. 100 (public version).  The explosion threw him across the room and caused severe lacerations, one of which severed his brachial artery and resulted in serious blood loss that led him to collapse.  *Id.* ¶ 9.  Over the following years, Carrasco developed PTSD with "depression and personality changes;" was scarred from extensive lacerations; needed partial finger amputations because of gangrene; and lost function of his right arm and hand.  *Id.* ¶ 10.  He was awarded a Purple Heart for his injuries and the Meritorious Service Medal.  *Id.* ¶ 11; *id.*, Ex. 5, Purple Heart Certificate, ECF No. 39; Carrasco Decl., Ex. 12, Meritorious Service Medal Certificate.  Carrasco continues to experience pain from his injuries, has no use of his right arm and hand, Carrasco Decl. ¶ 10, and has received a combined 90% VA disability rating based on the injuries he incurred at the attack, *id.* ¶ 17; *id.*, Ex. 10, Letter from VA.  His wife, Kirsten I. Carrasco, is also a plaintiff in this action.

Kirsten I. Carrasco learned of the attack on the news but had to wait "[f]or two agonizing days" to hear anything about her husband's condition.  Decl. of Kirsten I. Carrasco (Sept. 15, 2021) ¶¶ 5, 8, 10, ECF No. 39.  She was incredibly relieved to finally hear from him and was there when he arrived for additional medical treatment at Walter Reed in the days after the attack.  *Id.* ¶¶ 10, 13.  Upon their return home, Kirsten Carrasco became her husband's primary caretaker.  *Id.* ¶ 16.  She "cleaned his wounds, . . . , gave him his medications, helped him get dressed and helped him shower."  *Id.*  Kirsten Carrasco also found "evident from the very

beginning" after her husband's return home that his "personality had changed." *Id.* ¶ 18.  She

then became anxious that Carrasco was now "quick to anger" and felt as if she were "constantly

walking on eggshells." *Id.*  To this day, Kirsten Carrasco remains angry about the bombing and

anxious about how her husband's PTSD will continue to affect their relationship. *Id.* ¶ 19.

### 12. *Five Family Members of Staff Sergeant Artis R. Coleman, Sr.*

On June 25, 1996, Artis R. Coleman, Sr. was a Staff Sergeant in the U.S. Air Force

quartered in Khobar Towers who was seriously injured in the bombing and awarded $7 million

for his pain and suffering in *Schooley*, 2019 WL 2717888, at \*19-20, 75.  Coleman's VA

disability rating was over 70%. *Id.* at \*19, 75.  Five of Coleman's family members are plaintiffs

in this action: his mother, Allia M. Coleman; his sisters, Lana L. Coleman-Wiggins and

Demetrius Coleman; and his brothers, Charlie E. Coleman and Cornelius Coleman.  Decl. of

Allia M. Coleman (Oct. 4, 2021) ("Coleman Decl.") ¶ 4, ECF No. 40 (sealed), ECF No. 101

(public version).

Coleman's mother, Allia M. Coleman, became terrified upon learning about the bombing

on the news and immediately began praying for her son and his colleagues.  Coleman Decl. ¶¶ 5,

9.  Unable to reunite with her son for months after the attack, she became his primary caretaker

after he suffered two aneurisms attributed to his injuries from the bombing and "was never able

to work again." *Id.* ¶ 10.  Allia Coleman was "devastated" to see her son give up his career as an

airman and often wonders what could have been if not for the bombing. *Id.*

Coleman's sister, Lana L. Coleman-Wiggins, learned that her brother was in the Khobar

Towers attack through a phone call from her sister, Demetrius Coleman.  Decl. of Lana L.

Coleman (Sept. 13, 2021) ("Lana Coleman Decl.") ¶ 9, ECF No. 40.  She then was "in panic for

four days, not knowing whether [Coleman] was safe." *Id.*  Later, when Coleman suffered two

aneurisms in 1997, Lana Coleman-Wiggins found it traumatizing and "devastat[ing]" to see her brother "hooked up to machines and tubes," unable to communicate.  *Id.*  She took four weeks off work to stay with him in the hospital and was "in anguish not knowing if he would live or die," which exacerbated her high blood pressure.  *Id.*

Coleman's other sister, Demetrius Coleman, learned of the bombing on the news.  Decl. of Demetrius Coleman (Sept. 15, 2021) ("Demetrius Coleman Decl.") ¶¶ 4, 8, ECF No. 40.  She "was worried day and night" waiting to hear if her brother had survived.  *Id.* ¶ 8.  After Coleman suffered an aneurism attributable to the blast, Demetrius Coleman "was devastated" and "anguish[ed]" knowing that the bombing had ended her brother's career "at such a young age" and made him experience so many health problems.  *Id.* ¶ 9.  She still becomes upset upon hearing about other bombings on the news.  *Id.*

Coleman's brother, Charlie E. Coleman, learned of the attack a few days after it occurred because he was stationed in Germany as part of a military deployment.  Decl. of Charlie E. Coleman (Sept. 12, 2021) ("Charlie Coleman Decl.") ¶¶ 4, 9, ECF No. 40.  When he finally reunited with his brother in 1997, Charlie Coleman experienced "enormous anxiety from seeing [Coleman's] injuries and . . . watching him struggle with PTSD."  *Id.* ¶ 10.  He was devastated when Coleman "was hospitalized in 1997 with two aneurisms caused by the injuries he had sustained in the blast," *id.*, and remains "constantly worried about [his] brother's health and well-being," *id.* ¶ 11.

Coleman's other brother, Cornelius Coleman, also learned of the attack by way of a phone call from his sister, Demetrius Coleman.  Decl. of Cornelius Coleman (Sept. 9, 2021) ("Cornelius Coleman Decl.") ¶¶ 4, 9, ECF No. 40.  As his eldest sibling, Cornelius Coleman, helped his little brother with homework, supported his extracurriculars, and regularly assisted

their mother—who was a single parent—take care of him.  *Id.* ¶ 8.  He found it "unbearable to have to wait for several days" before learning if Coleman had survived the attack.  *Id.* ¶ 9.  Later, when he visited Coleman in the hospital after he suffered the aneurisms, Cornelius Coleman was "shock[ed]" and "anguished" to see his little brother—"a young, healthy man"—injured "so badly" and "fighting for his life."  *Id.*  To this day, he "cannot get out of [his] mind the sight of [his] brother lying in the hospital bed, hooked up to tubes."  *Id.* ¶ 10.  Cornelius Coleman has "suffered from depression" watching his brother, who "now walks with a cane, has seizures, [and] delayed speech, "struggle every day" and being unable meaningfully to participate in any family activities.  *Id.* ¶¶ 11-12.  These circumstances have fundamentally altered Cornelius Coleman's relationship with his younger brother.  *Id.* ¶ 12.

### 13. *Jeffrey Conrad and One Family Member*

On June 25, 1996, Jeffrey Conrad was a Senior Airman quartered in Khobar Towers. Decl. of Jeffrey Conrad (Aug. 26, 2021) ("Conrad Decl.") ¶ 6, ECF No. 41 (sealed), ECF No. 102 (public version).  Running away from the towers after the blast, Conrad's cut his feet with glass and after a certain point could no longer walk.  *Id.* ¶ 14.  All he could hear following the explosion was "panic and screaming."  *Id.* ¶ 11.  Upon returning home in the United States, Conrad developed PTSD and cannot "sit near windows or with [his] back exposed."  *Id.* ¶¶ 26-27.  He also suffers from "nightmares where it sounds like [he] can hear the floors above [him] collapsing."  *Id.* ¶ 27.  When Conrad encounters a trigger for his PTSD—which can range from attending a social gathering to living through the anniversary of the attack—his PTSD symptoms may flare up for weeks, and these include "unexpected crying, bad dreams, screaming in [his] sleep, and anger over small issues that can be extreme."  *Id.* ¶ 28.  He was awarded a Purple Heart for the injuries sustained in the attack.  *Id.* ¶ 24; *id.*, Ex. 4 (Purple Heart Certificate).  The

VA gave him an 80% combined disability rating consisting of 70% PTSD and 10% tinnitus, both a consequence of the Khobar Towers bombing.  Conrad Decl. ¶ 26; *id.*, Ex. 6 (Letter from VA).

Conrad's fiancée at the time of the bombing, and now wife, Teresa Conrad, learned of the attack from two neighbors whose partners were also in the military, and she was not told whether Conrad had survived for nearly twelve hours.  Decl. of Teresa Conrad (Aug. 26, 2021) ("Teresa Conrad Decl.") ¶¶ 7-8, ECF No. 41.  Twenty-four "sleepless hours after the bombing happened," she finally received a four-minute phone call from Coleman, who "told [her] he loved [her] and [their] daughters."  *Id.* ¶ 9.  Teresa Conrad has seen her husband become "a different person since the bombing:" she has "struggled with his fear of loud noises" and has "spent years dealing with flashbacks, bad dreams, [and] anxiety."  *Id.* ¶ 13.  Finding herself "shaking and crying privately over the [attack] off and on for a long time," she also has had to cope with her own emotions in the attack's aftermath and developed PTSD—something that has "affect[ed] everything in [her] daily life," including how she has raised her children.  *Id.* ¶¶ 13-16.

### 14. *Dallas W. Croft and Three Family Members*

On June 25, 1996, Dallas W. Croft was a Staff Sergeant in the U.S. Air Force quartered in Khobar Towers.  Decl. of Dallas W. Croft ("Croft Decl.") (Sept. 15, 2021) ¶ 7, ECF No. 42 (sealed), ECF No. 103 (public version).  The explosion threw Croft against the wall and knocked him unconscious, causing him to sustain severe lacerations in his head, arm, and leg from broken glass.  *Id.* ¶ 9.  Despite these injuries, he assisted other injured service-members in the attack's immediate aftermath and later earned the Air Force Achievement Medal for Outstanding Achievement with Valor for these efforts.  *Id.* ¶ 12; *id.*, Ex. 6, Air Force Achievement Medal Certificates.  Croft also suffered a concussion and a traumatic brain injury after the bombing.  Croft Decl. ¶ 10.  Today, he still suffers from headaches, insomnia, and PTSD.  *Id.*  Croft

received a combined 90% disability rating from the VA, including individual ratings of 30% for the PTSD he developed after bombing.  Croft Decl. ¶ 14; *id.*, Ex. 7, Letters from VA.  Three of Croft's family members are also plaintiffs in this action: his wife, Juli A. Croft, and his two sons, Dallas T. Croft and Andrew K. Croft.  Croft Decl. ¶ 4.

Croft's wife, Juli A. Croft—who at the time was also on active duty in the Air Force—learned about the bombing through vague and confusing phone messages from military leadership personnel.  Decl. of Juli A. Croft (Sept. 19, 2021) ("Juli Croft Decl.") ¶¶ 4, 7, 8, ECF No. 42.  Although she finally heard from her husband about ten hours after the attack, Juli Croft was never able to relax while Croft was still deployed and remained distressed knowing "he could be continuously in harm's way."  *Id.* ¶ 12.  She describes her stress levels for the rest of Croft's deployment as "unreal."  *Id.*  When her husband returned home about two months after the attack, Juli Croft perceived a "definite difference" in his personality and demeanor, which she attributes to the PTSD he developed as a survivor of the bombing.  *Id.* ¶ 13.  Since then, Juli Croft has helped manage her husband's PTSD and depression episodes—which are usually significantly worse around the bombing's anniversary in June—and is "always there for him to assist during times of nightmares and bad dreams."  *Id.* ¶¶ 14-15.  The bombing's physical and psychological mark on her husband has created a "new normal" for their family, including the inability to attend certain triggering events such as those with large crowds and activities that involve "loud explosive noises . . . like fireworks or hot air balloon festivals."  *Id.* ¶¶ 18-19.  Juli Croft also Croft witnessed her husband's relationship with their sons become strained due to his constant emotional instability before seeking PTSD treatment, and explains that life with him is "different, difficult at times," but it is their "new normal" and they take "each day as it comes," whether "good or bad, emotional, or stable."  *Id.* ¶¶ 19, 23.

Croft's son, Dallas T. Croft, was two years old at the time of the bombing.  Decl. of Dallas T. Croft (Dec. 2, 2021) ("Dallas Croft Decl.") ¶¶ 4, 7, ECF No. 42.  The PTSD that his father developed after the bombing caused Dallas Croft to "suffer emotional distress growing up." *Id.* ¶ 8.  He saw Croft become depressed and distant and was also on the receiving end of his quick temper. *Id.* ¶ 8.  In addition, the range of activities that Dallas Croft can do with his father have been limited by his intolerance to "large crowds" and noises. *Id.* ¶ 10.  Dallas Croft helps Croft cope with the "depressive episode" he experiences around the attack's anniversary each year—a role that, despite enduring challenges, has at least turned more manageable in the last ten years as Croft has become "more open to talk about" what he lived through at Khobar Towers. *Id.* ¶¶ 11-12.

Croft's other son, Andrew K. Croft, was only eight months old at the time of the attack. Decl. of Andrew K. Croft (Dec. 10, 2021) ("Andrew Croft Decl.") ¶¶ 4, 7, ECF No. 42.  Like his brother, Andrew Croft was affected by his father's PTSD—and concomitant "flares of temper" and depressive episodes—while growing up. *Id.* ¶ 8.  Nevertheless, he "didn't really understand the emotional distress that [he] grew up with" until he was in his "mid to late teens." *Id.* ¶ 12.  It was at this time that Andrew Croft began to learn more about depression and PTSD, and realized the impact that these conditions have had on both his and his father's "emotional well-being." *Id.*  Today, Andrew Croft has come to understand that the "trauma [his father] experienced in the bombing" explains why he "was raised the way" he was in the years since June 1996 and that he has "lived with the second and third order effects of the bombing by being raised by a father who has PTSD." *Id.* ¶ 13.  Despite all of this, Andrew Croft still decided to join the Air Force—like his father, mother, and older brother before him. *Id.* ¶ 14.

### 15. *Benjamin C. Depweg*

On June 25, 1996, Benjamin C. Depweg was a Senior Airman quartered in Khobar

Towers.  Decl. of Benjamin C. Depweg (Jan. 2, 2022) ("Depweg Decl.") ¶ 5, ECF No. 43

(sealed), ECF No. 104 (public version).  When the bomb exploded, Depweg was in the parking

lot outside one of the towers.  *Id.* ¶ 7.  He fell to the ground, everything went black, and he

became covered in scrapes and bruises.  *Id.* ¶¶ 9-10.  In the attack's immediate aftermath,

Depweg helped in triaging the wounded and did not sleep for three days.  *Id.* ¶ 11.  Upon

returning home, he had survivor's guilt and feelings of helplessness after losing seven close

friends in the attack.  *Id.* ¶ 16.  Depweg has sought therapy to manage his PTSD but still

experiences night terrors; "dreams about [his] buddies that didn't survive, dreams about [his] son

enlisting and serving at the same time [he] did;" anxiety; an intolerance for crowds; high blood

pressure; and chronic widespread pain.  *Id.* ¶ 15.  He also manifests "bouts of anger" and has

been told he "drink[s] too much."  *Id.*  Since the attack, Depweg has struggled with interpersonal

relationships and gone through two divorces.  *Id.* ¶ 17.  In addition, he has been unable to work

for three years because of medical issues.  *Id.*  The VA gave Depweg a combined 60% disability

rating, including individual ratings of 10% for right knee patelloformal arthritis and 50% for

PTSD.  *Id.* ¶ 18; *id.*, Ex. 4, Letter from VA.

### 16. *Craig J. Dick and Four Family Members*

On June 25, 1996, Craig J. Dick was a Senior Airman quartered in Khobar Towers.  Decl.

of Craig J. Dick (Nov. 2, 2021) ("Dick Decl.") ¶ 6, ECF No. 44 (sealed), ECF No. 105 (public

version).  At the time of the blast, he was driving into Building 131 of the complex, which was

the site of the bombing.  *Id.* ¶¶ 8-9.  The explosion threw him fifty feet away and rendered him

unconscious; its "shock wave was so powerful it blew off" his uniform.  *Id.* ¶ 9.  As a result of

the bombing, Dick sustained a concussion, pleural effusion, eardrum ruptures, and multiple lacerations. *Id.* ¶ 11. He also required surgery to remove metal shrapnel from his left foot, and to this day suffers from tinnitus and some permanent hearing loss, together with scars and shrapnel leftover in his body. *Id.* ¶¶ 11-12. Dick received a combined 50% rating from the VA for disabilities attributable to the attack. *Id.* ¶ 14; *id.*, Ex. 7, Letters from VA. In recognition of the injuries he sustained, Dick was awarded a Purple Heart. Dick Decl. ¶ 13; *id.*, Ex. 6, Purple Heart Certificate. Four of Dick's family members are also plaintiffs in this action: his mother, Kathleen A. Dick; his father, Craig W. Dick; and his two brothers, Brett M. Dick and Cory P. Dick.

Dick's mother, Kathleen A. Dick learned of the attack on the news, was "horrified," and awaited in "despair" for any word about her son's condition for three days. Decl. of Kathleen A. Dick (Sept. 11, 2021) ("Kathleen Dick Decl.") ¶¶ 8-9, ECF No. 44. Due to the lack of economic means, she was unable to visit her son during his recovery at the Holloman Air Force Base in New Mexico and did not reunite with him until two years after the attack. *Id.* ¶ 10. In the years since, Kathleen Dick has "feared for" her son's safety every time he has been deployed overseas and still finds it "painful" to speak with him about the attack. *Id.*

Dick's father, Craig W. Dick, learned of the attack from his wife, Kathleen, and waited with her and the rest of the family for three days until receiving more information about his son's condition. Decl. of Craig W. Dick (Sept. 11, 2021) ("Craig W. Dick Decl.") ¶¶ 4, 8, ECF No. 44. He experienced severe shock, fear, and anguish in the days following the bombing. *Id.* ¶ 12. Although thankful that his son was "out of harm's way," Craig W. Dick remains "distressed that [his son] still suffers his physical injuries" and worries about his quality of his life, especially "as he gets older," because his son still has shrapnel embedded in his body. *Id.* ¶ 11.

Dick's brother, Brett M. Dick was twenty-one years old at the time of the bombing.
Decl. of Brett M. Dick (Sept. 27, 2021) ("Brett Dick Decl.") ¶¶ 4,7, ECF No. 44.  Awaiting three
days with the rest of his family for confirmation that Dick had survived the attack, Brett Dick
was "dishearten[ed]."  *Id.* ¶ 8.  He still finds it difficult to think about what happened to his older
brother.  *Id.* ¶ 10.

Dick's other brother, Cory P. Dick, was sixteen years old at the time of the bombing.
Decl. of Cory P. Dick (Oct. 24, 2021) ("Cory Dick Decl.") ¶¶ 4, 8, ECF No. 44.  After a tightknit
upbring with his older brothers—"work[ing] on the farm, play[ing] sports, and generally
spen[ding] [their] free time playing together"—Cory Dick "was shocked and terrified to learn"
that his brother was in the bombing, "not knowing if [he] would ever see him again."  *Id.* ¶ 8.  He
also found difficult to watch his mother in distress from constantly worrying about his brother
after the attack without "knowing what to say or how to help" her.  *Id.* ¶ 9.  Like his parents,
Cory Dick was unable to reunite with his brother for two years after the bombing, a period in
which he "remained fearful for [Dick's] safety and well-being until [he] could see him again."
*Id.* ¶ 10.  To this day, he continues to worry "about worst case scenarios" as his brother suffers
from PTSD and agoraphobia (*i.e.,* the fear of crowded places).  *Id.* ¶ 11.

### 17. *Jason B. Dixon and One Family Member*

On June 25, 1996, Jason B. Dixon was a Senior Airman quartered at Khobar Towers in
Building 127, which was "directly behind Building 131, the building closest to the blast site."
Decl. of Jason B. Dixon (Oct. 31, 2021) ("Dixon Decl.") ¶¶ 6, 8, ECF No. 45 (sealed), ECF No.
106 (public version).  The blast jolted Dixon out of bed, and he ran down the stairs, without
shoes, to escape the building.  *Id.* ¶ 10.  His "feet were shredded by the broken glass on the floor,
and [he] had glass embedded in both feet"—which he later "dug . . . out" with a pocketknife.  *Id.*

38

¶¶ 10, 12.  He also sustained lacerations to his head and face from flying glass shrapnel.  *Id.* ¶ 9.

Twelve of Dixon's friends and coworkers died in the blast, which contributed to the development

of PTSD, survivor's guilt, anxiety, depression, and an intolerance towards crowds and loud

noises.  *Id.* ¶ 15.  Dixon feels like his PTSD has only worsened over the years and finds that

"[e]verything has changed since the bombing," including his personality and relationships.  *Id.*

In recognition of his injuries, Dixon was awarded a Purple Heart and Air Force Commendation

Medal.  *Id.* ¶ 17; *id.*, Ex. 5, Purple Heart Certificate; Dixon Decl., Ex. 6, Air Force

Commendation Medal.  He received a combined 80% disability rating from the VA, including

individual ratings of 70% for PTSD, 10% for tinnitus, and 10% for residuals of lacerations and

foreign bodies, including embedded glass particles, in both feet.  Dixon Decl. ¶ 19.  Dixon's

wife, Donna J. Dixon, is also a plaintiff in this action.  *Id.* ¶ 4.

Donna J. Dixon learned of the attack through a phone call from the security police at

Eglin Air Force Base.  Decl. of Donna J. Dixon (Sept. 12, 2021) ("Donna Dixon Decl.") ¶¶ 4, 7,

ECF No. 45.  She was in shock and stricken with panic, and it was not until five hours later,

when she finally received a call from her husband, that she felt any relief.  *Id.* ¶ 8.  Still, Donna

Dixon continued to fear for her husband's life while he remained overseas.  *Id.*  Upon his return

home days after the attack, she became her husband's primary caretaker and in the years since

has "learned how to cope with his bouts of PTSD."  *Id.* ¶¶ 10-11.  Donna Dixon still struggles,

however, "dealing with her [husband] and his anger."  *Id.* ¶ 11.  She also continues to worry

about him constantly and "to have grief . . . for his well-being."  *Id.* ¶¶ 11-12.

### 18. *Carrie C. Dobos and Ten Family Members*

On June 25, 1996, Carrie L. Dobos was a Technical Sergeant quartered in Khobar

Towers.  Decl. of Carrie L. Dobos (Sept. 14, 2021) ("Dobos Decl.") ¶ 7, ECF No. 46 (sealed),

ECF No. 107 (public version).  She was awakened by the blast and had to crawl out of her room while "[g]lass and rubble were raining down on" her.  *Id.* ¶ 9.  Although she was injured by the broken glass and other debris, Dobos did not seek immediate medical attention and instead focused on aiding those around her, like a "bleeding airman" whom she "carried . . . down four flights of stairs and took . . . safely to triage."  *Id.* ¶ 10.  For her injuries and the assistance she provided her colleagues, Dobos was awarded a Purple Heart and the Air Force Commendation Medal with Valor.  *Id.* ¶ 11; *id.*, Ex. 6, Purple Heart Certificate; Ex. 7, Air Force Commendation Medal Certificate.  Since the attack, Dobos has developed PTSD and still suffers from nightmares, sleep problems, anxiety, hypervigilance, and an aversion to loud noises.  Dobos Decl. ¶ 16.  The VA gave her a combined 50% disability rating, including 30% for PTSD stemming from the Khobar Towers bombing.  *Id.* ¶ 17.; *id.*, Ex. 10, Letter from VA.  Ten of Dobos's family members are also plaintiffs in this action: her husband, Edward C. Dobos; her daughters, Haley I. Dobos, Molly A. Dobos, Erika L. Rust, and Kasey D. Phillips; her mother, Anne M. French; her father Charles D. French; and her sisters, Tina M. Judge, Brenda J. French, and Dena L. DeJoe.

　　　Dobos's husband, Edward D. Dobos, was active-duty military at the time of the attack and watched the news to find out more information after hearing about the bombing.  Decl. of Edward C. Dobos (Sept. 14, 2021) ("Edward Dobos Decl.") ¶ 4, ECF No. 46.  Edward Dobos knew his wife was in Saudi Arabia but "wasn't sure exactly where she was" and "became distraught" and "terrified[] not knowing if she was okay, injured or dead."  *Id.* ¶¶ 7-9.  It was not until about six hours later that he finally learned Dobos had survived the attack, although he could not speak with her for another three or four days.  *Id.* ¶¶ 9, 11.  Before his wife ultimately returned to the United States in September 1996, Edward Dobos experienced "enormous anxiety

and distress," worried that another attack would take place in Saudi Arabia—overwhelming emotions that he nevertheless sought to hide to protect their four young children who were at home with him.  *Id.*  ¶¶ 10, 12.  He has witnessed his wife "become antsy if there are sudden loud noises" and "more reclusive" since the attack, to the extent that they now "stay home more often than not."  *Id.* ¶ 13.

Dobos's eldest daughter, Molly A. Dobos, was thirteen years old at the time of the attack and did not learn about the bombing until a few days later because her father "tried to keep the news" from her and her sisters.  Decl. of Molly A. Dobos (Sept. 14, 2021) ("Molly Dobos Decl.") ¶¶ 4, 7, ECF No. 46.  She then became "worried and scared" for her mother's safety from that moment "until she came home three months later."  *Id.* ¶ 8.  Although she has constantly "marvel[ed]" at her mother's bravery since the attack, Molly Dobos nevertheless continues to feel anxiety and worry for her mother's safety.  *Id.* ¶ 9.

Erika L. Rust, Dobos's second daughter, was twelve years old when the Khobar Towers were bombed.  Decl. of Erika L. Rust (Sept. 16, 2021) ("Rust Decl.") ¶¶ 5, 8, ECF No. 46.  In the days after the attack, she overheard her father "talking to someone about my mom being hurt" and immediately became "worried" for her mother and "anxious" about her dad, who was taking care of her and her three sisters.  *Id.* ¶¶ 9-10.  Rust could then not reunite with her mother until the conclusion of her deployment in September 1996.  *Id.* ¶ 11.

Dobos's third daughter, Kasey D. Phillips, was ten years old at the time of the attack.  Decl. of Kasey D. Phillips (Sept. 16, 2021) ("Phillips Decl.") ¶¶ 5,8, ECF No. 46.  She remembers that her father "stayed in his room for a few days" after learning of the bombing, which made her worried not only about her mother's condition but also "about how [her] dad was doing . . .  trying to take care of all [four] kids" knowing their mother had been in the attack.

*Id.* ¶¶ 8-9.  Many years later, Phillips continues to notice that her mother does not discuss the bombing and is still sensitive to loud noises.  *Id.* ¶ 11.

Dobos's youngest daughter, Haley I. Dobos, was only two years old at the time of the attack.  Decl. of Haley I. Dobos (Sept. 15, 2021) ("Haley Dobos Decl.") ¶¶ 4, 7, ECF No. 46.  Although she was too young at the time to remember the bombing, Haley Dobos witnessed the impact of the attack on her mother as she grew older, and notices that her mother is intolerant of loud noises and feels sick to "her stomach whenever the attack is mentioned." *Id.* ¶¶ 7, 8.

Dobos's mother, Anne M. French, learned of the bombing through a phone call and immediately began to feel an "intense fear[]" for her daughter's "survival and safety."  Decl. of Anne M. French (Sept. 20, 2021) ("French Decl.") ¶¶ 5, 8, ECF No. 46.   She then waited for "eight long hours" to hear about Dobos's condition and remained stressed and anxious about her daughter's well-being until reuniting with her six months later.  *Id.* ¶¶ 8-9.  French still worries about Dobos.  *Id.* ¶ 10.  She feels "sick" whenever they talk about the bombing or "when someone mentions . . . any types of bombs and injuries," even when veterans appear on television discussing what "they have been through." *Id.* ¶ 10.  Still, French recognizes that her daughter "was one of the lucky ones not to lose a limb or her eyesight" even though "her injuries, while not visible, are still there."  *Id.* ¶ 11.

Dobos's father, Charles D. French, also did not know—for about eight hours—whether his daughter had survived after learning about the bombing from his wife, Anne.  Decl. of Charles D. French (Dec. 9, 2021) ("Charles French Decl.") ¶¶ 4, 7, ECF No. 46.  He was "scared" and "worried" about Dobos's safety until he was eventually able to speak with her.  *Id.* ¶ 7.  French did not see his daughter for six months after the attack.  *Id.* ¶ 8.  He explains that, although his family is "not the type . . . to dwell on things," the memories of the attack and its

immediate aftermath "are there and very real." *Id.* ¶ 9.  French worries more for his daughter "if she doesn't feel right" and is still concerned about the bombing's long-term effects on her.  *Id.*

One of Dobos's younger sisters, Tina M. Judge, learned of the bombing from her mother and was "terrified" to find out more about her sister's condition.  Decl. of Tina M. Judge (Sept. 9, 2021) ("Judge Decl.") ¶¶ 5, 9, ECF No. 46.  In that moment, she found it "excruciating to be so far away and not be able to help or even get information about her" sister.  *Id.* ¶ 9.  When they finally reunited at their parents' home in December 1996, Judge recalls hugging her sister tightly, crying, and not wanting to let go of her.  *Id.* ¶ 10.  Judge heard from Dobos about the "blood splattered on what was left of a wall, seeing a cup that remained on the edge of a desk and the rest of the room completely destroyed, [and] seeing the remains of clothes that were blown off a person"—which made Judge realize "how close" her sister "had been to being blown up."  *Id.* ¶¶ 11-12.  To this day, Judge tries "not to cry" when she "tell[s] people" about Dobos and remains "so proud" of her bravery the day of the attack.  *Id.* ¶ 14.

Brenda J. French, another of Dobos's sisters, learned of the bombing on the radio while driving to work.  Decl. of Brenda J. French (Dec. 9, 2021) ("Brenda French Decl.") ¶¶ 7-8, ECF No. 46.  After her employer "would not let [her] leave to find out what was happening with [her] sister," Brenda French decided to quit her job that day so she could confirm whether her sister "was okay."  *Id.* ¶ 9.  She helped take care of Dobos upon her return home months later.  *Id.* ¶ 10.  Today, every time she sees her sister, Brenda French "recall[s] the pain and the injuries" of the attack.  *Id.* ¶ 11.  She is also still pained whenever she hears of military deaths and affected by the "horrible experience every day."  *Id.* ¶ 12.

Dobos's third sister, Dena J. DeJoe, was told of the attack by her mother and felt "despair in [her] heart . . . . [at] [t]he thought of [Dobos's] husband and daughters not having a wife and

mother." Decl. of Dena J. DeJoe (Sept. 10, 2021) ("DeJoe Decl.") ¶¶ 5, 9, ECF No. 46.

Relieved to find out her sister had survived the attack, DeJoe nevertheless was still in "misery"

until she "could see, talk, and hold her [sister] when she finally came home." *Id.* ¶ 11. DeJoe

remembers how her family "fell apart" when Dobos finally returned from Saudi Arabia and the

memories and feelings associated with that day often "come back with a vengeance." *Id.* ¶ 12.

More than twenty years after the attack, DeJoe is still hurt and becomes teary by "just thinking of

how differently things could have worked out" for her sister on that fateful day. *Id.* ¶ 14.

### 19. *Christopher O. Doggett and Three Family Members*

On June 25, 1996, Christopher O. Doggett was a Senior Airman quartered at Khobar

Towers. Decl. of Christopher O. Doggett (Oct. 11, 2021) ("Doggett Decl.") ¶ 6, ECF No. 47

(sealed), ECF No. 108 (public version). When the bomb went off, Doggett was thrown off the

sofa where he was sitting and knocked unconscious, and he sustained "multiple severe

lacerations" from glass and concrete fragments "sprayed . . . all over" him. *Id.* ¶ 8. Some of

these lacerations were so substantial around his wrist and both knees that they exposed his bone.

*Id.* ¶ 9. As a result of the attack, Doggett additionally sustained a traumatic brain injury

producing chronic headaches, a concussion, and has developed PTSD, nightmares, anxiety, sleep

problems, and an intolerance towards crowds. *Id.* Doggett was awarded a Purple Heart for

"wounds received in action." *Id.* ¶ 11; *id.*, Ex. 5, Purple Heart Certificate. He has received a

combined 100% disability rating from the VA, with individual ratings of 50% for PTSD, 50%

for insomnia, 30% for restless leg syndrome, 10% for traumatic brain injury, 10% for facial

scars, and for 30% Meniere's disease with bilateral hearing loss, vertigo, and tinnitus, all

attributable to his injuries and rendering him "totally and permanently disabled." Doggett Decl.

¶ 12; *id.*, Ex. 6., Letters from VA. Three of Doggetts's family members are also plaintiffs in this

action: his daughter, Alyxandra L. Doggett; his mother, Sherrie K. McBride; and his sister, Sandra L. Skinner.  Doggett Decl. ¶ 4.

Doggett's daughter, Alyxandra L. Doggett, was only one-and-a-half years old at the time of the attack.  Decl. of Alyxandra L. Doggett (Nov. 5, 2021) ("Alyxandra Doggett Decl.") ¶¶ 4, 7, ECF No. 47.  She grew up witnessing her father suffer "through all of the dark stages that follow an event as traumatic" as the one he survived at Khobar Towers.  *Id.* ¶ 9.  The more she understands what her father experienced and has lived through since the bombing, the more affected Alyxandra Doggett has become by the events of June 25, 1996.  *Id.* ¶ 10.  She thus has "grown to be[] terrified and [has] severe anxiety of being in public spaces or large even centers due to expecting the worst," such that someone may be shot or a bomb may go off.  *Id.*  She fears that someone will be shot or a bomb will be set off, and she has vivid nightmares of the Khobar Towers bombing.  *Id.* ¶ 12.  Even now as an adult, Alyxandra Doggett experiences "multiple vivid nightmares" about the attack and how it wounded her father.  *Id.*

Doggett's mother, Sherrie K. McBride, learned of the attack from her cousin, who drove to the grocery store where McBride was shopping to share the news.  Decl. of Sherrie K. McBride (Oct. 29, 2021) ("McBride Decl.") ¶ 4, 7, ECF No. 47.  McBride then agonized for two days without knowing if her son had survived the attack.  *Id.* ¶ 8.  When they finally spoke, her son told her that "a bomb went off" in his face, he had been injured "pretty badly," and was now "in a hospital alone with no other service members."  *Id.* ¶ 9.  Doggett was deployed several times after the bombing, and during those periods McBride "was scared every time the phone rang" and "refused to watch the television news."  *Id.* ¶ 11.  She has perceived her son to "different ever since the bombing" and constantly worries about both his physical and mental health.  *Id.* ¶ 12.

Doggett's sister, Sandra L. Skinner, was seventeen at the time of the Khobar Towers bombing.  Decl. of Sandra L. Skinner (Sept. 9, 2021) ("Skinner Decl.") ¶¶ 5, 8, ECF No. 47.  She recalls the days in which her family did not whether her brother was alive as "the scariest days of [her] life."  *Id.* ¶ 8.  When Doggett finally returned home, Skinner was shocked by the extent of his "very visible" physical injuries.  *Id.* ¶ 10.  Skinner has since then struggled watching her brother deal with PTSD and the sequalae of his physical injuries for the past 25 years.  *Id.* ¶ 11.

### 20. *Terry M. Dunn, Jr. and Four Family Members*

On June 25, 1996, Terry M. Dunn, Jr. was a Senior Airman quartered in Khobar Towers. Decl. of Terry M. Dunn, Jr. (Dec. 6, 2021) ("Dunn Jr. Decl.") ¶ 6, ECF No. 48 (sealed), ECF No. 109 (public version).  He was thrown by the blast to the ground and then escaped the building he was in, together with several colleagues.  *Id.* ¶ 10.  Dunn then spent the days after the attack "cleaning up glass and debris and retrieving unsecured communication equipment inside the buildings that were no longer occupied."  *Id.* ¶ 13.  Throughout those cleanup efforts, Dunn confronted a "sickening" scene, with "dried blood everywhere, even on the walls" and "furniture."  *Id.*  After retiring from the Air Force in 1997, Dunn began experiencing PTSD, including survivor's guilt, depression, and "quite a bit of anxiety that even though [he] was in the United States, [he] may still be the target of an attack."  *Id.* ¶ 18.  His PTSD has only become more severe over the years, with his "triggers . . . more frequent and less tolerable," although he is now in therapy to "better deal" with these symptoms.  *Id.*  Dunn was awarded the Air Force Achievement Medal in recognition of his accomplishments while deployed to Saudi Arabia from April to July 1996.  *Id.* ¶ 15; *id.*, Ex. 6, Air Force Achievement Medal decoration papers.  The VA gave him a combined 30% disability rating for the PTSD he has developed since the attack. Dunn Jr. Decl. ¶ 19; *id.*, Ex. 8, Letter from VA.

Dunn's daughter, Markie B. Dunn was only nine months' old at the time of the bombing. Decl. of Markie B. Dunn (Sept. 20, 2021) ("Dunn Decl.") ¶¶ 4, 7, ECF No. 48.  Although she did not learn about the attack until she was an adult, the "emotional instability" Dunn developed as a consequence affected Markie Dunn growing up because "he was not able to help [her] with emotional problems throughout [her] adolescence."  *Id.* ¶ 8.  This emotional distance with her father was compounded by other issues she experienced in her upbringing, including "several mental illnesses and eating disorders" that she attributes to "genetics, unresolved trauma, or both."  *Id.*  All of this left Markie Dunn "with a feeling of abandonment that [she] still cannot shake" and unable to "start proper emotional development" until she began dating her partner at age 21.  *Id.* ¶ 9.

Dunn's mother, Vicki L. Dunn, learned of the attack on the TV news, and the following two days waiting to know whether her son had survived "was the most frightening thing [she] had] ever experienced."  Decl. of Vicki L. Dunn (Sept. 10, 2021) ("Vicki Dunn Decl.") ¶ 8, ECF No. 48.  Vicki Dunn's relationship with her son is "much closer now," but she often still thinks "about the Khobar Towers bombing and how [her] only son could have been killed."  *Id.* ¶ 10.

Dunn's father, Terry M. Dunn, Sr., also learned of the attack on the news and found it "unbearable" not knowing about his son's conditions for two days.  Decl. of Terry M. Dunn, Sr. (Sept. 10, 2021) ("Dunn Sr. Decl.") ¶¶ 4, 7, ECF No. 48.  His son's eventual return to the United States after his deployment was no easier: Terry Dunn then began to worry and "become more concerned . . . about [Dunn's] well-being, where he would live and how he would be able to pay his bills."  *Id.* ¶ 8.

Dunn's younger sister, Hope M. Gambill, similarly learned of the attack through the news and waited in anguish with the rest of her family for two days to hear whether her brother had

survived.  Decl. of Hope M. Gambill (Dec. 13, 2021) ("Gambill Decl.") ¶¶ 5, 9, ECF No. 48.

Although she was very close to her brother during their upbringing, Gambill's relationship with

Dunn changed and turned colder after the bombing.  *Id.* ¶ 10.  She perceived Dunn to be "more

anxious" and unlike the "brother [she] was raised with."  *Id.*  Today, Gambill becomes

particularly worried whenever her brother has "flashbacks" to the Khobar Towers attack and is

"scare[d] . . . that he . . . feel[s] this way."  *Id.* ¶ 12.  She just wishes her brother "to be okay."  *Id.*

### 21. *George G. Dyer III*

On June 25, 1996, George G. Dyer III was a Master Sergeant quartered at Khobar

Towers.  Decl. of George G. Dyer III (Aug. 28, 2021) ("Dyer III Decl.") ¶ 5, ECF No. 49

(sealed), ECF No. 110 (public version).  He was sleeping in his dorm room on the seventh floor

of Building 131—the one closest to the bomb—at the time of the attack.  *Id.* ¶ 7.  The blast

inflicted a "direct hit" to his room, causing Dyer to be propelled from the seventh floor down to

the "rubble," where he was later "found unconscious."  *Id.*  He sustained severe injuries to his

feet, ribs, and orbital bones in his head, all of which required over 300 stitches.  *Id.* ¶ 8.  Dyer

also suffered a traumatic brain injury and experiences chronic pain in his neck, back, shoulders,

hips, knees, and ankles, as well as PTSD and tinnitus, due to the bombing.  *Id.* ¶ 12.   Although

he no longer takes any pain medications after the opiates he "was prescribed . . . for twenty years

. . . had a significant negative impact on [his] life," he remains "in constant pain."  *Id.*  Dyer was

awarded a Purple Heart in recognition of his "wounds received in action."  *Id.* ¶ 11; *id.*, Ex. 8,

Purple Heart Certificate.  Dyer feels that he has "been irreparably shattered" by both the

psychological and physical injuries that "have taken over such a large part of [his] life."  *Id.* ¶ 14.

The VA gave him a combined 60% disability rating, including individual ratings of 30% for

PTSD, 20% for post traumatic injury/fracture of the left ankle, and 10% for post traumatic

injury/fracture of bilateral knees and cervical spine, all injuries stemming from the bombing.  *Id.* ¶ 15; *id.*, Ex. 9, Letter from VA.

### 22. *Bryan W. Fox and Two Family Members*

On June 25, 1996, Bryan W. Fox was an Airman First Class quartered in Khobar Towers. Decl. of Bryan W. Fox (Dec. 6, 2021) ("Bryan Fox Decl.") ¶ 6, ECF No. 50 (sealed), ECF No. 111 (public version).  Fox was cleaning a kitchen in Building 131 with several colleagues when the bomb exploded.  *Id.* ¶ 10.  With the blast, he "felt as though [he] was lifted from the ground and then slammed back down again;" the shards of glass hitting him felt like "being sandblasted with pure electricity."  *Id.* ¶ 11.  In that moment, Fox "thought [he] was dead."  *Id.* ¶ 12.  He recalls "accepting death . . . and making peace with God and the Universe because [his] mind was convinced that [he] was dying."  *Id.*  Fox sustained lacerations in his back, left arm, and left leg, and was eventually treated in a hospital—only to later need his wounds be re-opened to remove additional shards of glass and treat infection.  *Id.* ¶¶ 17-21, 27.  Surviving the attack left an indelible mark in Fox.  *Id.* ¶ 33.  He explains that, after the bombing, "nothing was right" with him and he became "quick tempered" and "began to drink a lot."  *Id.* ¶¶ 33-34.  He also had "dizzy spells and hallucinations," including of "dead friends" who would be "someone else" when he "looked again."  *Id.* ¶ 34.  This has made Fox feel like he "has been . . . living in the Twilight Zone" since the attack, "go[ing] through periods of being highly motivated and well on [his] way to a brighter future just to have it all crumble because of PTSD symptoms and deep bouts of crushing depression."  *Id.* ¶ 39.  Fox received a combined 100% disability rating from the VA because of the PTSD he developed since the bombing.  *Id.* ¶ 43; *id.*, Ex. 13, Letter from VA.  For his "wounds received in action," Fox was awarded a Purple Heart.  Fox Decl. ¶ 29, *id.*, Ex. 5, Purple Heart Certificate and Special Order.

Fox's mother, Sylvetta E. Fox, learned about the attack through her sister.  Decl. of Sylvetta E. Fox (Sept. 15, 2021) ("Fox Decl.") ¶¶ 5, 8, ECF No. 50.  Waiting for news about her son made it "the longest evening of [her] life," and even after she finally heard from Fox, Sylvetta Fox was still so "afraid . . . there could be another attack" that she was unable to "eat for several days after the bombing."  *Id.* ¶¶ 10, 12.  It "breaks [her] heart daily" that the bombing changed her only son's personality from a "fun-loving child to a person with severe PTSD," causing their relationship to become distant.  *Id.* ¶¶ 16-17.  For Sylvetta Fox, the last time she saw her child, "as [she] knew him," was when she visited him in April 1996 before his deployment to Saudi Arabia.  *Id.* ¶ 18.  To this day, she worries "about [Fox] on a daily basis" and "panic[s]" whenever she cannot "reach him" and doesn't "know where he is."  *Id.* ¶ 19.

Fox's father, Walter W. Fox, learned of the bombing along with his wife, Sylvetta.  Decl. of Walter W. Fox, Jr. (Sept. 15, 2021) ("Fox Jr. Decl.") ¶¶ 4, 7, ECF No. 50.  He was "shocked and devastated" to realize his son was housed at the site of the attack.  *Id.* ¶ 7.  Until speaking with him later that evening, Walter Fox "feared that [his son] had been killed."  *Id.* ¶ 8.  Walter Fox became one of his son's caretakers upon his return to the United States and "took him to his doctor's appointments."  *Id.* ¶ 11.  Today, he worries about Fox "all the time, especially about his PTSD."  *Id.* ¶ 12.

### 23. *John P. Garcia, Jr. and Three Family Members*

On June 25, 1996, John P. Garcia, Jr. was a Senior Airman quartered in Khobar Towers.  Decl. of John P. Garcia, Jr. (Nov. 3, 2021) ("Garcia Jr. Decl.") ¶ 6, ECF No. 51 (sealed), ECF No. 112 (public version).  When the bomb exploded, Garcia was thrown eight feet away by the blast and lost consciousness.  *Id.* ¶ 10.  Upon regaining consciousness and despite his own injuries, Garcia spent the next 36 hours "assist[ing] medical personnel with the dead and injured"

and helping FBI agents in their search for any part of the truck used in the bombing. *Id.* ¶¶ 13-14. Today, Garcia suffers from memory loss, migraines, hearing loss, and the emotional numbness, fear of crowds, mood swings, depression, anxiety, and hypervigilance that accompany PTSD. *Id.* ¶¶ 18-19. He "still retain[s] shrapnel in [his] face and extremities," even after undergoing surgery in 1998 to remove shrapnel fragments from his face. *Id.* ¶ 18. As recently as 2015, Garcia had a piece of shrapnel removed from his gum line and feels that the "psychological impact of the bombing is a constant battle." *Id.* ¶¶ 17, 19. He was awarded a Purple Heart in recognition of his injuries during combat. *Id.* ¶ 22; *id.*, Ex. 5, Purple Heart Certificate and Special Order, dated Jan. 20, 2006). The VA has rated Garcia 100% disabled, giving him individual ratings of 50% for PTSD, 50% for obstructive sleep apnea, 40% for traumatic brain injury, 20% for facial numbness, 10% for tinnitus, and 30% for cheek scars. Garcia Jr. Decl. ¶ 25.; *id.*, Ex. 7., Letter from VA, dated Dec. 8, 2015, ECF No. 51. Three of Garcia's family members are also plaintiffs in this action: his mother, deceased, represented by the Estate of Virginia Garcia; his father, John P. Garcia, Sr., in an individual capacity and as the proposed representative of the Estate of Virginia Garcia; and his brother, Michael Garcia. Garcia Jr. Decl. ¶ 4.

Garcia's mother, Virginia Rose Garcia, has passed away, but submitted a signed statement about the bombing's impact on her life before her death. Decl. of John P. Garcia Sr., Proposed Personal Representative of the Estate of Virginia Rose Garcia (Jan. 9, 2021) ("Garcia Decl.") ¶ 10; *id.*, Ex. 5, Personal Statement of Virginia Garcia. Virginia learned of the bombing when she returned from work and found her husband and mother watching the news. *Id.* Not knowing whether Garcia had survived over the next three days, she became so distressed that she could not "sleep, work, or eat." *Id.* Virginia Garcia was finally able to speak to her son about a

week later.  *Id.*  She did not realize, however, that "he was injured in the attack" until he returned

home in January 1997.  *Id.*  Only then did Virginia Garcia first see the scars on his face and that

he "seemed emotional [sic.] distressed."  *Id.*  After the attack, she perceived Garcia to be

"different" and their mother-son relationship was never the same.  *Id.*

Garcia's father, John P. Garcia, Sr., learned of the attack on the news and was not able to

speak to his son for seven days, which were filled with sleepless nights and worry.  Decl. of John

P. Garcia, Sr. (Dec. 4, 2021) ("Garcia Sr. Decl.") ¶¶ 4, 7, 9, ECF No. 51.  Like his late wife, John

Garcia did not realize his son had been injured until his return to the United States in January

1997.  *Id.* ¶ 11.  He perceived that his "son did not [share] on the phone that he was injured to

save" the family "any more worry."  *Id.*  Regardless, finally seeing his son "triggered many

distressful emotions" in John Garcia that he feels to this day.  *Id.*  He finds it "difficult . . . to see

[Garcia] struggle in his personal relationships," a challenge the whole family perceives resulted

from the trauma he sustained at Khobar Towers.  *Id.* ¶ 12.  John Garcia is continuously

concerned for his son's well-being, especially as he experiences episodes of depression and

anxiety.  *Id.* ¶ 13.

Garcia's brother, Michael Garcia, who was twenty-two years old at the time of the attack,

learned about the bombing on the radio and rushed home to watch the news.  Decl. of Michael

Garcia (Sept. 20, 2021) ("Michael Garcia Decl.") ¶¶ 4, 7, 8, ECF No. 51.  Distressed to see the

death toll rise for the attack without knowing whether his brother was safe, Michael Garcia

"became numb with worry and life."  *Id.* ¶ 12.  He recalls watching President Clinton "offer[] his

condolences to the families of those who died" on the news and getting "very choked up"

worrying that his family may soon be among those.  *Id.* ¶ 8.  In the week before the family

finally heard from his brother, Michael Garcia's worry and that of his family "was now at a

traumatic stress level with no end in sight." *Id.* ¶ 13.  Since the attack, he has noticed changes in Garcia's behavior and troubles in his ability to sustain any of the relationships "that should have been significant in his life," such as those with his two young children and his parents.  *Id.* ¶ 18. Michael Garcia has "suffered and ha[s] continued to suffer at different levels from [his brother's] change in character" but has never "stopped loving and caring for him."  *Id.* ¶ 19.

### 24. *Steven D. Garcia*

On June 25, 1996, Steven D. Garcia was a Senior Airman quartered in Khobar Towers. D. Decl. of Steven D. Garcia (Nov. 2, 2021) ("Steven Garcia Decl.") ¶ 5, ECF No. 52 (sealed), ECF No. 113 (public version).  At the time of the attack, he was in the bathroom of his dormitory, which was about 50 yards from where the fuel-truck bomb exploded.  *Id.* ¶ 6.  The explosion was a moment of "just pure, intense terror for" Garcia.  *Id.* ¶ 10.  He remembers "there was broken glass and smoky dusty air everywhere."  *Id.* ¶ 8.  Steven Garcia sustained lacerations from glass shrapnel to his legs and back.  *Id.*  He was awarded the Armed Forces Expeditionary Medal and Air Force Achievement Medal.  *Id.* ¶ 18; *id.*, Ex. 6, Armed Forces Expeditionary Medal Certificate; *id.*, Ex. 7, Air Force Achievement Medal Certificate, dated Jan. 22, 1997. Today, Steven Garcia struggles with PTSD, "which has negatively impacted [his] career and family life" and has resulted in episodes of severe anger and rage, debilitating hyper-vigilance, paranoia, and a fear of strangers that impacts his entire family.  Steven Garcia Decl. ¶¶ 20-21. He received a 50% VA disability rating for his PTSD.  *Id.* ¶ 28; *id.*, Ex. 9, Letters from VA, dated Apr. 26, 2019; Jan. 18, 2021.

### 25. *Alfredo R. Guerrero*

On June 25, 1996, Alfredo R. Guerrero was a Military Policeman at Khobar Towers.

Decl. of Alfredo R. Guerrero (Dec. 2, 2021) ("Guerrero Decl.") ¶ 5, ECF No. 53 (sealed), ECF No. 114 (public version).  At the time of the attack, Guerrero was patrolling the roof of Building 131—the closest to impact—and witnessed when the truck-bomb was parked.  *Id.* ¶ 7.  He "called an alert over the radio and proceeded to try . . . clear the building" as he "realized with horror that a bomb was about to blow."  *Id.* ¶ 8.  Guerrero, however, "did not have enough time to . . . alert . . . everyone to evacuate the building."  *Id.* ¶ 9.  Through the blast, he sustained shrapnel wounds, contusions, and temporary loss of the use of one hand.  *Id.* ¶ 9.  Guerrero was awarded a Purple Heart in recognition of his combat wounds and an Airman's Medal for heroism.  *Id.* ¶ 10; *id.*, Ex. 2, Data Verification Brief.  The VA gave him a combined 30% disability rating in connection with injuries sustained at Khobar Towers.  *Id.* ¶ 12; *id.*, Ex. 4., Letter from VA, dated Sept. 30, 2021.

### 26. *Carl R. Hamilton, Jr. and Four Family Members*

On June 25, 1996, Carl R. Hamilton, Jr. was an Airman First Class quartered in Khobar Towers.  Decl. of Carl R. Hamilton, Jr. (Sept. 16, 2021) ("Hamilton Jr. Decl.") ¶ 6, ECF No. 54 (sealed), ECF No. 115 (public version).  He witnessed the explosion while driving back to Khobar Towers from a nearby air base.  *Id.* ¶¶ 8-9.  Upon arriving at the compound, Hamilton was "recruited to help security police at the check station" and to triage the wounded, an experience he found unpleasant as he "tri[ed] to scan and see if any of [his] buddies were in the area."  *Id.* ¶¶ 10, 12.  After a sleepless night, the next day was "pure hell" for Hamilton: "wondering, stressing, and speculating."  *Id.* ¶ 14.  Three of Hamilton's close friends perished in the attack and he has struggled with PTSD ever since, becoming depressed and suffering panic attacks—conditions which he attempted to "self-medicate with alcohol for many years."  *Id.* ¶ 18.  Hamilton attributes the collapse of his marriage to the attack's psychological sequelae.  *Id.* ¶

19.  He is currently "undergoing cognitive behavioral therapy at the VA to help with [his] symptoms," and received a combined 100% VA disability rating for post-traumatic stress disorder, persistent depressive disorder with major depressive disorder and alcohol use disorder, all stemming from the Khobar Towers bombing.  *Id.* ¶¶ 20-21; *id.*, Ex. 4., Letters from VA, dates Aug. 15, 2011, Nov. 6, 2019, Oct. 27, 2020, and Dec. 15, 2020, ECF No. 54.  Four of Hamilton's family members are also plaintiffs in this action: his mother, Karen M. Rainville; his stepfather, Dennis A. Rainville; his sister, Lisa M. Glenn; and his ex-wife, Autumn Hamilton O'Brien. Hamilton Jr. Decl. ¶ 4.

Hamilton's mother, Karen M. Rainville learned of the bombing on the news and "tried continuously to contact the Red Cross and the Family Emergency number shown on CNN" to no avail.  Decl. of Karen M. Rainville (Sept. 15, 2021) ("Rainville Decl.") ¶¶ 6-7, ECF No. 54. Late that evening, Rainville heard through her son's friend that Hamilton had survived the attack and received a call from her son the next morning.  *Id.* ¶ 10.  Rainville found it "evident" during that call that Hamilton "was in shock and severely traumatized."  *Id.* ¶ 11.  Since his return home two days after the attack, it has been "heart-wrenching" for Rainville to watch her son transform from an "outgoing, highly social, quick-witted" person to a "paranoid, depressed, anxiety-ridden, and fearful" one.  *Id.* ¶ 14.  She now "constantly worr[ies] about [Hamilton's] mental health and his ability to cope and handle every day life."  *Id.*  Watching her son suffer is "devastating to [Rainville] as his mother."  *Id.* ¶ 16.

Hamilton's step-father, Dennis A. Rainville, learned of the attack through a phone call from his wife and immediately left work to seek out information about his stepson, with whom he "always had a close relationship[] as his biological father was never in the picture."  Decl. of Dennis A. Rainville (Sept. 12, 2021) ("Dennis Rainville Decl.") ¶¶ 4, 8, 12-13, ECF No. 54.

When Hamilton called his family the next morning after the bombing, Dennis Reinville found it "obvious" that, even though his stepson "wasn't injured . . . [,]he was severely traumatized." *Id.* ¶ 15.  He has "agoniz[ed]" seeing Hamilton "suffer[] with PTSD since the bombing" and has "missed work to deal with issues and breakdown episodes that [Hamilton] has had over the years." *Id.* ¶¶ 21-22.

Hamilton's half-sister, Lisa M. Glenn, learned about the attack through a phone call from her mother while she was at work and became "so distraught that [she] fell to the ground crying hysterically." Decl. of Lisa M. Glenn (Sept. 30, 2021) ("Glenn Decl.") ¶¶ 5,8, ECF No. 54.  As Hamilton has struggled with PTSD since the bombing, she has been affected by witnessing "the decline in what used to interest him[] and his inability to be around groups of people." *Id.* ¶ 14. Glenn misses her "old" brother. *Id.*

Autumn Hamilton O'Brien, who was married to Hamilton when the Khobar Towers were bombed, learned of the attack through the news and "could not believe what [she] was looking at." Decl. of Autumn Hamilton O'Brien (Sept. 14, 2021) ("O'Brien Decl.") ¶¶ 4-10, ECF No. 54. She and the rest of Hamilton's family immediately sought out information through emergency hotlines but did not hear from Hamilton directly until the following morning, when he called and told her that three of his close friends were missing in action. *Id.* ¶¶ 10-12.  When her husband returned to the United States, O'Brien knew "[h]e was not himself." *Id.* ¶ 17.  She recalls that Hamilton looked "as if his body was there but his mind and soul were not present." *Id.*  In that moment, O'Brien—who had married Hamilton when she was just 18 years old—knew her "innocence was gone," although she "didn't realize . . . how hard the next twenty-five years" would be. *Id.* ¶ 14.  The severe, lasting impacts of Hamilton's struggle with PTSD "destroyed" her just as the "Khobar Towers bombing took" the Hamilton she knew and had loved. *Id.* ¶¶ 25-

29. At one point, for example, O'Brien witnessed her then husband "put[] a knife to his own throat" and she had to "talk him down" from hurting himself. *Id.* ¶ 23. After seventeen years of marriage, Hamilton's PTSD led to their divorce, and O'Brien herself was eventually diagnosed with PTSD, which has included panic attack episodes requiring hospitalization, "from the stress of living with [Hamilton] while he was suffering from PTSD." *Id.* ¶ 32.

### 27. *Jeffrey L. Hill and One Family Member*

On June 25, 1996, Jeffrey L. Hill was a Staff Sergeant quartered in Khobar Towers. Decl. of Jeffrey L. Hill (Oct. 5, 2021) ("Hill Decl.") ¶ 6, ECF No. 55 (sealed), ECF No. 116 (public version). The night of the bombing, he was working at the air base a few miles away from the Khobar Towers compound. *Id.* ¶ 9. He remembers seeing "a huge mushroom cloud and [thinking] that a nuclear bomb had been detonated" when the blast went off. *Id.* After the attack, Hill assisted the wounded and searched buildings for "any signs of life," all while witnessing horrors like "walk[ing] through blood and body pieces that were everywhere." *Id.* ¶ 12. In the decades since, Hill has suffered from severe survivor's guilt and PTSD, including symptoms like "insomnia, nightmares, hypervigilance, agoraphobia, panic disorder, depression, and hyperarousal from loud noises." *Id.* ¶ 16. Hill has received a combined 100% disability rating from the VA based on the PTSD he developed from the attack. *Id.* ¶ 20; *id.*, Ex. 8, Letter from VA, dated June 25, 2009. He also receives special monthly compensation for being housebound. *Id.* Hill was awarded both the Air Force Commendation Medal and the Armed Forces Expeditionary Medal. Hill Decl. ¶ 18; *id.*, Ex. 6, Armed Forces Commendation Medal Citation; Hill Decl., Ex. 7, Armed Forces Expeditionary Medal Certificate. His sister, Adrienne L. Fulton, is also a plaintiff in this action. Hill Decl. ¶ 4.

Adrienne L. Fulton learned of the attack through a call from her sister-in-law and had to wait another twelve painful hours to hear that Hill had survived and was busy helping rescue others.  Decl. of Adrienne L. Fulton (Nov. 1, 2021) ("Fulton Decl.") ¶¶ 5, 9, ECF No. 55. Fulton's grief and despair for her brother's safety did not subside until he returned home, and since then she has noticed that Hill is "more anxious," "vigilant," and unable to relax easily.  *Id.* ¶ 11.  Fulton lives "worried for [her brother] and his safety" and her "mind quickly rushes to the worst-case scenario as it did at the time of the event."  *Id.* ¶ 12.

### 28. *The Estate of Gregory M. Hillabrant and Two Family Members*

On June 25, 1996, Gregory M. Hillabrant was a Senior Airman stationed at Khobar Towers.  Decl. of Carrie D. Hillabrant, Personal Representative of the Estate of Gregory M. Hillabrant (Nov. 1, 2021) ("Hillabrant Decl.") ¶¶ 5, 9, ECF No. 56 (sealed), ECF No. 117 (public version).  Hillabrant has since passed away and his estate is represented by his wife, Carrie D. Hillabrant.  *Id.* ¶ 1.  While returning to Khobar Towers from the air base, Hillabrant saw the explosion and its blast "blew his truck off the road."  *Id.* ¶ 11.  Immediately thereafter, Hillabrant delivered supplies, located emergency lights, rescued wounded airmen from the rubble, and helped establish the triage area.  *Id.*  Hillabrant developed PTSD in the years that followed and "suffered with anxiety, depression, survivor's guilt, and insomnia for the rest of his life."  *Id.* ¶ 13.  He received a combined 30% disability rating from the VA based on his PTSD.  *Id.* ¶¶ 13, 15; *id.*, Ex. 8, Letter from VA, dated Aug. 15, 2019.  He was also a recipient of the Armed Forces Expeditionary Medal and Air Force Certificate of Appreciation. *Id.* ¶ 12; *id.*, Ex. 6, Armed Forces Expeditionary Medal Certificate, dated Sept. 12, 1996; Hillabrant Decl., Ex. 7, Air Force Certificate of Appreciation, dated Sept. 12, 1996.

Hillabrant's mother, Jane M. Hillabrant was "shocked, saddened, worried, afraid, scared, and horrified" when she found out about the bombing.  Decl. of Jane M. Hillabrant (Sept. 15, 2021) ("Jane Hillabrant Decl.") ¶ 11, ECF No. 56.  When her son returned home from his deployment, she could "feel his hurt and sadness and in turn it made [her] feel hurt and sad for him." *Id.* ¶ 23.  "A piece of [Hillabrant] was lost" in the attack and Jane Hillabrant felt as though a part of herself was also lost "because even a mother's love cannot heal some things." *Id.* ¶ 24.  Although her son did not come back with visible scars, Jane Hillabrant "could see it in his eyes" that he "was a changed man after the bombing." *Id.* ¶ 23.

Hillabrant's brother, Stephen R. Hillabrant, learned of the bombing from a call from his mother, and the news made him upset and scared.  Decl. of Stephen R. Hillabrant (Nov. 8, 2021) ("Stephen Hillabrant Decl.") ¶¶ 4, 11, 13, ECF No. 56.  As the sibling living closest to his parents, he also "experienced their emotions and anger" in the attack's aftermath. *Id.* ¶ 12.  When Hillabrant returned home, Stephen Hillabrant had difficulties reconnecting with his brother, who "was different" and "much angrier" although "that wasn't his character" before. *Id.* ¶ 14.  Stephen Hillabrant also recalls becoming "overwhelm[ed]" at times when he had to serve as his parents' emotional support in the wake of the attack. *Id.* ¶ 13.

### 29. *Rodney Houston and Five Family Members*

On June 25, 1996, Rodney Houston was an Airman First Class quartered in Khobar Towers.  Decl. of Rodney Houston (Sept. 13, 2021) ("Houston Decl.") ¶ 6, ECF No. 57 (sealed), ECF No. 118 (public version).  At the time of the bombing, he was in his dormitory on the sixth floor of Building 131—the one closest to the bomb-truck—and with the blast "the sliding glass doors and bricks were blown toward the left side of [his] body." *Id.* ¶ 8.  Houston sustained lacerations to his face, arms, and legs as a result, and pieces of broken glass were retained in his

eyes.  *Id.*  He was hospitalized for several days and had to receive plastic surgery for these

injuries.  *Id.* ¶¶ 9-11.  Upon returning to the United States, Houston developed PTSD and sought

therapy to help cope with the loss of nineteen fellow airmen in the attack.  *Id.* ¶ 12.  Today, he

continues to struggle with survivor's guilt, PTSD, insomnia, an intolerance of crowds, and

difficulty trusting others.  *Id.* ¶¶ 14, 16.  Houston still wonders why he "was allowed to live

when nineteen others died."  *Id.* ¶ 16.  The VA rated him as 100% disabled, with individual

ratings of 70% based on his PTSD and 10% on his facial scars, making Houston "totally and

permanently disabled."  *Id.* ¶ 15; *id.*, Ex. 8, Letter from VA, dated Dec. 18, 2019.  Five of

Houston's family members are also plaintiffs in this action: his sisters, Teresa Ferguson, Cindy

Houston, and Patricia Houston; and his brothers, Nathan Houston and Henry Houston.  Houston

Decl. ¶ 4.

Houston's sister, Teresa Ferguson "could not sleep for at least two weeks" when she

heard her brother had been injured in the attack and did not know his fate "for many hours after

the attack."  Decl. of Teresa Ferguson (Dec. 18, 2021) ("Ferguson Decl.") ¶¶ 5, 8, ECF No. 57.

Even after learning he had survived, she would still wake "up in sweats at night."  *Id.* ¶ 8.  These

night sweats have continued until the present and Ferguson also often has nightmares about her

brother being in danger and screaming for help.  *Id.* ¶ 9.  The bombing "forever changed" her

"outlook on life and [her] surroundings."  *Id.*

Cindy Houston, another of Houston's sisters, felt "shocked, frightened and panicked"

when she heard news of the attack and "feared the worst until nine hours later when [her brother]

was able to call to tell [their] mother he was alive, but seriously injured."  Decl. of Cindy

Houston (Sept. 24, 2021) ("Cindy Houston Decl.") ¶¶ 4, 7.  Even today, she "see[s] the cuts and

scars on [Houston's] face . . . [and has] dreams about him being killed."  *Id.* ¶ 9.  Whenever her

brother had to go abroad for other deployments after returning from Saudi Arabia, Cindy

Houston feared that the Khobar Towers bombing "would happen again."  *Id.*

Houston's third sister, Patricia Houston, learned of the attack through a phone call from

her mother and was distraught to hear her brother was "missing in action."  Decl. of Patricia

Houston (Jan. 6, 2021) ("Patricia Houston Decl.") ¶¶ 3, 6, ECF No. 57.  It was not until nine

hours later, when Houston was finally able to call his family, that her anguish lessened.  *Id.* ¶ 6.

Houston's brother, Henry Houston, was with his mother when she received a call

informing that Houston was "missing in action" after the attack.  Decl. of Henry Houston (Oct. 4,

2021) ("Henry Houston Decl.") ¶¶ 4, 7, ECF No. 57.  Henry Houston tried to keep his family

calm while they waited for updates for the next nine hours, but "deep down [he] was also very

worried as [Houston] was [his] youngest brother."  *Id.* ¶ 7.  Despite feeling incredible relief when

his little brother returned home safely, Henry Houston is still "deeply saddened" by how

Houston's "injuries changed his personality."  *Id.* ¶ 8.

Houston's other brother, Nathan Houston, learned through his mother that Houston was

missing after the attack.  Decl. of Nathan Houston (Oct. 1, 2021) ("Nathan Houston Decl.") ¶¶ 4,

7, ECF No. 57.  In that moment, he "feared the worst had happened."  *Id.* ¶ 7.  Despite their

tightknit upbringing, the attack "took a toll on [their] relationship" and Nathan Houston's

relationship with his brother has been "distant" and just "not the same" since Houston returned

from Khobar Towers.  *Id.* ¶ 8.

### 30. *Steven Jaronsky and One Family Member*

 On June 25, 1996, Steven Jaronsky was a Senior Airman quartered in Khobar Towers.

Decl. of Steven Jaronsky (Dec. 13, 2021) ("Jaronsky Decl.") ¶ 6, ECF No. 58 (sealed), ECF No.

119 (public version).  He was at a kitchen in his dormitory with friends, including plaintiff Bryan

W. Fox, when the bomb exploded. *Id.* ¶ 8.[6]  The blast threw Jaronsky against a wall and "pelted

[him] with so much broken glass that [he] thought [he] was being electrocuted." *Id.* ¶ 9.  As a

consequence of the attack, he had shrapnel all over his body, sustained a concussion, and also

experienced hearing loss, stomach issues, headaches, loss of some peripheral vision, and other

ailments. *Id.* ¶ 20.  Jaronsky has undergone multiple surgical procedures to remove glass from

beneath his skin. *Id.* ¶ 18.  He was awarded a Purple Heart in recognition of his combat wounds.

*Id.* ¶ 19; *id.*, Ex. 2, Certificate of Discharge.  Today, Jaronsky struggles with PTSD, facing

episodes involving nightmares, insomnia, and intolerance of loud noises, for which the VA has

rated him 10% disabled. *Id.* ¶¶ 21-22; *id.*, Ex. 3, Letter from VA, dated Sept. 22, 2003.

Jaronsky's mother, Elise Lombardo, is also a plaintiff in this action.

Jaronsky's mother, Elsie Lombardo learned of the attack on the radio while she was

driving and, for the next two days, "frantically tried to find out if [her son] was safe."  Decl. of

Elise Lombardo (Sept. 19, 2021) ("Lombardo Decl.") ¶¶ 4, 7, ECF No. 58.  Lombardo "could

not eat or sleep" and "cri[ed] hysterically" until she finally received a call from her son that he

"was injured and in extreme pain." *Id.* ¶ 10.  For months after the bombing, she was so anxious

that she "lost time at work and had difficulty focusing." *Id.* ¶ 11.  Lombardo continues to "suffer

from nightmares about the bombing and [has] problems sleeping." *Id.* ¶ 12.  Her grandson's

ongoing deployment to Somalia with the Army has "brought back the Khobar Towers attack

with all the terror [she] felt then." *Id.* ¶ 13.

---

[6]      Plaintiff Bryan W. Fox, *see supra* Section II.C.22, submitted a witness declaration regarding Jaronsky describing how Fox stood between Jaronsky and the flying glass shrapnel when the bomb went off and thereafter Fox saw Jaronsky become "badly injured . . . due to the amount of blood he was losing."  Decl. of Bryan W. Fox as Witness (Dec. 6, 2021) ("Bryan Fox Witness Decl.") ¶¶ 4-5, ECF No. 58.  Fox has also witnessed Jaronsky's struggles with PTSD since the attack, explaining that "both our cases and experiences" with that disorder "are exact in every way" and have "caused major damage in . . . our lives both professionally and personally." *Id.* ¶ 8.

### 31. *Richard R. Jiron and Nine Family Members*

On June 25, 1996, Richard R. Jiron was a Staff Sergeant quartered in Khobar Towers.
Decl. of Richard R. Jiron (Nov. 3, 2021) ("Jiron Decl.") ¶ 6, ECF No. 59 (sealed), ECF No. 120
(public version).  After receiving an emergency notice to evacuate Building 131—which was his
dormitory and the building closest to the truck-bomb—Jiron began running down the stairs until
the bomb exploded when he was "mid-way between floors."  *Id.* ¶¶ 8-9.  The blast threw him to
the floor and he recalls "initially [not] being able to breathe."  *Id.* ¶¶ 9-10.  Jiron was also
barefoot and his "hands and feet were shredded by the shattered glass."  *Id.* ¶ 15.  Despite these
injuries, after exiting Building 131, he immediately began assisting other wounded airmen and
helped retrieve personal items from within the damaged buildings—which felt as "equally as
devastating" as the bombing as he saw his colleagues' "blood on the walls and floors, shards of
glass embedded in the concrete walls . . . and pictures of families . . . strewn throughout."  *Id.* ¶
19.  Since the attack, Jiron has been diagnosed with PTSD and experienced episodes of
insomnia, depression, and anxiety.  *Id.* ¶ 26.  He also suffers from some permanent hearing loss
and tinnitus.  *Id.* ¶ 25.  For his injuries, the VA gave Jiron a combined 60% disability rating, with
individual ratings of 50% for PTSD and 10% for tinnitus.  *Id.* ¶ 36; *id.*, Ex. 11, Letters from VA,
dated Aug. 3, 1999, Feb. 17, 2020.  He was awarded the Armed Forces Expeditionary Medal and
Air Force Achievement Medal for his actions after the bombing and a Purple Heart for wounds
sustained in combat.  *Id.* ¶¶ 21, 24; *id.*, Ex. 8, Armed Forces Expeditionary Medal Certificate and
Special Order, dated Sept. 10, 1996; Jiron Decl., Ex. 9, Memorandum in Support of
Recommendation for Air Force Achievement Medal; Jiron Decl., Ex. 5, Purple Heart Certificate
and Special Order, dated Aug. 6, 1996.  Despite these recognitions and the medical treatment he
has received over the years, Jiron's relationship with his wife and children is today "much

different than the close relationship that existed prior to the bombing," a change he attributes to his preference these days of focusing on work, "avoid[ing] groups," and "isolat[ing] . . . in an office." Jiron Decl. ¶¶ 31-32. Jiron thus finds that the Khobar Towers bombing changed his life "drastically" as a "person, a husband, and a father." *Id.* ¶ 34.

Nine of Jiron's family members are also plaintiffs in this action: his wife, Brandy O. Jiron; his daughter, Kimberly J. Jiron; his son, Randall R. Jiron; his mother, Mary J. Jiron; his father, Randall Jiron; his brothers, Adrian M. Jiron, Alvin G. Jiron, and Matthew L. Jiron; and his sister, Carol M. Lewis. *Id.* ¶ 4.

Jiron's wife, Brandy O. Jiron, learned of the attack on the radio while driving back home and later received a phone call informing her that her husband's barracks were attacked. Decl. of Brandy O. Jiron (Sept. 13, 2021) ("Brandy Jiron Decl.") ¶¶ 5, 12-13, 19, ECF No. 59. Fortunately, just "an hour or two later," Brandy Jiron received a call from her husband saying he was okay. *Id.* ¶ 25. When Jiron returned home from Saudia Arabia days later, she could tell her husband "was not the same person," *id.* ¶ 31: Jiron was no longer "the loving and doting father to [their] children" and was instead "just a bear" with "no patience" for her or their kids, *id.* ¶ 38. With time, Brandy Jiron's relationship with her husband became severely strained because of his PTSD. They began to experience financial difficulties and Brandy Jiron felt not just depressed, but "suicidal." *See id.* ¶¶ 42-43. Brandy Jiron has chosen to stay with her husband because she "love[s] him, and . . . always will, even with all the ups and downs," although the "bombing at Khobar Towers irreparably changed" him, "is no longer an affectionate man," and "refuses to be present and supportive of [her] or [their] children." *Id.* ¶ 51.

Jiron's daughter, Kimberly J. Jiron, was three-and-a-half years old at the time of the bombing and only remembers that her "grandmother was crying and trying to comfort [her], but

[she] didn't understand why."  Decl. of Kimberly J. Jiron (Sept. 14, 2021) ("Kimberly Jiron Decl.") ¶¶ 4, 7, ECF No. 59.  As she became older and learned more about attack, Kimberly Jiron realized how the bombing had a "huge impact on [her] dad and family."  *Id.* ¶ 9.  She has struggled with depression, anxiety, and PTSD, and the way she has coped with these disorders has been modeled by her father, who "is so withdrawn that it is difficult to talk to him at all."  *Id.* ¶¶ 16-19.  Kimberly Jiron also recalls growing up in a highly regimented household, with no family vacations, hugs and kisses on the cheeks, or travel to big cities, all of which she attributes to Jiron's focus on safety after his experience in Khobar Towers.  *Id.* ¶¶ 7, 11-12.  To this day, she describes her father as "not always present" and disliking large groups, big parties or celebrations, traveling and swimming—although "he doesn't ever miss the evening news."  *Id.* ¶ 19.

Jiron's son, Randall R. Jiron, was only one year old at the time of the bombing and "has suffered emotionally" in its aftermath because of the impact it had on his father.  Decl. of Randall R. Jiron (Sept. 13, 2021) ("Randall R. Jiron Decl.") ¶¶ 4, 7, ECF No. 59.  Growing up, he perceived his father become "detached and unemotional with [his] children" and also have "anger issues," with the "smallest things set[ting] him off" as a consequence of his PTSD.  *Id.* ¶¶ 7-8.  He also explains that his "family did not participate in normal family activities . . . because of [his] father's fear of another terrorist attack."  *Id.* ¶ 10.  Randall Jiron attributes his own "high anxiety and depressive episodes" to his proximity to Jiron while he navigated the psychological sequalae of surviving the attack.  *Id.* ¶ 8.  Today, Randall Jiron finds it "emotionally draining" to spend time with his father and "can barely talk to him without causing an argument due to how [his father] reacts."  *Id.* ¶ 9.

Jiron's mother, Mary J. Jiron, was convinced that she had lost her son after seeing news reports of the Khobar Towers bombing.  Decl. of Mary J. Jiron (Sept. 14, 2021) ("Mary Jiron Decl.") ¶¶ 5, 8, ECF No. 59.  She was relieved when Jiron was finally able to call her, but remained worried that there would be additional bombings or that he would be unable to leave Saudi Arabia.  *Id.* ¶¶ 8-9.  Mary Jiron feels guilty because she encouraged her son to join the Air Force and struggles bearing "responsib[ility] for putting him into harm's way."  *Id.* ¶ 11.  Today, Mary Jiron is "very vigilant because you never know what is going to happen where" since the "world is a mess and there could be a terrorist attack even at the grocery store."  *Id.* ¶ 12.

Jiron's father, Randall Jiron, was at work at UPS when his boss found him along his route and told him to "go home right away because [his] son was in a bombing in Saudi Arabia and could be dead."  Decl. of Randall Jiron (Sept. 14, 2021) ("Randall Jiron Decl.") ¶¶ 4, 7, ECF No. 59.  Until hearing otherwise later that evening, he was "devastated" and "sure [his] son was gone."  *Id.* ¶ 9.  Randall Jiron had to "take off a few days of work" after the attack "in order to calm down" because he "was way too emotional to drive safely" as a UPS driver.  *Id.* ¶ 11. Once Jiron returned home, Randall Jiron's relationship with him changed as his son "became very secluded" and now limits the time he spends with family.  *Id.* ¶ 13.  Randall Jiron himself has also changed after the attack, limiting where he "travel[s] to" and avoiding "any Arab country fearing other terrorist attacks."  *Id.* ¶ 14.

Jiron's younger brother, Adrian M. Jiron, spent the day after the attack thinking that his older brother had died and trying to comfort his mother, who was going "through the unimaginable sensation of possibly losing her son so suddenly."  Decl. of Adrian M. Jiron (Oct. 24, 2021) ("Adrian Jiron Decl.") ¶¶ 5, 10, ECF No. 59.  He "was angry, confused, and worried for weeks, possibly months after the attack."  *Id.* ¶ 10.  Although Jiron was a caring and

affectionate big brother growing up, Adrian Jiron perceived his "spark . . . to have been smothered by the horrendous attack." *Id.* ¶¶ 8-9. He saw Jiron, for instance, go from being "the outspoken big brother" to being withdrawn and quiet. *Id.* ¶ 11. Adrian Jiron is "fill[ed] . . . with grief" whenever he thinks about his brother's pain and is afraid of traveling "to foreign countries, attend big events, or even gather with people in large crowds" because of what his brother lived through at Khobar Towers. *Id.* ¶ 12.

Jiron's other younger brother, Alvin G. Jiron, was a teenager and a rising high school when the attack occurred. Decl. of Alvin G. Jiron (Sept. 24, 2021) ("Alvin Jiron Decl.") ¶¶ 5, 8, ECF No. 59. When his parents told him about the bombing, Alvin Jiron became terrified thinking his brother had died. *Id.* ¶ 8. He recalls that since the attack, but "especially immediately after," his brother turned "very closed off and distant like he was in a depression." *Id.* ¶ 10. Alvin Jiron had a hard time seeing his brother like that, although they "still managed to share [their] love for each other and do [their] best to be a family after the bombing." *Id.* In the years since, he has "experienced a lot of paranoia and anxiety from [his] brother's incident" because the attack at Khobar Towers made it seem "like it could happen again, anywhere." *Id.* ¶ 11.

Jiron's older brother, Matthew L. Jiron, was also serving in the Air Force at the time of the attack and received a call from his mother, distraught, asking if Jiron was stationed at Khobar Towers. Decl. of Matthew L. Jiron (Nov. 8, 2021) ("Matthew Jiron Decl.") ¶¶ 7, 8, ECF No. 59. Awaiting for confirmation that Jiron had survived the attack "was one of the scariest moments of [his] life and . . . seemed like an eternity" for him. *Id.* ¶ 8. Matthew Jiron perceives his brother "isn't the same person" as before the bombing and that he "lost some of his soul that day." *Id.* ¶ 10. Thinking about the events of June 25, 1996 also "brings back a lot of emotions and tears" for

Matthew Jiron: it "infuriates" him that "[n]ot only did [his] little brother almost die" but that "it seemed like the military did nothing to help him deal with the PTSD." *Id.* ¶¶ 10-11.

Jiron's sister, Carol M. Lewis, who was nineteen at the time, learned of the attack through a phone call from her mother but did not know the extent of her brother's injuries for another two weeks. Decl. of Carol M. Lewis (Sept. 15, 2021) ("Lewis Decl.") ¶¶ 6, 9, ECF No. 59. Growing up as Jiron's only sister, Lewis shared an extremely close, loving relationship with her big brother, who was very protective and liked to spoil her with "things like [her] very first Walkman, music cassette tapes, snack foods and candy." *Id.* ¶ 11. The bombing, however, "absolutely destroyed" their relationship and Jiron was "never the same." *Id.* ¶ 13. This "was a disturbing shock" to Lewis because her brother simply was not "the joyful and funny extrovert he used to be," making her wonder whether Jiron "did not like [her] or want to be around [her] anymore." *Id.* ¶ 14. Lewis remained "angry and embittered for years" because the "terrorists stole [her] brother" and still lives in fear that her "family may be targeted or bombed." *Id.* ¶ 15.

### 32. *One Family Member of Staff Sergeant Stephen K. Johnson*

Stephen K. Johnson, a Staff Sergeant in the Air Force quartered in the Khobar Towers, was a plaintiff in *Schooley*, 2019 WL 2717888, at *14. He was injured in the attack and awarded $6 million for pain and suffering stemming from injuries he sustained in the attack. His brother, Christopher M. Johnson, is now a plaintiff in this action. Christopher Johnson learned of the Khobar Towers bombing through a phone call from his mother, but it was not until at least a day later that he heard more about his brother's condition. Decl. of Christopher M. Johnson (Sept. 1, 2021) ("Johnson Decl.") ¶¶ 4, 7-9, ECF No. 60 (sealed), ECF No. 121 (public version). He thereafter left his army basic training at Fort Knox, Kentucky, and returned home in Hunstville, Alabama to be with his mother and siblings as they awaited Johnson's return to the United

States.  *Id.* ¶¶ 9-10.  Christopher Anderson "ended up having to take two weeks off training to help [his] mother get through . . . an emotionally trying time."  *Id.* ¶ 11.  Upon reuniting, he saw that his brother's "personality had changed."  *Id.* ¶ 12.  Christopher continues to worry for his brother, whose injuries at Khobar Towers "created a real sense of vulnerability in [him] as an American soldier" and have made him "hyper-vigilan[t]" during his combat tours" and postings in Afghanistan, Iraq and Kuwait.  *Id.* ¶ 13.

### 33. *Roger K. Kaalekahi IV and Two Family Members*

On June 25, 1996, Roger K. Kaalekahi was a Senior Airman quartered in Khobar Towers who, with the explosion, "[s]uddenly . . . saw a flashing light," felt unbearable pain in his head, and was thrown to the ground.  Decl. of Roger K. Kaalekahi IV (Sept. 28, 2021) ("Kaalekahi IV Decl.") ¶¶ 5-7, ECF No. 61 (sealed), ECF No. 122 (public version).  After a friend, plaintiff David Robinson, helped him out of Building 129 (the dormitory to which he was assigned), Kaalekahi required immediate medical attention because he "had sustained a depressed skull fracture and multiple lacerations to [his] face, hand, and legs."  *Id.* ¶ 8.  He also later required surgery to remove glass from his knee, and since surviving the attack has developed PTSD along "with chronic headaches, mood swings, sleep apnea, sleep deprivation . . . depression [and] high blood pressure."  *Id.* ¶¶ 13-15.  Kaalekahi has received a 70% combined disability rating from the VA, with individual ratings of 50% for PTSD, 10% for skull fracture, and 10% for knee injury, *id.* ¶ 16; *id.*, Ex. 4, Letter from VA, dated Feb. 2, 2016, and was awarded a Purple Heart in recognition of his combat wounds, Kaalekahi IV Decl. ¶ 12; *id.*, Ex. 4, Purple Heart Certificate, dated July 2, 1996.  Two of Kaalekahi's family members are also plaintiffs in this action: his wife, Valerie Kaalekahi, and his daughter, Kiana Kaalekahi.  Kaalekahi IV Dec. ¶ 4.

Kaalekahi's wife, Valerie M. Kaalekahi, learned of the attack from a coworker but did not receive concrete information about her husband's condition for multiple days, becoming terrified when she was told he "was unaccounted for."  Decl. of Valerie M. Kaalekahi (Sept. 28, 2021) ("Valerie Kaalekahi Decl.") ¶¶ 5, 10, 12-16, ECF No. 61.  It was not until three days after the bombing that, in the middle of the night, she received a call from Kaalekahi following his surgery for depressed skull fracture.  *Id.* ¶ 17.  Valerie Kaalekahi did not return to work until her husband flew back to the United States five weeks later.  *Id.* ¶ 18.  In the intervening years, she has tried help Kaalekahi cope with the "physical and emotional trauma" stemming from the attack but he has "shut [her] out," which has "put a great strain" on their marriage.  *Id.* ¶ 20.  "Recalling these memories of the Khobar Towers bombing brings tears" to Valerie Kaalekahi's eyes, and she is "still coping with the emotional, physical, and psychological effects" that emerged from the attack.  *Id.* ¶ 22.

Kaalekahi's daughter, Kiana K. Kaalekahi, was only eleven months old at the time of the attack, but her parents told her about it and explained the injuries her father sustained as she became older.  Decl. of Kiana K. Kaalekahi (Sept. 27, 2021) ("Kaalekahi Decl.") ¶¶ 4, 7-8, ECF No. 61.  Kiana Kaalekahi grew up watching her father suffer from his lasting physical injuries, unstable emotions, and physical scarring.  *Id.* ¶¶ 8-9.  She found it "hard to communicate with a parent who was going through emotional and physical pain" and "got upset very fast."  *Id.* ¶ 10.  Today, Kiana Kaalekahi continues to worry for her father's well-being.  *Id.* ¶ 11.

### 34. *David A. Krueger*

On June 25, 1996, David A. Krueger was an Airman First Class quartered in Khobar Towers.  Decl. of David A. Krueger (Oct. 4, 2021) ("Krueger Decl.") ¶ 5, ECF No. 62 (sealed), ECF No. 150 (public version).  He was waiting for transportation in the parking lot behind

Building 131, which was closest to the truck-bomb, when the blast threw him against a wall and knocked him unconscious. *Id.* ¶ 8. Upon regaining consciousness, Krueger "had a large bump on the back of [his] head" and his "ears were ringing from the noise of the blast." *Id.* ¶ 9. Amidst the darkness and chaos, he thought American troops "were under attack by Iraq" and that he was "going to be killed." *Id.* ¶ 8. Krueger sustained a concussion, hearing loss, and tinnitus as result of the bombing; he has also developed PTSD manifesting through episodes of nightmares, anxiety, and depression. *Id.* ¶¶ 14-15. Since the attack, he has noticed changes in his personality and struggles with self-isolation, mood swings, and his interpersonal relationships. *Id.* ¶¶ 15, 17. He was rated 100% disabled by the VA because of his PTSD, anxiety, and depression. *Id.* ¶ 18; *id.*, Ex. 10, Letters from VA, dated Jan. 30, 2019, Feb. 21, 2019. In recognition of his assistance in the cleanup, search, and security efforts after the bombing, Krueger was awarded the Armed Forces Expeditionary Medal and Certificate of Appreciation. Krueger Decl. ¶¶ 11-12; *id.*, Ex. 6, Armed Forces Expeditionary Medal Certificate, dated Aug. 15, 1996; *id.*, Ex. 7, Certificate of Appreciation, dated Aug. 15, 1996; *id.*, Ex. 8, Letter of Evaluation, dated Aug. 15, 1996.

### 35. *David W. Long, Sr. and Two Family Members*

On June 25, 1996, David W. Long, Sr. was a Staff Sergeant quartered in Khobar Towers. Decl. of David W. Long, Sr. (Aug. 27, 2021) ("Long Sr. Decl.") ¶ 6, ECF No. 63 (sealed), ECF No. 123 (public version). When the bomb exploded, he was thrown to the floor and sustained deep lacerations from glass shrapnel on his head, hands, and leg, with the laceration on his left hand so "deep" that he could even see the tendon. *Id.* ¶ 9. Long refused to receive medical assistant right away, however, because he "saw other airmen with very severe injuries." *Id.* To this day, Long suffers from pain in his hand, scarring, migraines, vertigo, and tinnitus. *Id.* ¶ 14.

71

He also has PTSD manifesting through nightmares, night terrors, panic attacks, an intolerance of crowds, and paranoia.  *Id.* ¶¶ 15-16.  Long received a 90% combined VA disability rating, with individual ratings of 70% for PTSD, 30% for bilateral vestibular weakness, 10% for tinnitus, 10% for paresthesia of iliofemoral nerve with scar, and 10% for contusion of his left hand with associated scarring.  *Id.* ¶ 18; *id.*, Ex. 8, Letter from VA, dated Feb. 22, 2018.  Nevertheless, he is compensated at the 100% rate because he is unemployable due to those service-connected disabilities and is considered "totally and permanently disabled."  *Id.*  Long was awarded a Purple Heart for his combat wounds and was recognized with the Outstanding Unit Award with Valor.  *Id.* ¶ 13, Ex. 6, Purple Heart Certificate and Special Order, dated Feb. 22, 2018; *id.*, Ex. 3, Certificate of Discharge.  Two of Long's family members are also plaintiffs in this action: his wife, Cynthia A. Long, and his son, David W. Long, Jr.  *Id.* ¶ 4.

Long's wife, Cynthia A. Long, learned of the bombing on the news and heard from her husband later that day that he was injured and "could see the bone and tendons moving when he tried to move his finger."  Decl. of Cynthia A. Long (Aug. 27, 2021) ("Long Decl.") ¶¶ 5, 8, 12, ECF No. 63.  When Long returned home six weeks later, Cynthia Long perceived that he "was pretty much a wreck" because of his PTSD.  *Id.* ¶ 14.  Due to the intolerance of "loud noises or large crowds" that Long developed after the attack, for instance, Cynthia Long and her family could no longer engage in typical activities like cookouts and traveling.  *Id.* ¶¶ 14-16, 19-20.  Her husband also "has nightmares on a regular basis" and has awakened Cynthia Long by "slapping at [her] like he is trying to get away from something/someone."  *Id.* ¶ 22.  Long's quicker temper and altered emotional state make it difficult to disagree with him for fear of setting him off, for which Cynthia Long "still feel[s] like [she is] walking on egg shells just to keep the peace."  *Id.* ¶¶ 24-25.  She perceives that her husband today "is not the person that [she] married 40 years

ago" and "would do anything to help him get back what he lost due to the bombing." *Id.* ¶ 27. For Cynthia Long, "the stress that [she] deals with daily is something you can't explain to someone that has not been through what [her husband] has." *Id.* ¶ 28.

Long's son, David W. Long, Jr., was thirteen years old at the time of the bombing and did not know whether his father had survived for a day. Decl. of David W. Long, Jr. (Sept. 7, 2021) ("Long Jr. Decl.") ¶¶ 4, 7, 9, ECF No. 63. He was grateful that his father was okay, but "had a hard time sleeping for a while after the attack" and "was still very worried about [his] father's safety while he was still deployed to Saudi Arabia. *Id.* ¶ 10. In the years since, David Long Jr. has suffered because of his father's PTSD: he could "not have friends over anymore because [they] kept making too much noise and it bothered [his] father too much" nor could his father spend family time together in crowds or go to sporting events "because the large crowds made [him] nervous." *Id.* ¶¶ 13-14.

### 36. *Christopher E. Marsh*

On June 25, 1996, Christopher E. Marsh was an Airman First Class quartered in Khobar Towers. Decl. of Christopher E. Marsh (Aug. 27, 2021) ("Marsh Decl.") ¶ 5, ECF No. 64 (sealed), ECF No. 124 (public version). When the bomb exploded, Marsh was thrown to the ground and pelted with glass and debris. *Id.* ¶ 7. His ears were ringing and he could not hear. *Id.* As he made his way out of the building, Marsh found an injured coworker and helped her down the stairs, then assisted other injured airmen. *Id.* He has struggled with psychological and emotional changes since returning home, including insomnia, nightmares, panic attacks, paranoia, sensitivity to loud noises and crowds, impatience, and mood swings. *Id.* ¶¶ 8-10. The VA rated Marsh 70% disabled, with 50% attributed to his PTSD from the Khobar Towers bombing. *Id.* ¶ 11; *id.*, Ex. 5, VA eBenefits Website Disability Ratings Page.

### 37. *John G. McCarthy*

On June 25, 1996, John G. McCarthy was a Staff Sergeant quartered in Khobar Towers.
Decl. of John G. McCarthy (Dec. 28, 2021) ("McCarthy Decl.") ¶ 5, ECF No. 65 (sealed), ECF
No. 125 (public version).  When the bomb exploded, McCarthy had evacuated his room on the
fifth floor of Building 131 after receiving a security warning and was running downstairs to warn
his fellow airmen on the fourth floor.  *Id.* ¶ 8.  "The blast sent [McCarthy] flying across the
stairwell and slammed [him] into the floor, knocking [him] unconscious and causing a
concussion and traumatic brain injury."  *Id.* ¶ 9.  Upon regaining consciousness, McCarthy began
to assist others and gave a bleeding airman his shirt to use as a makeshift bandage.  *Id.* ¶ 11.  He
was awarded a Purple Heart for his wounds in combat and the Air Force Commendation Medal
with Valor for his efforts in helping evacuate Building 131.  *Id.* ¶¶ 16-17; *id.*, Ex. 4, Purple Heart
Certificate, dated Dec. 16, 1996; *id.*, Ex. 5, Air Force Commendation Medal Certificate, dated
Oct. 21, 1996.  Since the attack, McCarthy has developed PTSD and experienced depression,
anxiety, and night terrors.  McCarthy Decl. ¶ 19.  His "anxiety and stress levels" also led
McCarthy to suffer a heart attack "while . . . still in [his] forties."  *Id.*  The VA rated McCarthy
80% disabled, with individual ratings of 50% for obstructive sleep apnea, 30% for coronary
artery disease, 10% for PTSD, 10% for chronic lumbar spine strain, 10% for surgical scars, 10%
for cervical spine degenerative disc disease, and 10% for tinnitus.  *Id.* ¶¶ 18, 21; *id.*, Ex. 7,
Letters from VA, dated Nov. 10, 2016 and Mar. 20, 2017.

### 38. *Jason L. Melvin*

On June 25, 1996, Jason L. Melvin was an Airman First Class quartered in Khobar
Towers.  Decl. of Jason L. Melvin (Sept. 1, 2021) ("Melvin Decl.") ¶ 5, ECF No. 66 (sealed),
ECF No. 126 (public version).  The bomb knocked him out of bed and thrown him to the floor of

his dormitory at Building 120. *Id.* ¶ 7. Melvin quickly reported to the blast location and assisted with securing the area and evacuation of the injured and deceased. *Id.* ¶¶ 9-10. For the remainder of this time at the Khobar Towers complex, he recalls that the American mission "continued to receive threats on daily basis." *Id.* ¶ 11. Melvin was awarded the Air Force Achievement Medal with Valor in recognition of his efforts after the bombing. *Id.* ¶ 12; *id.*, Ex. 4, Air Force Achievement Medal Certificate, dated June 24, 1997. Since the attack, Melvin has suffered from PTSD with "intrusive memories" about the bombing together with panic attacks, anxiety, hypervigilance, insomnia, headaches, and hypertension. *Id.* ¶¶ 14-15. He received a 60% combined disability rating from the VA, with individual ratings of 50% for PTSD and 10% for tinnitus. *Id.* ¶ 16; *id.*, Ex. 6, Letter from VA, dated Aug. 22, 2019.

### 39. *Flor D. Morales and One Family Member*

On June 25, 1996, Flor D. Morales was an Airman First Class quartered in Khobar Towers. Decl. of Flor D. Morales (November 21, 2021) ("Morales Decl.") ¶ 7, ECF No. 67 (sealed), ECF No. 127 (public version). When the blast hit, Morales felt "a suction[-]like feeling and heard a booming sound" which made her fall back and caused lacerations on her right arm and leg. *Id.* ¶¶ 12-13, 15. She did not realize, amidst the ensuing chaos, that she was bleeding until someone else told her. *Id.* ¶ 13. "After years of suppressing [her] thoughts, feelings, and memories," Morales "was diagnosed with chronic PTSD" and she has been seeing a therapist for over a year. *Id.* ¶ 19. Both the psychological and emotional toll of the explosion have damaged her interpersonal relationships, made daily tasks difficult, and exacerbated her PTSD with episodes of paranoia, paralyzing fear, insomnia, and survivor's guilt. *Id.* ¶¶ 16, 19. Morales also suffers from constant neck and back pain making even the smallest movements—like hopping and running—painful. *Id.* ¶ 21. In recognition of her combat wounds, Morales was awarded a

Purple Heart. *Id.* ¶ 17; *id.*, Ex. 6, Purple Heart Certificate, dates Aug. 26, 1996.  She has been

rated 100% by the VA based on individual ratings of 50% for PTSD, 40% for lumbar spine

degenerative disc disease, 10% for tinnitus, 20% for leg radiculopathy, 20% for left upper

extremity radiculopathy, and 20% for cervical spine degenerative disease.  Morales Decl. ¶ 23;

*id.*, Ex. 8, Letters from VA, dated Sept. 11, 2017, Feb. 14, 2018, and July 3, 2020. Morales's

mother, Martina Ortiz, is also a plaintiff in this action.  Morales Decl. ¶ 4.

Martina Ortiz learned of the attack on the news and was distraught and in fear for her

daughter's life "for three or four hours."  Decl. of Martina Ortiz (Feb. 17, 2022) ("Ortiz Decl.")

¶¶ 5, 8.  She was relieved to learn her daughter was safe, but "continued to worry for [her] safety

until she returned home from her deployment."  Ortiz continues to "experience worry and

sorrow" today for the "pain [Morales] still suffers from the injuries she sustained" at Khobar

Towers.  *Id.* ¶ 9.

### 40. *Morris M. Myers, Jr. and One Family Member*

On June 25, 1996, Morris M. Myers was a Staff Sergeant quartered at Khobar Towers.

Decl. of Morris M. Myers, Jr. (Dec. 7, 2021) ("Myers Jr. Decl.") ¶ 6, ECF No. 68 (sealed), ECF

No. 128 (public version).  He was on the phone with his wife when the blast hit, "throwing

[Myers] first against the wall, and then against the railing" of the balcony he was in.  *Id.* ¶¶ 9-10.

Despite the ache in his back and neck, Myers assisted with bandaging and transporting the

wounded in the hours immediately after the attack and "could not bring [him]self to ask for

medical assistance after seeing everything [he] saw."  *Id.* ¶ 15.  Myers "developed PTSD as a

result of the bombing" with flare ups of "hypervigilance, depression, nightmares, and insomnia."

*Id.* ¶ 22.  What he experienced at Khobar Towers changed Myers's life: he "began to self-

medicate with alcohol . . . lost [his] family . . . . lost [his] career," and even contemplated

committing suicide in more than one occasion.  *Id.* ¶ 25.  He was rated as 50% disabled by the VA for PTSD.  *Id.* ¶ 26; *id.*, Ex. 6, Letter from VA, dated Aug. 31, 2017.  Myers was awarded the Air Force Achievement Medal with Valor for his courage and efforts after the bombing. Myers Jr. Decl. ¶ 21; *id.*, Ex. 4, Air Force Achievement Medal Certificate, dated Oct. 29, 1997. His mother, Sherry D. Byes, is also a plaintiff in this action.  *Id.* ¶ 4.

Sherry D. Byes learned of the attack when Air Force officials called to advise her son was "missing in action" after the bombing.  Decl. of Sherry D. Byes (Oct. 11, 2021) ("Byes Decl.") ¶¶ 5, 8, ECF No. 68.  In that moment, she became "so distressed" that she had to leave work and later spoke to her daughter-in-law, who told her that "the phone line had gone dead when she was talking to [Myers]."  *Id.* ¶ 8.  This made Byes believe that her son "had been killed."  *Id.*  She was finally able to speak with Myers the next day but nevertheless remained "in extreme distress and . . . fear" for him, which "exacerbated [her] high blood pressure" and otherwise made her unable to properly "function and care for [her] other children during this time."  *Id.* ¶¶ 8-9.

### 41. *William G. Neff*

On June 25, 1996, William G. Neff was a Senior Airman quartered at Khobar Towers. Decl. of William G. Neff (Dec. 6, 2021) ("Neff Decl.") ¶ 5, ECF No. 69 (sealed), ECF No. 129 (public version).  He was watching TV with fellow plaintiff Zachary Capogna when the bomb exploded.  *Id.* ¶ 7.  The blast got "him blown across the room" towards "the back wall."  *Id.* ¶ 8. Neff sustained severe lacerations to his hands and feet, with glass shrapnel embedded in both. *Id.*  Despite these injuries, he provided Capogna with "buddy care first aid" and helped carry him down three flights of stairs with the assistance of other airmen.  *Id.* ¶ 9.  In recognition of his combat wounds, Neff was awarded a Purple Heart.  *Id.* ¶ 13; *id.*, Ex. 7, Purple Heart Certificate

and Special Order dated Aug. 6, 1996.  Neff has developed PTSD since the attack, causing him

to have a "shorter fuse" and to often "feel bothered, scared, and nervous."  Neff Decl. ¶ 16.  He

received a combined 80% VA disability rating, including individual ratings of 50% for PTSD.

*Id.* ¶ 17; *id.*, Ex. 8, Letter from VA, dated May 2, 2019.

### 42. *Elisha J. Novell*

On June 25, 1996, Elisha J. Novell was a Staff Sergeant quartered in Khobar Towers.

Decl. of Elisha J. Novell (Aug. 26, 2021) ("Novell Decl.") ¶ 5, ECF No. 70 (sealed), ECF No.

130 (public version).  The bomb exploded as Novell was leaving a dining facility at the complex.

*Id.* ¶¶ 8, 9.  He thereafter "immediately responded to the scene of the explosion to help evacuate

the survivors from the rubble" and was posted as the "area supervisor" for this operation.  *Id.* ¶

10.   Novell later assisted the FBI in securing the area and searching for evidence.  *Id.* ¶ 11.   In

recognition of these contributions, he was awarded the Armed Forces Expeditionary Medal.  *Id.*

¶ 12; *id.*, Ex. 7, Armed Forces Expeditionary Medal Certificate, dated Apr. 4, 1996 to July 5,

1996.  Novell has struggled with his mental health since the bombing, receiving "diagnoses for

major depressive disorder, PTSD, substance use disorder, and social adjustment disorder."  *Id.* ¶

14.  These conditions contributed to his placement in an "involuntary suicide hold" at a

psychiatric hospital after attempting suicide in 2018.  *Id.* ¶ 16.  The deterioration of Novell's

mental health has also affected his interpersonal relationships and ability to socialize, costing

him his first marriage and making him "have no friends of [his] own nor any desire to have any."

*Id.* ¶¶ 15, 18.  The VA rated him 80% disabled, including an individual rating of 50% for an

adjustment disorder attributed to the Khobar Towers bombing.  *Id.* ¶ 19; *id.*, Ex. 10, Letters from

VA, dated May 14, 2019 and Apr. 9, 2013.

### 43. *Two Family Members of Airman Laurence P. Oliver*

Laurence P. Oliver was a Senior Airman quartered in Khobar Towers on June 25, 1996 and also a plaintiff in *Schooley*, 2019 WL 2717888, at *20.  As a result of the attack, Oliver developed PTSD and was awarded $7 million for a VA disability rating above 70%.  *Id.*, at *75. Two of his family members are now plaintiffs in this action: his mother, Donna Lee Oliver, and his father, Paul Oliver.  Decl. of Donna L. Oliver (Sept. 16, 2021) ("Oliver Decl.") ¶ 4, ECF No. 71 (sealed), ECF No. 131 (public version).

Oliver's mother, Donna Lee Oliver, learned of the bombing through a call from her mother and "could not believe" what she saw when she turned on the TV news.  *Id.* ¶ 10. "[S]ome of the worry" she was experiencing was relieved upon receiving a call from her son later that evening.  *Id.* ¶ 11.  Still, knowing that her son was at Khobar Towers during the attack brought back for Donna Oliver "all the horrors and fears" of losing one of her brothers for "unknown causes" when he was just 23 years old and having another brother injured in a plane crash in Vietnam.  *Id.* ¶¶ 12, 14.  Wherever her son goes, Donna Oliver wonders whether he "will . . . be safe" or if she will "lose him."  *Id.* ¶ 18.  She has been "greatly affected" by the "emotional injuries" of watching Oliver struggle with PTSD and finds that the "shock and fear of that devastation does not go away."  *Id.* ¶ 20.

Oliver's father, Paul Oliver, was "in stunned disbelief" when he learned about the attack and "waited hours for word about" his son.  Decl. of Paul Oliver (Sept. 13, 2021) ("Paul Oliver Decl.") ¶¶ 4, 10-11, ECF No. 71.  Although "greatly relieved" upon receiving notice that his son was alive, Paul Oliver nevertheless remained "stress by the situation" and fearful that Oliver "could still return home injured."  *Id.* ¶ 11.  He "had no supports in place to assist [him] or help [him] cope" with what he was experiencing.  *Id.* ¶ 12.  Things were "dramatically different"

when Oliver returned to the United States, and Paul Oliver's "open and loving relationship" with his son "became cautious and tentative." *Id.* ¶ 13.

### 44. *Mark W. O'Toole and Three Family Members*

On June 25, 1996, Mark W. O'Toole was a Senior Airman quartered in Khobar Towers. Decl. of Mark W. O'Toole (Oct. 5, 2921) ("O'Toole Decl.") ¶ 6, ECF No. 72 (sealed), ECF No. 132 (public version).  He was "blown backwards by the explosion" into a wall, knocked unconscious, and sustained multiple injuries, including a concussion, lacerations under his left eye, blown out eardrums, and a broken nose. *Id.* ¶ 8.  Glass fragments also became embedded in his right eye, arms, legs, and torso.  *Id.*  Upon returning to the United States about one month after the attack, O'Toole was sent to a brain trauma unit for treatment of his "memory problems, headaches, ringing ears, and brain bruising." *Id.* ¶ 10.  He is still undergoing psychological treatment for PTSD and is "reminded of Khobar every day."  *Id.* ¶¶ 11, 14.  O'Toole was awarded a Purple Heart for the injuries he sustained in combat.  *Id.* ¶ 13; *id.*, Ex. 5, Purple Heart Certificate, dated Aug. 7, 1996.  The VA rated him 80% disabled, with individual ratings of 50% for PTSD and traumatic brain injury, 50% for post-concussion headaches, and 10% for tinnitus. O'Toole Decl. ¶ 15; *id.*, Ex 6, Letter from VA, dated Sept. 10, 2019.

O'Toole's wife, Stacey L. O'Toole, learned of the bombing on the news and spent five hours "distraught trying to find out what happened" to her husband.  Decl. of Stacey L. O'Toole (Sept. 13, 2021) ("Stacey O'Toole Decl.") ¶¶ 5, 8, ECF No. 72.  She remained worried about O'Toole until he returned home two months later.  *Id.* ¶ 9.  As a result of the bombing, Stacey O'Toole feels that her husband changed into a "different person" who was no longer the "happy-go-lucky guy" she fallen in love with during high school.  *Id.* ¶ 10.  She witnessed O'Toole "mask[]" the pain resulting from his undiagnosed PTSD "with alcohol and drugs."  *Id.* ¶ 11.

Stacey O'Toole explains that they lost their family "home and the life [they] had built together" because of her husband's PTSD.  *Id.* ¶ 11.

O'Toole's daughter, Kayla K. Kasten, was only five years old at the time of the bombing. Decl. of Kayla K. Kasten (Sept. 21, 2021) ("Kasten Decl.") ¶¶ 5, 8, ECF No. 72.  Growing up, she witnessed how her father's PTSD affected her entire family.  *Id.* ¶ 10.  Kasten, for example, recalls that O'Toole's "nightmares . . . would wake up the entire house" and that her "mom . . . was constantly affected because she would be the only one who could calm [O'Toole] down." *Id.*  She has since then "blocked out most of [her] childhood."  *Id.* ¶ 12.  To this day, Kasten struggles hearing her father say that "he wishes it was him who had been killed so someone else could have gone home" at Khobar Towers.  *Id.* ¶ 15.

O'Toole's other daughter, Kelsie E. O'Toole, was only two years old at the time of the attack.  Decl. of Kelsie E. O'Toole (Sept. 13, 2021) ("Kelsie O'Toole Decl.") ¶¶ 4, 7, ECF No. 72.  Although she does not remember the bombing, she grew up worrying about her father's well-being and today still becomes "paranoid" when she does not hear from him "at least once day" because of his "severe PTSD" and "survivor's guilt."  *Id.* ¶ 8.  Kelsie O'Toole does remember, however, that her "family didn't participate in a lot of the usual activities that families do together because [her] father could not tolerate loud noises."  *Id.* ¶ 9.

### 45. *Eldred E. Pailin*

On June 25, 1996, Eldred E. Pailin was a Staff Sergeant quartered in Khobar Towers. Decl. of Eldred E. Pailin (Oct. 5, 2021) ("Pailin Decl.") ¶ 5, ECF No. 73 (sealed), ECF No. 132 (public version).  When the bomb exploded, Pailin "felt [the] vibration of the building," was thrown to the wall, and hit with glass and metal fragments, which inflicted lacerations in his arms and legs.  *Id.* ¶ 8.  He developed PTSD since the attack and "can never forget that night."  *Id.* ¶

15.  Sometimes, Pailin even "wonder[s] why God spared [him] and did not let [him] die in the attack."  *Id.*  His PTSD manifests mainly through episodes of poor sleep, cold sweats, a fear of loud noises, crowds, and survivor's guilt.  *Id.*  Pailin was rated 70% disabled by the VA, including individual ratings of 50% for PTSD, 10% for tinnitus, and 10% for painful laceration scars on his left elbow and left calf.  *Id.* ¶ 16; *id.*, Ex. 13, Letter from VA, dated June 14, 2019, ECF No. 73.  He was also awarded a Purple Heart for his combat wounds, the Armed Forces Expeditionary Medal, and the Air Force Certificate of Appreciation for Outstanding Service. Pailin Decl. ¶¶ 9-10; *id.*, Ex. 7, Purple Heart Certificate and Special Order, dated Aug. 6, 1996; *id.*, Ex. 8, Armed Forces Expeditionary Medal Certificate, dated July 11, 1996; *id.*, Ex. 9, United States Air Force Certificate of Appreciation, dated July 11, 1996.

### 46. *Jeremy L. Parratt and Two Family Members*

On June 25, 1996, Jeremy L. Parratt was an Airman First Class quartered in Khobar Towers.  Decl. of Jeremy L. Parratt (Nov. 3, 2021) ("Parratt Decl.") ¶ 6, ECF No. 74 (sealed), ECF No. 134 (public version).  He was headed to complete an overnight shift at the nearby airbase when the bomb exploded, causing his ears to ring and his van to blow "off the road."  *Id.* ¶¶ 9-10.  After being denied reentry to the Khobar Towers complex, he was ordered instead to patrol the perimeter of the nearby airbase, without a weapon, and "watch for anyone trying to overrun the base."  *Id.* ¶ 11.  Parratt was shocked to return to Khobar Towers the next day and witness "a huge crater where the truck had detonated" and that "[t]here was blood literally everywhere."  *Id.* ¶¶ 12-13.  Over the next several days, he assisted in the cleanup efforts and "can still see all of the blood splattered everywhere you walked."  *Id.* ¶ 16.  Years later, Parratt was awarded the Armed Forces Expeditionary Medal in recognition of these efforts.  *Id.* ¶ 15; *id.*, Ex. 3, Certificate of Discharge.  Since the attack, he developed PTSD and his "life . . . has been

up and down," facing regular episodes of anxiety and depression and challenges in "hold[ing] steady employment" and "keeping friends."  Parratt Decl. ¶¶ 17-18.  Parratt has "daily anxiety and panic attacks" and finds that PTSD "has made a normal life completely impossible for [him]."  *Id.* ¶ 18.  The VA has rated him 90% disabled, with individual ratings of 70% for PTSD, 50% for obstructive sleep apnea secondary to PTSD, and 10% for tinnitus from the bombing.  *Id.* ¶ 24; *id.*, Ex. 5, Letter from VA, dated Dec. 19, 2019.  Two of Parratt's family members are also plaintiffs in this action: his mother, Priscilla R. Bradley, and his sister, Amy P. Hall.  *Id.* ¶ 4.

Parratt's mother, Priscilla R. Bradley, learned of the attack when she heard about it on the radio.  Decl. of Priscilla R. Bradley (Nov. 12, 2021) ("Bradley Decl.") ¶¶ 4, 7, ECF No. 74.  She "felt like [she] had been punched in the chest" when she heard the news and could not know for "several hours" if her son had survived.  *Id.* ¶ 10.  Even after receiving notice that Parratt had survived, Bradley "still had nightmares about" the attack.  *Id.* ¶¶ 10, 13.  Her son's PTSD has affected their entire family and Bradley has seen him experience "personality changes" since the attack.  *Id.* ¶ 12.

Parratt's sister, Amy P. Hall, learned of the bombing on the news, which left her "in shock and in fear" for her brother's life.  Decl. of Amy P. Hall (Sept. 13, 2021) ("Hall Decl.") ¶¶ 5, 9, 10, ECF No. 74.  Hall kept her mother company while awaiting confirmation that Parratt had survived for twelve hours that "seemed much longer" and made for a "very . . . stressful wait."  *Id.* ¶ 10.  Hall witnessed her brother return from Khobar Towers as a "different person" and finds it "haunting" to see him "struggle daily" with the symptoms of PTSD which have "worsened over the years."  *Id.* ¶¶ 12-13.  She checks on Parratt weekly and is "affected by nightmares and sleeplessness still to this day."  *Id.* ¶¶ 13-14.

### 47. *Pascha R. Payton*

On June 25, 1996, Pascha R. Payton was an Airman First Class quartered in Khobar Towers.  Decl. of Pascha R. Payton (Oct. 12, 2021) ("Payton Decl.") ¶ 5, ECF No. 75 (sealed), ECF No. 135 (public version).  When the bomb exploded, Payton thought bombs were "dropping . . . from the sky," felt the "roof cave[] in," and "the floor [come] out from under [her]."  *Id.* ¶¶ 8, 10.  A sliding glass door exploded into Payton's room, inflicting severe lacerations from broken glass in her left knee and arm.  *Id.* ¶ 9.  She recalls fearing that another "attack [was] going to happen again" in the chaotic days after the bombing.  *Id.* ¶ 12.  In recognition of her combat wounds, Payton was awarded a Purple Heart.  *Id.* ¶ 13; *id.*, Ex. 4, Purple Heart Certificate and Special Order, dated July 29, 1997.  The bombing "changed [her] forever" and today she feels like the opposite of the "happy-go-lucky person" she used to be.  Payton Decl. ¶ 19.  Payton was diagnosed with PTSD and has experienced "anxiety, depression, memory loss, sleep impairment, and personality changes."  *Id.* ¶¶ 19, 21.  She received a combined 100% disability rating from the VA, with an individual rating of 50% for PTSD stemming from the bombing.  *Id.* ¶ 22; *id.*, Ex. 10, Letters from VA, dated Nov. 8, 2019 and Oct. 7, 2021.

### 48. *Michael J. Perfetti*

On June 25, 1996, Michael J. Perfetti was a Senior Airman quartered in Khobar Towers. Decl. of Michael J. Perfetti (Dec. 6, 2021) ("Perfetti Decl.") ¶ 5, ECF No. 76 (sealed), ECF No. 136 (public version).  When the bomb exploded, Perfetti "heard an incredibly loud blast" and was "thrown from the couch and blasted against a wall."  *Id.* ¶ 7.  He was pelted with glass shrapnel and sustained lacerations all over his body.  *Id.*  Two weeks after the attack, Perfetti required surgery to remove glass from his foot.  *Id.* ¶ 10.  He was diagnosed with PTSD after the bombing, but discontinued treatment after feeling that his assigned "VA therapist was

dismissive." *Id.* ¶ 11.  Perfetti's PTSD has only "gotten worse over the years" and his "anger has increased," forcing him to not "trust anyone" and into a "hypervigilant state." *Id.* ¶ 12.  He considers that the burden of these psychological changes contributed to his divorce in 2006 after his ex-wife deemed he was no longer "the same person." *Id.*  Perfetti also suffers from intrusive thoughts and survivor's guilt, having known "many of the airmen who lost their lives or were injured" during the attack. *Id.* ¶ 12.  To honor his wounds in combat, he was awarded a Purple Heart. *Id.* ¶ 13; *id.*, Ex. 4, Purple Heart Certificate, dated Aug. 26, 1996.  Perfetti also received the Armed Forces Expeditionary Medal.  Perfetti Decl. ¶ 14; *id.*, Ex. 3, Certificate of Discharge. The VA designated him 70% disabled, all of it attributed to the PTSD he developed from the bombing.  Perfetti Decl. ¶ 16; *id.*, Ex. 5, Letter from VA, dated Oct. 4, 2017.

### 49. *Shane Rechcygl*

On June 25, 1996, Shane Rechcygl was a Senior Airman quartered in Khobar Towers. Decl. of Shane Rechcygl (Aug. 30, 2021) ("Rechcygl Decl.") ¶ 5, ECF No. 77 (sealed), ECF No. 137 (public version).  He was working a shift in the flightline at the nearby airbase when the bomb exploded and he felt its vibration and saw the resulting "fire and smoke." *Id.* ¶ 7. Rechcygl "raced to the barracks at Khobar Towers" after the attack to "help the other airmen get to safety" and "assisted with triage, search and rescue, and cleanup of living quarters." *Id.*  He was tasked not only with cleaning up debris in the affected buildings, but also "finding and collecting bodies and body parts" among the rubble. *Id.* ¶ 9.  Rechcygl was awarded the Air Force Achievement Medal in recognition of these efforts. *Id.* ¶ 10; *id.*, Ex. 4, Air Force Achievement Medal Certificate, dated Nov. 25, 1996.  In the months and years after the bombing, Rechcygl developed PTSD with "symptoms including hypervigilance, nightmares, problems sleeping, and exaggerated startle response, and flashbacks." Rechcygl Decl. ¶ 13.  The

VA rated him 90% disabled, including an individual rating of 30% for PTSD from the bombing. *Id.* ¶ 14; *id.*, Ex. 6, Letter from VA, dated July 16, 2020.

### 50. *Rafael Rivera, Jr.*

On June 25, 1996, Rafael Rivera, Jr. was a Senior Airman quartered in Khobar Towers. Decl. of Rafael Rivera, Jr. (Nov. 4, 2021) ("Rivera Jr. Decl.") ¶ 5, ECF No. 78 (sealed), ECF No. 138 (public version). He was watching TV with friends on the fifth floor of Building 131 when fellow plaintiff John G. McCarthy ran into the suite and told them to evacuate the building immediately. *Id.* ¶ 7. Rivera then "ran to the elevator," and when the bomb exploded, "was knocked unconscious." *Id.* He does not remember anything from that moment until he later woke up at the Saudi hospital where he was hospitalized for five days. *Id.* ¶ 8. At that time, Rivera learned that he "was found among the debris, lying on top of the elevator doors, with [his] eyes open but unresponsive." *Id.* He underwent surgery to remove glass from one of his legs and was later aeromedically evacuated to a U.S. military hospital in Germany for further treatment. *Id.* In addition, Rivera sustained a fractured shoulder, broken shoulder blade, torn leg tendons from glass, abrasions, hearing loss, tinnitus, and was diagnosed with PTSD because of the bombing. *Id.* ¶ 10. He continues to suffer pain in his shoulder and ankle, hearing loss, tinnitus, and PTSD with "constant nightmares and daydreams about the blast on a daily basis." *Id.* ¶ 12. Rivera was awarded a Purple Heart for the injuries he sustained in combat. *Id.* ¶ 13; *id.*, Ex. 5, Purple Heart Certificate and Special Order, dated July 2, 1996. He has been rated 100% disabled by the VA, including individual ratings of 30% for left shoulder injuries, 40% for lumbar strain, 10% for tinnitus, and 20% for a left ankle ligament sprain. *Id.* ¶ 15; *id.*, Ex. 6, Letters from VA, dated Feb. 17, 2018; Sept. 4, 2019; Dec. 22, 2020.

**51. *David C. Robinson***

On June 25, 1996, David C. Robinson was a Staff Sergeant quartered at Khobar Towers. Decl. of David C. Robinson (Dec. 9, 2021) ("Robinson Decl.") ¶ 5, ECF No. 79 (sealed), ECF No. 139 (public version).  When the bomb exploded, Robinson was standing in front of a set of sliding glass doors and saw a flash of light accompanied by a resounding "boom."  *Id.* ¶ 7.  The blast knocked him to the ground and rendered him "unconscious for an unknown period."  *Id.* Upon regaining consciousness, Robinson "could feel the blood streaming [off] his face, nose, and both arms."  *Id.*  He sustained severe swelling, lacerations, and glass fragments became imbedded in his eyes and limbs requiring surgery.  *Id.* ¶¶ 14-17.  Notwithstanding these injuries, Robinson's thoughts immediately turned to assisting fellow plaintiff Roger Kaalekahi, who he heard crying for help and half-carried out of building.  *Id.* ¶ 9.

Robinson still suffers "from numbness in the fingers of [his] right hand resulting from a deep laceration to the elbow, migraine . . .  migraine headaches, tinnitus, balance problems, problems with memory and concentration, and PTSD with nightmares, insomnia . . . survivor's guilt, and depression."  *Id.* ¶ 23.  The mental health repercussions of the attack became so severe that he "thought of suicide several times."  *Id.* ¶ 29.  Robinson was awarded a Purple Heart for his wounds in combat.  *Id.* ¶ 25, *id.*, Ex. 6, Purple Heart Certificate, dated July 2, 1996.  He also received the Air Force Commendation Medal with Valor and the Air Force Outstanding Unit Award with Valor.  *Id*. ¶ 26; *id.*, Ex. 7, Air Force Commendation Medal Certificate, dated Dec. 18, 1997; *id.*, Ex. 3, Certificate of Discharge.  Each year, on the anniversary of the bombing, Robinson goes "into shutdown mode" and explains that his emotional availability was "replaced with emptiness" after the attack.  *Id.* ¶¶ 42-43.  He was designated 70% disabled by the VA, including individual ratings of 30% for PTSD, 20% for chondromalacia knees, 10% for

gastroesophageal reflux disease, and 10% for headaches. *Id.* ¶ 45; *id.*, Ex. 10, Letters from VA, dated Mar. 1999 and Dec. 2, 2019.

### 52. *Trena W. Schmidt*

On June 25, 1996, Trena W. Schmidt was a Staff Sergeant quartered in Khobar Towers. Decl. of Trena W. Schmidt (Feb. 15, 2022) ("Schmidt Decl.") ¶ 5, ECF No. 80 (sealed), ECF No. 140 (public version).  With the explosion, she heard rumbling and thought there was an earthquake or that they "were being bombed by airplanes." *Id.* ¶¶ 10-11.  The blast threw Schmidt out of bed, causing her to sustain multiple lacerations from glass shrapnel. *Id.* ¶ 12. This fall also resulted in "permanent orthopedic injuries," which continue to inflict back and neck pain, stiffness, and a loss in Schmidt's range of motion. *Id.* ¶ 12.  After the attack, Schmidt "dove into assisting the wounded, survivors with concussions or in shock, [and] airmen who just needed help to calm down." *Id.* ¶ 19.  She also helped medical personnel treat others and ignored her own injuries because she believed "there were people hurt a lot worse" than her. *Id.*

Schmidt was awarded the Air Force Achievement Medal with Valor and the Armed Forces Expeditionary Medal for her service. *Id.* ¶ 23; *id.*, Ex. 7, Air Force Achievement Medal Certificate, dated Feb. 28, 1997, ECF No. 80; Schmidt Decl. ¶ 23; *id.*, Ex. 8, Armed Forces Expeditionary Medal Certificate, dated July 18, 1996.  Since the bombing, she developed PTSD and feels less trusting, more anxious, and "is always suspicious of what might happen." Schmidt Decl. ¶¶ 25-26.  Schmidt was rated 100% disabled by the VA, with individual ratings of 50% attributable to PTSD and 20% due to a degenerative disease in her lumbar spine (claimed as lumbago or lower back degenerative arthritis). *Id.* ¶ 28; *id.*, Ex. 9, Letters from VA, dated May 17, 2021; Aug. 25, 2021.

### 53. *Michael S. Spencer and One Family Member*

On June 25, 1996, Michael S. Spencer was a Senior Airman quartered in Khobar Towers. Decl. of Michael S. Spencer (Dec. 8, 2021) ("Spencer Decl.") ¶ 5, ECF No. 81 (sealed), ECF No. 141 (public version).  The blast threw Spencer "from the floor in the day room to the kitchen entryway" and made his head hit a wall, causing him to lose consciousness for several minutes. *Id.* ¶ 8.  In the instants that followed the explosion, he "couldn't hear anything, [his] nose and ears were bleeding, and [his] head ached," but regardless he decided to "charge[] at the door using [his] shoulder to break it open" so that he and his roommates could evacuate the building. *Id.* ¶¶ 8-10.  This caused Spencer to suffer permanent shoulder injury.  *Id.* ¶ 10.  Finding "[t]here was no time to seek treatment for [him]self," he then assisted providing aid to his colleagues who were more seriously wounded and recovering the deceased.  *Id.* ¶¶ 13-14.  Spencer recalls that he "could smell the burnt flesh so badly it was like [he] could taste it."  *Id.* ¶ 14.  The day after the attack, while looking for survivors, Spencer "found shoes with feet in them."  *Id.* ¶ 15.  He was later awarded the Armed Forces Expeditionary Medal and Air Force Certificate of Appreciation in recognition of these and other efforts.  *Id.* ¶ 16; *id.*, Ex. 4, Armed Forces Expeditionary Medal Certificate, dated July 11, 1996; *id.*, Air Force Certificate of Appreciation, dated July 11, 1996.

After returning to the United States, Spencer had an MRI showing that he had sustained a concussion and traumatic brain injury in the attack.  Spencer Decl. ¶ 17.  He also developed PTSD in the years that followed, suffering episodes of nightmares, depression, outbursts of anger, and poor sleep.  *Id.* ¶ 19.  Spencer has been hospitalized twice at VA facilities after attempting suicide.  *Id.* ¶ 20.  The VA rated him 80% disabled, with individual ratings of 70% for PTSD and 10% for tinnitus.  *Id.* ¶ 22; *id.*, Ex. 7, Letter from VA, dated Jan. 28 2021. Spencer's wife, Talena M. Spencer, is also a plaintiff in this action.  *Id.* ¶ 4.

Talena M. Spencer learned of the attack through a call from her husband letting her know "he had been in a bombing" and later heard more on the news.  Decl. of Talena M. Spencer (Dec. 7, 2021) ("Talena Spencer Decl.") ¶¶ 5, 8, ECF No. 81.  She was thereafter "in shock and in fear" for Spencer, with whom she had been married for just over a year.  *Id.* ¶ 8.  In the 25 years since the attack, Talena Spencer has struggled to keep her husband "alive through the episodes and life-altering emotions that come with the PTSD that [he] came home with" from Saudi Arabia.  *Id.* ¶ 11.  Talena Spencer has suffered seeing her children go through experiences "they should never have been exposed to," which she attributes to both the physical and psychological trauma her husband suffered at Khobar Towers.  *Id.* ¶¶ 12-13.  The extent of Spencer's emotional disturbance has been such that Talena Spencer has "had [him] leave [their] home for fear."  *Id.* ¶ 14.

### 54. *Andre L. Stanton*

On June 25, 1996, Andre L. Stanton was a Staff Sergeant quartered in Khobar Towers. Decl. of Andre L. Stanton (Dec. 17, 2021) ("Stanton Decl.") ¶ 5, ECF No. 82 (sealed), ECF No. 142 (public version).  When the bomb exploded, Stanton was rushing to grab his identification card after security had instructed the evacuation of his dormitory, Building 131.  *Id.* ¶ 8.  He was "flung against the wall and knocked unconscious for a minute or two."  *Id.*  Stanton was hospitalized for two days in Saudi Arabia and thereafter evacuated to a U.S. military hospital in Germany to treat "severe lacerations to [his] face, nose, neck, arms, legs and hand . . . and . . . [] ear duct."  *Id.* ¶ 11.  He describes his feet as "shredded by glass."  *Id.* ¶ 8.  In the years since the attack, these injuries have required Stanton to undergo multiple reconstructive surgeries in his face and right arm.  *Id.* ¶ 11.

He was awarded a Purple Heart in recognition of his combat wounds. *Id.* ¶ 12; *id.*, Ex. 3, Certificate of Discharge. Today, Stanton suffers from increased anxiety and is "much more cautious . . . and aware of [his] surroundings." Stanton Decl. ¶ 15. He received a 50% disability rating from the VA, including individual ratings of 30% due to scarring on his right cheek, neck, and ear, 10% for acryostenosis with residual chronic conjunctivitis, 10% for facial nerve impairment, 10% for nerve damage on his right leg, and 10% for tinnitus. *Id.* ¶ 14; *id.*, Ex. 4, VA eBenefits Website Disability Ratings Page.

### 55. *Billy J. Stewart*

On June 25, 1996, Billy J. Stewart was a Master Sergeant quartered in Khobar Towers. Decl. of Billy J. Stewart (Nov. 20, 2021) ("Stewart Decl.") ¶ 5, ECF No. 83 (sealed), ECF No. 143 (public version). Stewart was jogging around the compound when the bomb exploded, knocking him "off [his] feet" and "blast[ing] [him] with shrapnel and broken glass." *Id.* ¶ 7. He sustained lacerations all over his body in that moment, but only realized the next morning that "a half-inch glass shard . . . had penetrated" one of his legs. *Id.* ¶¶ 9, 14. Stewart did not sleep for six days after the bombing and recalls that period as replete with additional bomb threats. *Id.* ¶ 17. He was awarded a Purple Heart for his wounds in combat. *Id.* ¶ 19; *id.*, Ex. 7, Purple Heart Certificate and Special Order, dated Aug. 8, 1996. Stewart also received the Air Force Achievement Medal, Armed Forced Expeditionary Medal, and Air Force Certificate of Appreciation. Stewart Decl. ¶ 20; *id.*, Ex. 8, Armed Forces Achievement Medal Certificate and Special Order, dated Jan. 24, 1997; *id.*, Ex. 9, Armed Forces Expeditionary Medal Certificate, dates Apr. 2, 1996 through July 4, 1996; *id.*, Ex. 10, United States Air Force Certificate of Appreciation, dates Apr. 2, 1996 through July 4, 1996.

Since the attack, Stewart developed PTSD and high levels of anxiety and, after his divorce seventeen years ago, has experienced "no desire to be in a relationship again in his lifetime."  Stewart Decl. ¶¶ 22-25.  These conditions have made Stewart emotionally volatile: "[a]lmost every day [he] can be having a calm day and the next moment [he'll] be shouting rages without explanation."  *Id.* ¶ 24.  To this day, he goes "through serious bouts of depression, especially around the anniversary of the bombing."  *Id.* ¶ 26.  Stewart received a 90% combined disability rating from the VA, with individual ratings of 50% for PTSD, 50% for sleep apnea, 20% for right knee pain, and 10% for tinnitus.  *Id.* ¶ 30; *id.*, Ex. 13, Letter from VA, dated May 12, 2004.

### 56. *One Family Member of Airman Steven R. Kitis*

Steven R. Kitis was an airman wounded in the Khobar Towers bombing and a plaintiff in *Schooley*, 2019 WL 2717888, at *51.  His mother, Stella L. Thot, now a plaintiff in this action, recalls learning about the bombing through a news headline.  Decl. of Stella L. Thot (Aug. 30, 2021) ("Thot Decl.") ¶¶ 5, 9, ECF No. 84 (sealed), ECF No. 144 (public version).  Immediately "panicked" and "scared beyond belief" lacking information of her son's condition, Thot was relieved when she finally heard from her son the day after the attack although she recalls the weeks after that as "filled with fear."  *Id.* ¶¶ 10, 12.  When Kitis returned to the United States weeks later, she "quickly" noticed he had changed and was no longer a "happy-go-lucky type of person;" now, Thot perceived her son as "quick to anger, isolated, and distant."  *Id.* ¶ 13.  Her other son, Alex, was killed in a car accident in December 2000 and afterwards Thot became overcome by fear about what could happen to Kitis, who was "all [she] had left."  *Id.* ¶¶ 17-18.  To this day, Thot often fears new places and large crowds, and "live[s] with [the] uncomfortable feeling that, if it could happen to [Kitis], it could happen to [her]."  *Id.* ¶¶ 22-23.

### 57. *One Family Member of Airman Aaron R. Weimer*

Aaron R. Weimer, an airman harmed in the Khobar Towers bombing, was also a plaintiff in *Schooley*, 2019 WL 2717888, at *25. His brother, Michael D. Weimer, is now a plaintiff in this action and recalls hearing about the bombing on the news. Decl. of Michael D. Weimer (Aug. 26, 2021) ("Weimer Decl.") ¶¶ 4, 8, ECF No. 85 (sealed), ECF No. 145 (public version). Being very tight with his brother, Aaron Weimer found it "agonizing" to await confirmation that he was safe for about six hours. *Id.* ¶¶ 8, 10. He "suffered emotional distress directly after the bombing," *id.* ¶ 13, but became "more concerned" about his brother when he witnessed the "emotional and mental injuries from the bombing start[] surfacing in the form of substance abuse," *id.* ¶ 14. Aaron Weimer continues to grapple with such sequalae of the attack today, assisting as one of his brother's caregivers and taking time off work "when things in his [brother's] life become too much . . . and he needs family by his side." *Id.* ¶¶ 13-15.

### 58. *Anthony J. Whiting*

On June 25, 1996, Anthony J. Whiting was a Staff Sergeant quartered in Khobar Towers. Decl. of Anthony J. Whiting (Aug. 26, 2021) ("Whiting Decl.") ¶¶ 5, ECF No. 86 (sealed), ECF No. 146 (public version). When the bomb exploded, Whiting was pelted by debris and flying glass, but helped his roommate, co-plaintiff Christopher Doggett, who was badly injured, get to safety. *Id.* ¶¶ 10, 14-21. Whiting also assisted other airmen out of the building and treated their injuries in triage. *Id.* He did all this barefoot, which left his feet "in tatters," as well as after sustaining gashes on his head and knee. *Id.* ¶ 22. In recognition of his combat wounds, Whiting was awarded a Purple Heart. *Id.* ¶ 27; *id.*, Ex. 8, Purple Heart Certificate and Special Order, dated Aug. 15, 1997. He was also awarded the Air Force Commendation Medal with Valor, Armed Forces Expeditionary Medal, and Air Force Achievement Medal. Whiting Decl. ¶ 27;

*id.*, Ex. 9, Air Force Commendation Medal Certificate and Special Order, dated Oct. 18, 1996, Air Force Expeditionary Medal Certificate, dated June 27, 1996, Air Force Achievement Medal Certificate, dated Mar. 21, 1996 to June 27, 1996.

Whiting still suffers from PTSD symptoms that he can be describe as "exhausting" and include hypervigilance, sleep problems, and an intolerance of crowds and loud sounds.  Whiting Decl. ¶ 31.  He received an 80% combined disability rating from the VA, with an individual rating of 50% attributed to the PTSD he developed from the bombing.  *Id.* ¶ 33; *id.*, Ex. 11, Letters from VA, dated Oct. 9, 2012 and Dec. 1, 2012.

### 59. *One Family Member of Airman Douglas T. Widdis*

Douglas Widdis was injured in the Khobar Towers bombing and a plaintiff in *Schooley*, 2918 WL 2717888, at *75.  Widdis's wife, April A. Widdis, is now a plaintiff in this action and recalls learning about the bombing through a call from her mother.  Decl. of April A. Widdis (Aug. 26, 2021) ("Widdis Decl.") ¶¶ 6, 10-11, ECF No. 87 (sealed), ECF No. 147 (public version).  She then had to wait 24 hours to hear from her husband and remained deeply worried until he returned home, fearful that additional attacks would occur.  *Id.* ¶¶ 15, 16, 19.  April Widdis still worries about the impact of the bombing, especially over her then-young daughters, and "notice[s] episodes of uneasiness and fear when [her husband] is subjected to loud or heavy dropping that shakes the ground."  *Id.* ¶¶ 13, 17-19, 26.

### 60. *Two Family Members of Airman John J. Yeichner*

John J. Yeichner was an airman wounded in the Khobar Towers bombing and a plaintiff in *Schooley*, 2019 WL 2717888, at *25.  His mother, Kymberlye R. Yeichner, and his brother, Robert B. Yeichner, are now both plaintiffs in this action.  Decl. of Kymberlye R. Yeichner (Aug. 30, 2021) ("Yeichner Decl.") ¶ 4, ECF No. 88 (sealed), ECF No. 148 (public version).

Kymberlye learned of the attack while listening to the news at work and became "so distraught and worried about the fate of [her] son that [she] had to leave work." *Id.* ¶ 9.  Despite calling numerous military personnel and other hotlines, she was unable to receive confirmation that her son had survived for another 48 hours, which caused "fear and grief [that] were overwhelming." *Id.* ¶¶ 9-10.  Kymberlye Yeichner perceived her son "was experiencing horrible sorrow for the loss of his friends and that he had witnessed gruesome and terrible things" when she finally spoke to him.  *Id.* ¶ 10.  To support Yeichner, who developed severe PTSD upon his return to the United States, Kymberlye Yeichner eventually moved from Washington to Florida to be closer to him—a move that led to the dissolution of her marriage.  *Id.* ¶¶ 8, 11-12.  She continues to worry about Yeichner's well-being to this day.  *Id.* ¶ 12.

Yeichner's brother, Robert B. Yeichner, was also in the Air Force at the time of the attack and had to be taken off police duty while he awaited information about his brother's condition.  Decl. of Robert B. Yeichner (Aug. 30, 2021) ("Robert Yeichner Decl.")  ¶¶ 4, 9, 13, ECF No. 88.  When Robert Yeichner was finally able to speak with this brother, John Yeichner revealed the toll of his injuries and that several of his friends had been killed.  *Id.* ¶ 16.  "The loss of his friends, the grieving that [Yeichner] goes through annually as the anniversary of the attacks nears, the toll it has taken on his life has unexpectedly taken a toll" on Robert Yeichner's life, too.  *Id.*  Robert Yeichner has continued to perceive this "painful" legacy of the attack as he has supported his brother emotionally and financially since retiring from the armed forces.  *Id.* ¶¶ 15, 17.

### 61. *Robert K. Young*

On June 25, 1996, Robert K. Young was a Senior Airman quartered in Khobar Towers. Decl. of Robert K. Young (Oct. 11, 2021) ("Young Decl.") ¶ 5, ECF No. 89 (sealed), ECF No.

149 (public version).  When the bomb exploded, he felt the "ground rumble[] and the glass from [his] window blew down [his] bed linen."  *Id.* ¶ 9.  Young recalls that the blast then resembled "the feeling of someone grabbing [him] by the collar and belt and throwing [him] forward onto the floor."  *Id.*  In the attack's immediate aftermath, Young barely noticed that he was bleeding as he focused on helping another injured airman get to the triage area for safety.  *Id.* ¶ 12.  He did not receive prompt treatment for his injuries out of a desire to "mak[e] sure that the resources were utilized trying to save lives" or treating those "absolutely shredded by shrapnel" rather than on him "receiving stitches."  *Id.* ¶ 14.  Today, however, Young still carries "permanent scars from [the] shrapnel wounds" he sustained in the attack.  *Id.* ¶ 17.  In the years since, Young was diagnosed with PTSD, and has suffered from "nightmares, sleep problems, anxiety, and depression."  *Id.*  He received a 90% combined disability rating from the VA, which reflects a 70% individual rating for PTSD arising from the Khobar Towers bombing.  *Id.* ¶ 19; *id.*, Ex. 6, Letter from VA, dated Aug. 12, 2020.

### D.  Procedural History

Plaintiffs filed this lawsuit on March 2, 2020.  *See* Compl., ECF No. 1.  As discussed *infra* in Part III.B, Iran was properly served under the FSIA and, after failing to appear, the Clerk of Court entered default against Iran on December 31, 2020.  *See* Clerk's Entry of Default, ECF No. 17.  Apart from filing an amended complaint on August 19, 2021, *see* FAC, ECF No. 19, no action was taken in this matter for almost a year, until the Court directed plaintiffs to show cause "why this case should not be dismissed for failure to prosecute."  Min. Order (Dec. 2, 2021).  The plaintiffs subsequently moved for judicial notice of prior related cases and for default judgment as to liability and damages.  *See* Pls.' Mot. Liability; Pls.' Mot. Damages.  These two motions are now ripe for resolution.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) permits a court to consider entering a default judgment when a party applies for that relief.  *See* FED. R. CIV. P. 55(b)(2).  Nevertheless, "strong policies favor resolution of disputes on their merits" and, therefore, "'[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'"  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).  Furthermore, "entry of a default judgment is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted), and so the procedural posture of a default does not relieve a federal court of its typical obligations, including its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."  *Mwani*, 417 F.3d at 6.

When default judgment is sought under the FSIA, a claimant must also "establish[] his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  This requirement "provides foreign sovereigns a special protection akin to that assured the federal government by FED. R. CIV. P. 55([d])."  *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under rule 55([d])").  While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," courts must be mindful that Congress enacted § 1605A, FSIA's terrorism exception, and § 1608(e) with the "aim[] to prevent state sponsors of

terrorism — entities particularly unlikely to submit to this country's laws — from escaping liability for their sins." *Han Kim v. People's Democratic Republic of Korea*, 774 F.3d 1044, 1047-48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)); *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019). With this objective in mind, the D.C. Circuit has instructed that "courts have the authority — indeed, we think, the obligation — to 'adjust evidentiary requirements to . . . differing situations.'" *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)).

Generally, courts in FSIA default actions must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001). Courts take uncontroverted factual allegations that are supported by admissible evidence as true. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus*, 750 F. Supp. 2d at 171)); *accord Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 319 (RCL) (D.D.C. 2014); FED. R. CIV. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when adverse party "fails to properly address another party's assertion of fact").

The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient.'" *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)), as "the courts are granted broad discretion to determine what degree and kind of evidence is satisfactory," *Maalouf*, 923 F.3d at 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785). In particular, "[i]n a FSIA default proceeding, a factual finding is not deemed clearly erroneous if

there is an adequate basis in the record for inferring that the district court . . . was satisfied with the evidence submitted." *Owens*, 864 F.3d at 785 (second alteration in original) (internal quotation marks omitted).

## III. DISCUSSION

A default judgment may be entered when (1) the court has subject-matter jurisdiction over the claims; (2) personal jurisdiction is properly exercised over the defendant; (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendant; and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek. Each of these requirements is satisfied here and addressed *seriatim* below.

### A.  Subject-Matter Jurisdiction under the FSIA

"The district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" seeking "relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title." 28 U.S.C. § 1330(a). Plaintiffs seek *in personam* relief. This Court must decide, therefore, whether defendant is entitled to immunity under the "state sponsor of terrorism" exception set forth in §1605A.[7]

"[T]he FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015) (citing 18 U.S.C. § 1604), but "that grant of immunity is subject to a number of exceptions," *id.* at 13-14. Plaintiffs assert jurisdiction based on the FSIA's terrorism exception. 28 U.S.C. § 1605A, *see* FAC ¶ 1. In relevant part, this exception abrogates a foreign state's

---

[7]    This suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A(b), but the "limitation period in § 1605A(b) is not jurisdictional," and the defendant has "forfeited [their] affirmative defense . . . by failing to raise it in" this Court, *Owens*, 864 F.3d at 804; *see also Maalouf*, 923 F.3d at 1115 (holding that a district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

immunity in cases where a plaintiff seeks "money damages" for "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" if "engaged in by an official, employee, or agent of such foreign state." 28 U.S.C. § 1605A(a)(1). The FSIA defines a "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality" thereof. 28 U.S.C. § 1603(a). The exception also requires that "the foreign country was designated a 'state sponsor of terrorism at the time of the act,'" *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)), and that, at that time, "the 'claimant or the victim was' a 'national of the United States,'" *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)(I)), or was a member of the armed forces, 28 U.S.C. § 1605A(a)(2)(A)(ii)(II).[8]

Plaintiffs satisfy each of the applicable elements here. As stated above, Iran was designated a state sponsor of terrorism in 1984, twelve years before the 1996 Khobar Towers bombing. All 159 plaintiffs have averred in sworn declarations that they were United States citizens at the time of the attack or that their claim derives from a U.S. citizen.[9] Finally, plaintiffs seek damages "for personal injury . . . that was caused by an . . . extrajudicial killing" for which the defendant provided "material support or resources." 28 U.S.C. § 1605A(a)(1); *see*

---

[8]    Finally, the provision requires proof that, "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim," 28 U.S.C. § 1605A(a)(2)(A)(iii), but the attack took place in Saudi Arabia, not Iran, so this requirement does not apply.

[9]    Plaintiff Mari E. DeLacy, the wife of injured serviceman U.S. citizen Sandra Beneway, is the only plaintiff whose claim derives from a U.S. citizen victim. DeLacy was born in Northern Ireland and is a British citizen. *See* DeLacy Decl. ¶ 3. At the time of the attack on Khobar Towers on June 25, 1996, she was a lawful permanent resident of the United States domiciled in South Carolina, *see id.* ¶ 4, and thus has standing to bring a claim under 28 § U.S.C. 1605A(c) as an immediate family member of a United States Air Force member and United States national who was directly injured in the Khobar Towers bombing. *See Doe v. Democratic People's Republic of Korea Ministry of Foreign Affairs*, 414 F. Supp. 3d 109, 124 (D.D.C. 2019) (asserting jurisdiction over claims of four non-U.S. citizens family-member plaintiffs because the "plain text and plain meaning" of 28 U.S.C. § 1605A(a)(2) "indicate that 'the claimant and victim need not both be American citizens.'" (citing *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 570 (7th Cir. 2012)); *Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 13 (D.D.C. 2011).

*also Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a) grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially support extrajudicial killings committed by nonstate actors.").

More specifically, the truck bombing that plaintiffs allege caused their injuries was an "extrajudicial killing" resulting in the deaths of nineteen American military personnel. *See, e.g.*, *Rimkus*, 750 F. Supp. 2d at 182 ("The actions of defendant[] constituted both an extrajudicial killing and the provision of material support in satisfaction of the first element of liability."); *Akins I*, 332 F. Supp. 3d at 33 (same); *Aceto*, 2020 WL 619925 at *13 (same). The term "extrajudicial killing" in the FSIA's terrorism exception has the "meaning given" in "the Torture Victim Protection Act of 1991," *see* 28 U.S.C. § 1605A(h)(7), which defines the term as "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note § 3(a)).

Furthermore, this Court takes judicial notice of the evidence presented in *Blais* and *Heiser I*, which demonstrates that defendant provided "material support or resources" for this extrajudicial killing. As is clear from the evidence in those cases, described above, defendant authorized, "organized and sponsored" the Khobar Towers attack. *Heiser I*, 466 F. Supp. 2d at 262. The evidence shows that defendant helped to recruit, train, fund, supply, and direct Saudi Hezbollah. This establishes that defendant's actions were "a 'substantial factor' in the sequence of events that led to the plaintiff[s'] injur[ies]" and that the injuries were "'reasonably foreseeable or anticipated as a natural consequence of' the defendant's conduct." *Owens*, 864

F.3d at 206 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)) (explaining that the jurisdictional standard for causation under the FSIA's terrorism exception" is proximate cause).

Accordingly, under 28 U.S.C. § 1605A, defendant is not immune from this suit, and subject-matter jurisdiction may be properly exercised.  *See* 28 U.S.C. § 1330(a).

### B.  Personal Jurisdiction under the FSIA

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of [the FSIA]."  28 U.S.C. § 1330(b).  Here, service was ultimately made under § 1608(a)(4).  Section 1608 first prescribes two methods by which service shall ordinarily be made, *see* 28 U.S.C. § 1608(a)(1)-(2), but these methods were "not available" to plaintiffs in this action, *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 61 (D.D.C. 2019); *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 49 (D.D.C. 2019), as "[t]he defendant[] ha[s] neither made a special arrangement for service with the plaintiffs, nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).

Thus, plaintiffs initially attempted service under paragraph (a)(3) of § 1608 by sending copies, via Federal Express, of the summons, complaint, notice of suit, Foreign Sovereign Immunities Act, and a Farsi translation to defendant, through the Iranian Ministry of Foreign Affairs.  *See* Affidavit Requesting Foreign Mailing, ECF No. 8; Certificate of Mailing, ECF No. 9.  The package was returned to plaintiffs' counsel with a note that read "RTS - no service to destination," *see* Decl. of Joshua M. Ambush, Esq., ¶ 10, ECF No. 11-2; *id.*, Ex. A, ECF No. 11-3, after which plaintiffs, in accordance with § 1608(a)(4), transmitted copies of the summons, complaint, notice of suit, Foreign Sovereign Immunities Act, and a Farsi translation "through

diplomatic channels," *see* 28 U.S.C. § 1608(a)(4) (allowing resort to this method "if service cannot be made within 30 days under paragraph (3)").  *See* Certificate of Mailing, ECF No. 12. By this method, Iran was served.  *See* Return of Service, ECF No. 13.[10]  Consequently, this Court may exercise personal jurisdiction over defendant in this matter.

### C.  Defendant's Liability

All fifty-one service-member plaintiffs bring claims for battery and assault, FAC ¶¶ 385-393 (Counts I & II), and for intentional infliction of emotional distress ("IIED"), FAC ¶¶ 394-400, (Count III).  The 108 family-member plaintiffs bring claims for IIED and for loss of solatium.  FAC ¶¶ 401-407 (Count IV).[11]  All claims are brought under § 1605A(c), which creates a "[p]rivate right of action . . . for personal injury or death," and currently provides that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).

Section 1605A(c) provides no guidance on the substantive bases for liability that determine plaintiffs' entitlement to damages.  Consequently, courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)."  *Fraenkel*, 892 F.3d at 353; *see Estate of Heiser v. Islamic Republic of Iran* (*Heiser II*), 659 F. Supp. 2d 20, 24 (D.D.C. 2009) (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability); *see also Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi II*, 879 F. Supp. 2d at

---

[10]    Specifically, on December 2, 2020, the United States Department of State advised that the requirements for diplomatic service of the instant action under section 1608(a)(4) were fulfilled by causing delivery of a Summons, Complaint, and Notice of Suit to the Islamic Republic of Iran through Swiss channels on October 27, 2020.  *See* Return of Service at 1, ECF No. 13.

[11]    In addition, one of the family-member plaintiffs, Mari E. DeLacy, brings a claim of loss of companionship of spouse, under South Carolina law, as the common law wife at the time of the Khobar Towers attack of her now wife, Sandra J. Beneway, one of the injured service-member plaintiffs.  *See* FAC ¶¶ 408-411 (Count V).

54); *Worley*, 75 F. Supp. 3d at 335.  Defendant's liability is discussed in detail below, starting

with the service-member plaintiffs.

### 1.  Service-Member Plaintiffs

All 51 of the service-member plaintiffs—David J. Ackley, Jr., Rita G. Ackley, Andre L.

Bedgood, Sandra J. Beneway, Lisa M. Cafiero, Zachary J. Capogna, Jason D. Carley, Manuel J.

Carrasco, Jeffrey Conrad, Dallas W. Croft, Benjamin C. Depweg, Craig J. Dick, Jason B. Dixon,

Carrie L. Dobos, Christopher O. Doggett, Terry M. Dunn, Jr. George G. Dyer III, Bryan W. Fox,

John P. Garcia, Jr., Steven D. Garcia, Alfredo R. Guerrero, Carl R. Hamilton, Jr. , Jeffrey L. Hill,

the Estate of Gregory M. Hillabrant, Rodney Houston, Steven Jaronsky, Richard R. Jiron, Roger

K. Kaalekahi IV, David A. Krueger, David W. Long, Sr., Christopher E. Marsh, John G.

McCarthy, Jason L. Melvin, Flor D. Morales, Morris M. Myers, Jr., William G. Neff, Elisha J.

Novell, Mark W. O'Toole, Eldred E. Pailin, Jeremy L. Parratt, Pascha R. Payton, Michael J.

Perfetti, Shane Rechcygl, Rafael Rivera, Jr., David C. Robinson, Trena W. Schmidt, Michael S.

Spencer, Andre L. Stanton, Billy J. Stewart, Anthony J. Whiting, and Robert K. Young—bring

claims under the theories of assault, battery, and IIED.  As is discussed in the damages section

below, these plaintiffs may recover under only one theory, *see e.g.*, *EEOC v. Waffle House, Inc.*,

534 U.S. 279, 297 (2002) ("[I]t 'goes without saying that the courts can and should preclude

double recovery by an individual" (quoting *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333

(1980)), but each theory of liability is nevertheless evaluated.

### a.  Assault and Battery

Battery requires an act "intending to cause a harmful or offensive contact . . . or an

imminent apprehension of such a contact," and that such a contact in fact "directly or indirectly

results."  RESTATEMENT (SECOND) OF TORTS § 13.  "Harmful contact" causes a "physical

impairment of the condition of another's body, or physical pain or illness." *Id.* § 15; *see also*

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010) (defining these terms).

In materially supporting the truck bombing, defendant acted with the intent to cause harmful

contact with the residents and individuals in the vicinity of the Khobar Towers. *See, e.g.*, *Gill v.*

*Islamic Republic of Iran*, 249 F. Supp. 3d 88, 102 (D.D.C. 2017) (defining material support for

terrorist attacks as acts intending to cause harm). Although all service-member plaintiffs bring

claims for battery, only 44 aver that they were located at the Khobar Towers complex during the

bombing and consequently suffered harmful physical contact. [12] The other seven service-

member plaintiffs were not present at Khobar Towers during the attack and consequently do not

allege harmful physical contact from the explosion.[13] Instead, each of these seven plaintiffs

---

[12] *See* Ackley Jr. Decl. ¶ 10 (lacerations); Ackley Decl. ¶ 12 (lacerations); Bedgood Decl. ¶ 10 (cut, ringing in ears); Beneway Decl. ¶¶ 18, 20, 33-34 (loss of eye, PTSD); Capogna Decl. ¶¶ 9-11, 27 (lacerations, PTSD); Carley Decl. ¶¶ 8, 11, 15 (lacerations, embedded glass, PTSD); Carrasco Decl. ¶ 9 (lacerations, PTSD); Conrad Decl. ¶¶ 14, 26-28 (embedded glass, PTSD); Croft Decl. ¶¶ 9, 10 (lacerations, PTSD); Depweg Decl. ¶¶ 9-10, 16 (scrapes and bruises, PTSD); Dick Decl. ¶¶ 11-12, 14 (concussion, lacerations, embedded glass, PTSD); Dixon Decl. ¶¶ 9-10, 15 (lacerations, PTSD); Dobos Decl. ¶¶ 10, 16 (lacerations, PTSD); Doggett Decl. ¶¶ 8-9 (lacerations to the bone, PTSD); Dunn Jr. Decl. ¶¶ 10, 18 (thrown to the ground, PTSD); Dyer III Decl. ¶¶ 7, 12 (severe injuries, including to facial orbital bones, PTSD); Bryan Fox Decl. ¶¶ 17, 33, 39 (lacerations, PTSD); Garcia Jr. Decl. ¶¶ 13, 18-19 (shrapnel wounds, PTSD); Steven Garcia Decl. ¶¶ 9, 20-21 (lacerations, PTSD); Guerrero Decl. ¶ 9 (shrapnel wounds); Houston Decl. ¶¶ 8, 12 (lacerations and glass embedded in eyes, PTSD); Jaronsky Decl. ¶¶ 20, 21-22 (shrapnel wounds, embedded glass, PTSD); Jiron Decl. ¶¶ 10-11, 15, 25-26 (lacerations, embedded glass, PTSD); Kaalekahi IV Decl. ¶¶ 8, 13-15 (depressed skull fracture); Krueger Decl. ¶¶ 14-15, 17 (thrown to the ground, concussion, PTSD); Long Sr. Decl. ¶¶ 9, 15-16 (lacerations to the bone, PTSD); Marsh Decl. ¶¶ 7, 11, 15 (thrown to the ground, PTSD); McCarthy Decl. ¶¶ 7, 9, 19 (concussion, traumatic brain injury, PTSD); Melvin Decl. ¶¶ 7, 14-15 (thrown to the ground, PTSD); Morales Decl. ¶¶ 12, 16, 19, 21 (lacerations, PTSD, chronic pain); Myers Jr. Decl. ¶¶ 9-10, 22, 25 (thrown against railing, back and neck injuries, PTSD); Neff Decl. ¶¶ 8, 16 (lacerations, embedded glass, PTSD); O'Toole Decl. ¶¶ 8, 11 (lacerations, embedded glass, concussion, PTSD); Pailin Decl. ¶¶ 8, 16 (lacerations, PTSD); Payton Decl. ¶¶ 9, 19-21 (lacerations, PTSD); Perfetti Decl. ¶¶ 7, 11 (lacerations, PTSD); Rivera Jr. Decl. ¶¶ 10, 12 (fractures, lacerations, PTSD); Robinson Decl. ¶¶ 7, 14-17, 23 (deep lacerations, severe swelling, PTSD); Schmidt Decl. ¶¶ 12, 25-26 (lacerations, permanent orthopedic injuries, PTSD); Spencer Decl. ¶¶ 8, 10, 19 (knocked unconscious, permanent shoulder injury, PTSD); Stanton Decl. ¶¶ 8, 11 (knocked unconscious, severe lacerations); Stewart Decl. ¶¶ 7-9, 22 (lacerations, PTSD); Whiting Decl. ¶¶ 10, 22, 31 (embedded glass, lacerations, PTSD); Young Decl. ¶¶ 14, 17 (lacerations, embedded glass, PTSD).

[13] Lisa M. Cafiero was in a nearby civilian complex, *see* Cafiero Decl. ¶¶ 6, 11; Carl R. Hamilton, Jr. was in a Jeep a few miles away from the compound, *see* Hamilton Jr. Decl. ¶¶ 8-9; Jeffrey L. Hill was at the nearby airbase located a few miles away, Hill Decl. ¶ 9; Gregory M. Hillabrant was nearby in a truck, Hillabrant Decl. ¶ 11; Elisha J. Novell was at the airbase, Novell Decl. ¶¶ 8−10; Jeremy L. Parratt was en route to the airbase, Parratt Decl. ¶¶ 9-10; and Shane Rechcygl was also at the airbase. Rechcygl Decl. ¶ 7.

avers that he or she developed PTSD in the wake of the bombing.[14]  Although the trauma stemming from the attack is, of course, very real for those experiencing it, given that they did not suffer harmful or offensive contact from the bomb itself, these seven plaintiffs cannot recover under their battery claims.  *See Aceto*, 2020 WL 619925 at *15 (holding that only those plaintiffs "in the Khobar Towers complex at the time of the bombing" experienced "some harmful physical contact . . . from the bomb").  The remaining 44 service-member plaintiffs who were in the Khobar Towers complex at the time of the bombing, however, aver some harmful physical contact resulting from the blast, so defendant is liable to them for battery.

Assault occurs where a defendant "acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and . . . the other is thereby put in such imminent apprehension."  RESTATEMENT (SECOND) OF TORTS § 21(1).  "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," so where plaintiffs averred "that they did, in fact, fear such harm because of the attack," defendant may be held liable for assault.  *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010); *see also Valore*, 700 F. Supp. 2d at 76 (same).  Imminence is defined as being "so close to striking distance that [one] can reach the other almost at once."  RESTATEMENT (SECOND) OF TORTS § 29 cmt. 2.

The forty-four plaintiffs who were located at the Khobar Towers complex at the time of the bombing present valid claims for assault because they were within "striking distance" of the explosion and, as such, had an imminent apprehension of harm.  *Id.*  As noted, seven of the 51 service-member plaintiffs were not present at Khobar Towers at the time of the bombing: Lisa

---

[14]     Cafiero Decl. ¶¶ 41-41 (PTSD); Hamilton Jr. Decl. ¶¶ 17-18 (PTSD); Hill Decl. ¶ 16 (PTSD); Hillabrant Decl. ¶¶ 13, 15 (PTSD); Novell Decl. ¶¶ 14-16 (PTSD); Parratt Decl. ¶¶ 9-10, 17-18, 21-22 (PTSD); Rechcygl Decl. ¶ 13 (PTSD).

M. Cafiero, who was quartered in a civilian complex near Khobar Towers and heard and felt the explosion, Cafiero Decl. ¶¶ 6, 11; Carl R. Hamilton, Jr., who witnessed the explosion from a Jeep while returning to Khobar Towers from a nearby airbase, Hamilton Jr. Decl. ¶¶ 8-9; Jeffrey L. Hill, who saw the "mushroom cloud" from the airbase, Hill Decl. ¶ 9; Gregory M. Hillabrant, who saw and felt the explosion as he was returning to Khobar Towers from the airbase in a truck, Hillabrant Decl. ¶ 11; Elisha J. Novell, who was exiting the air base dining facility when the bomb detonated from a few miles away, Novell Decl. ¶¶ 8-10; Jeremy L. Parratt, who was heading for an overnight shift at the airbase when the bomb exploded, Parratt Decl. ¶¶ 9-10; and Shane Rechcygl, who saw the smoke and flames from the bomb and felt its vibration from where he was working at the airbase flight line, Rechcygl Decl. ¶ 7.  Although many of these plaintiffs witnessed the Khobar Towers bombing from a distance and feared that they would be harmed in a successive attack, their "distance from the blast is inconsistent with 'imminent apprehension.'" *Aceto*, 2020 WL 619925 at *15 (holding that plaintiff located at Dhahran Air Force Base who feared another imminent attack after witnessing the Khobar Towers bombing from miles away was too far to satisfy imminent apprehension requirement); *see* RESTATEMENT (SECOND) OF TORTS § 29 cmt. 2 (defining imminence as "so close to striking distance that he can reach the other almost at once").  That said, the forty-four service-member plaintiffs who were present at the Khobar Towers complex were in imminent apprehension of harm and defendant is liable to those plaintiffs for assault.

### b.   Intentional Infliction of Emotional Distress

Defendant is liable to plaintiffs for intentional infliction of emotional distress if "by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress to" the plaintiffs.  RESTATEMENT (SECOND) OF TORTS § 46(1); *see also Heiser II*, 659 F. Supp.

2d at 26.  "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress."  *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009); *see also Valore*, 700 F. Supp. 2d at 77 (same).  All fifty-one service-member plaintiffs have demonstrated, through their sworn declarations and corroborating submissions, that they suffered severe emotional and psychological distress as a result of the attack, including the seven plaintiffs who were not present at the Khobar Towers complex at the time of the bombing.  Forty-five service-members submit documentation of formal PTSD diagnoses.[15]  The declarations and documentation of the remaining six service-member plaintiffs demonstrate their significant emotional distress, both acute and chronic, resulting from having been targets of the attack. *See* Ackley Jr. Decl. ¶ 13 (nightmares, insomnia, startling in response to loud noises); Ackley Decl. ¶ 11 (startling in response to loud noises, persistent negative memories); Bedgood Decl. ¶ 12 (survivor's remorse); Cory Dick Decl. ¶ 11 (agoraphobia, acting withdrawn); Guerrero Decl. ¶ 8 (feelings of horror); Stanton Decl. ¶¶ 15-16 (hypervigilant, extra-cautious, struggles with interpersonal relationships).  Defendant is liable to all fifty-one service-members for IIED.

---

[15]     *See* Beneway Decl. ¶¶ 33-34 (PTSD); Cafiero Decl. ¶¶ 41-42 (PTSD); Capogna Decl. ¶ 29 (PTSD); Carley Decl. ¶ 11 (PTSD); Carrasco Decl. ¶ 10 (PTSD); Conrad Decl. ¶¶ 26-27 (PTSD); Croft Decl. ¶ 10 (PTSD); Depweg Decl. ¶ 15 (PTSD); Dixon Decl. ¶ 15 (PTSD); Dobos Decl. ¶ 16 (PTSD); Doggett Decl. ¶ 9 (PTSD); Dunn Jr. Decl. ¶ 18 (PTSD); Dyer III Decl. ¶ 12 (PTSD); Bryan Fox Decl. ¶¶ 40, 42 (PTSD); Garcia Jr. Decl. ¶ 25 (PTSD); Garcia Decl. ¶¶ 20-21 (PTSD); Hamilton Jr. Decl. ¶¶ 17-18 (PTSD); Hill Decl. ¶ 16 (PTSD); Hillabrant Decl. ¶¶ 13, 15 (PTSD); Houston Decl. ¶ 12 (PTSD); Jaronsky Decl. ¶¶ 21-22 (PTSD); Jiron Decl. ¶ 7 (PTSD); Kaalekahi IV Decl. ¶ 13-15 (PTSD); Krueger Decl. ¶ 14-15 (PTSD); Long Sr. Decl. ¶¶ 15-16 (PTSD); Marsh Decl. ¶ 11 (PTSD); McCarthy Decl. ¶ 19 (PTSD); Melvin Decl. ¶ 14-15 (PTSD); Morales Decl. ¶ 19 (PTSD); Myers Jr. Decl. ¶¶ 22-25 (PTSD); Neff Decl. ¶ 16 (PTSD); Novell Decl. ¶¶ 14-16 (PTSD); O'Toole Decl. ¶ 11 (PTSD); Pailin Decl. ¶ 15 (PTSD); Parratt Decl. ¶ 17-18 (PTSD); Payton Decl. ¶¶ 19-21 (PTSD); Rechcygl Decl. ¶ 13 (PTSD); Rivera Jr. Decl. ¶ 10 (PTSD); Robinson Decl. ¶ 29-30, 32, 34 (PTSD); Schmidt Decl. ¶¶ 25-26 (PTSD); Spencer Decl. ¶ 19 (PTSD); Stewart Decl. ¶ 22 (PTSD); Schmidt Decl. ¶¶ 25-26 (PTSD); Whiting Decl. ¶ 31 (PTSD); Young Decl. ¶ 17 (PTSD).

## 2.  Victims' Family Members

The remaining plaintiffs seek to collect damages as family members of service-members present in Saudi Arabia for the Khobar Towers bombing.  Eighty-nine of these plaintiffs—Rita G. Ackley, Jane F. Boyle, David J. Ackley, Sr., Scott H. Ackley, Sherry A. Bessette, David J. Ackley, Jr., Donald Stidham, Aleatha C. Harris, Elizabeth A. Bedgood, Shondrea R. Bedgood, Corey L. Bedgood, Mari E. DeLacy, Marshall L. Beneway, Barbara A. Crocco, Carol Bruns-Beneway Smith, Christina M. Mattingly, Gretchen A. Capogna, MacKenzie E. Capogna, Kyle T. Capogna, John H. Capogna, Chad N. Capogna, Justin A. Capogna, Olivia R. Capogna, Kirsten I. Carrasco, Teresa Conrad, Juli A. Croft, Dallas T. Croft, Andrew K. Croft, Kathleen A. Dick, Craig W. Dick, Brett M. Dick, Cory P. Dick, Donna J. Dixon, Edward C. Dobos, Molly A. Dobos, Erika L. Rust, Kasey D. Philips, Haley I. Dobos, Anne M. French, Charles D. French, Tina M. Judge, Brenda J. French, Dena J. DeJoe, Alyxandra L. Doggett, Sherrie K. McBride, Sandra L. Skinner, Markie B. Dunn, Vicki L. Dunn, Terry M. Dunn, Sr., Hope M. Gambill, Sylvetta E. Fox, Walter W. Fox, Jr., John P. Garcia, Sr., Virginia R. Garcia, deceased, represented by the Estate of Virginia R. Garcia, Michael Garcia, Karen M. Rainville, Dennis A. Rainville, Lisa M. Glenn, Autumn Hamilton O'Brien, Adrienne L. Fulton, Jane M. Hillabrant, Stephen R. Hillabrant, Teresa Ferguson, Cindy Houston, Patricia Houston, Henry Houston, Nathan Houston, Elsie Lombardo, Brandy O. Jiron, Kimberly J. Jiron, Randall R. Jiron, Mary J. Jiron, Randall Jiron, Adrian M. Jiron, Alvin G. Jiron, Carol M. Lewis, Matthew L. Jiron, Valerie M. Kaalekahi, Kiana K. Kaalekahi, Cynthia A. Long, David W. Long, Jr., Martina Ortiz, Sherry D. Byes, Stacey L. O'Toole, Kayla L. Kasten, Kelsie E. O'Toole, Priscilla R. Bradley, Amy P. Hall, and Talena M. Spencer—are family members of service-member plaintiffs to this suit. Eighteen of these plaintiffs—Abraham F. Ayala, Mariah C. Ayala, Philip W. Brown, Karen M.

Voie, Ingrid K. Simpson, Allia M. Coleman, Lana L. Coleman-Wiggins, Demetrius Coleman,

Charlie E. Coleman, Cornelius Coleman, Christopher M. Johnson, Donna Lee Oliver, Paul

Oliver, Stella L. Thot, Michael D. Weimer, April A. Widdis, Kymberlye R. Yeichner, and

Robert B. Yeichner—are family members of service-members who were plaintiffs in *Schooley*,

2019 WL 2717888, at *1.  One of these plaintiffs—Chaunda E. Brooks—is a family member of

a service-member plaintiff in *Heiser I*, 466 F. Supp. 2d at 229.

The family members' theory of liability is IIED.  *See* FAC ¶¶ 401-07 (Count IV).  The

Restatement permits recovery for those who were not a direct target of a defendant's conduct if

(1) "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional

harm upon a person [who] is not present" and (2) the claimant is a member of a victim's

immediate family, *Heiser II*, 659 F. Supp. 2d at 26-27 (quoting DAN B. DOBBS, THE LAW OF

TORTS § 307 (2000)), or the functional equivalent of an immediate family member, *see Bettis v.

Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (extending liability under the FISA

for IIED to "members of the victim's household" who were also "viewed as the functional

equivalent of immediate family members"); *see also* RESTATEMENT (SECOND) OF TORTS § 46,

cmt. l (leaving "open the possibility of situations in which presence . . . may not be required").

One hundred of the plaintiffs were plainly immediate family members at the time of the

attack—parents, siblings, spouses, and children—of the service-member victims.  *See Fritz*, 320

F. Supp. 3d at 63 (observing that the "strict meaning" of immediate family is "one's spouse,

parents, siblings, and children" (quoting *Heiser II*, 659 F. Supp. 2d at 28)).  Eight of the

plaintiffs—Carol Bruns-Beneway Smith, Chaunda E. Brooks, Justin A. Capogna, Olivia R.

Capogna, Teresa Conrad, Mari E. DeLacy, Dennis A. Rainville, and Lisa M. Glenn—do not fall

neatly into these traditional categories but are the functional equivalents of immediate family

members and are therefore able to maintain claims for IIED.  *See Bettis*, 315 F.3d at 337.  Half-siblings like Carol Bruns-Beneway Smith, Justin A. Capogna, Olivia R. Capogna, and Lisa M. Glenn "are presumed to recover" as full siblings would, *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007)), and the evidence here supports application of that presumption: each attest to close bonds with their half siblings.[16]

The remaining four family-member plaintiffs fall into different categories.  One is Chaunda E. Brooks, the stepsister of Joseph E. Rimkus, a service-member killed in the bombing. Brooks Decl. ¶ 6.  Stepsiblings may recover where they are "viewed as the functional equivalents of family members" based on a case-by-case analysis.  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 79 (D.D.C. 2010) (Lamberth, C.J.) (quotation marks omitted) (finding that a stepbrother "who remembers fishing and swimming with and was treated like a brother by [service-member], is the functional equivalent of a brother"); *see also Pennington v. Islamic Republic of Iran*, No. 19-796 (JEB), 2022 WL 168261, at *1-2 (D.D.C. Jan. 19, 2022).  Brooks attests having share an exceptionally close relationship with her brother, who "was more like a brother to [her] than a step-brother."  Brooks Decl. ¶ 6.  She describes how Rimkus "was protective, eager to impart his wisdom," and generally acted like the "'admirable big brother' in the television show of [her] life."  *Id.* ¶ 7.  Brooks "never once doubted that [she] was precious to Joseph," and "accepted [her] position as his favorite sister willingly and whole heartedly."  *Id.* 9. This illustrates that Brooks was thus the functional equivalent of an immediate family member— a sister—to Rimkus at the time of the bombing.

---

[16]    Carol Bruns-Beneway Smith feels "as close to Sandra as a full sister could be," although they did not grow up together, because they "have been very close since [Carol] was about twelve years old."  Bruns Beneway Smith Decl. ¶ 7.  Justin A. Capogna "grew up in the same home as Zachary as a young child" and they "continue to stay in touch as a family," visiting "each other many times over the years."  Justin Capogna Decl. ¶¶ 7, 9.  Olivia R. Capogna was "too young to remember" the bombing but as she grew up and learned about it, felt "pained . . . [by Zachary's] constant need to push himself to achieve constant safety."  Olivia Capogna Decl. ¶ 7.  Lisa M. Glenn "miss[es] [her] 'old' brother" and is saddened "to see the decline in what used to interest him."  Glenn Decl. ¶ 14.

Next, Dennis A. Rainville, Carl R. Hamilton's stepfather, was the functional equivalent of a father to service-member plaintiff Carl R. Hamilton.  Stepparents may recover as natural parents where they adopt their stepchild or are otherwise the "functional equivalents of family members." *Valore*, 700 F. Supp. 2d at 79 (finding that where a stepson "grew up" with his stepfather "as though they constituted a natural family," the stepfather was the functional equivalent of a father).  After marrying Hamilton's mother when Hamilton was ten years old, Rainville attests that he and Hamilton's mother and their respective biological children "functioned as a family of four," although Rainville did not adopt Hamilton.  Dennis Rainville Decl. ¶¶ 7-9.  "Other than the difference in . . . last names," Rainville further attests that "[Hamilton] is my son." *Id.* ¶ 10.  Today, they share "a close relationship and see each other at least once or twice a week," and Rainville is also "very close" to Hamilton's daughters, whom he considers his granddaughters. *Id.* ¶ 9.  Rainville was thus the "functional equivalent" of a father to Hamilton at the time of the bombing.

Third, Teresa Conrad was service-member Jeffrey Conrad's live-in fiancée at the time of the attack and also the functional equivalent to an immediate family member.  Teresa Conrad Decl. ¶ 25.  Conrad attests that since they began dating, she and her now husband lived together as a married couple. *Id.* ¶ 23.  Since 1994, the Conrads shared a bank account, living expenses, and other responsibilities. *Id.* ¶ 24.  They got engaged on Christmas Day in 1995 and married on June 20, 1998. *Id.*, Ex. 3, Marriage License, ECF No. 41.  Based on their dedicated relationship of two years before the bombing, their 1995 engagement before the bombing—and subsequent marriage, which has lasted over 23 years—Teresa and Jeffrey Conrad's "'bond . . . was the functional equivalent of marriage'" on June 25, 1996. *Bettis*, 315 F.3d at 337 (quoting *Surette*, 231 F. Supp. 2d at 270).

112

Finally, Mari E. DeLacy was also the functional equivalent of a spouse to service-member Sandra Beneway at the time of the bombing.  Although they were not legally married as same-sex marriage was not recognized in 1996, Beneway and DeLacy had been in a committed relationship since 1991 that was recognized by both their families and they shared a home and their finances.  Beneway Decl. ¶¶ 35-37; DeLacy Decl. ¶¶ 5, 8-12.   In 2013, they married in Delaware after same-sex marriage became legal in that state.  Beneway Decl. ¶ 37; DeLacy Decl. ¶ 12; *id.*, Ex. 4, Marriage License, ECF No. 33.  DeLacy accordingly was the functional equivalent of a spouse at the time of the bombing.  *See Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260 (D.D.C. 2002) (holding woman who was not legally married to the victim, but "had lived with [victim] for over 20 years in a bond that was the functional equivalent of marriage" and was recognized by family and colleagues, could recover for IIED); *cf. Aceto*, 2020 WL 619925 at, *16 (rejecting functional equivalent of spouse finding for couple that had met in "1994 or 1995" and had dated for less than two years before Khobar Towers bombing).  DeLacy is accordingly entitled to recover for IIED as the functional equivalent of a spouse to Beneway during the attack.[17]

In addition to the seven plaintiffs just discussed, Iran is liable for IIED to the 101-remaining family-member plaintiffs.  In this case, defendant's conduct in materially supporting Saudi Hezbollah was "sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present," such that a victim's immediate family members need not have been at the bombing to recover for their emotional distress.  *Heiser II*, 659 F. Supp. 2d at 27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834); *see Schooley*, 2019 WL 2717888, at *73

---

[17]    Since DeLacy may recover under 28 U.S.C. § 1605A(a) as the functional equivalent of a spouse, and she may only recover once, the issue of whether she is also entitled to recover under South Carolina law, as asserted in Count V of the Amended Complaint, FAC ¶¶ 408-11, need not be addressed.

(concluding the same); *Akins I*, 332 F. Supp. 3d at 38 (same).  Finally, all immediate family member plaintiffs and those plaintiffs that are the functional equivalent to immediate family members have shown, through their uncontested declarations, that they each suffered significant emotional consequences from the attack, in the days spent waiting for news of their loved ones and in the years after the attack.[18]

*       *       *

---

[18]     *See* Ackley Spouse Decl. ¶¶ 8, 12 (attesting to emotional distress stemming from her loved one's experience in the bombing); Boyle Decl. ¶¶ 13, 15-16 (same); Ackley Sr. Decl. ¶¶ 9, 11 (same); Scott Ackley Decl. ¶ 11 (same); Bessette Decl. ¶¶ 12, 14 (same); Ackley Jr. Spouse Decl. ¶¶ 8, 10 (same); Stidham Decl. ¶¶ 8-11 (same); Harris Decl. ¶¶ 9, 12-13 (same); Ayala Decl. ¶¶ 8, 13, 24-27 (same), Mariah Ayala Decl. ¶¶ 12-15 (same); Elizabeth Bedgood Decl. ¶¶ 8-9 (same); Shondrea Bedgood Decl. ¶¶ 9-10 (same); Corey Bedgood Decl. ¶¶ 9, 11-12 (same); DeLacy Decl. ¶¶ 22-28 (same); Marshall Beneway Decl. ¶¶ 11-12 (same); Crocco Decl. ¶¶ 12-13 (same); Smith Decl. ¶¶ 12-13 (same); Brooks Decl. ¶¶ 19, 27-29 (same); Brown Decl. ¶¶ 12, 18 (same); Voie Decl. ¶¶ 10, 12 (same); Simpson Decl. ¶¶ 10-12 (same); Mattingly Decl. ¶¶ 8, 10-12 (same); Gretchen Capogna Decl. ¶¶ 7, 11, 13 (same); MacKenzie Capogna Decl. ¶¶ 8-12 (same); Kyle Capogna Decl. ¶¶ 8-9, 11 (same); John Capogna Decl. ¶¶ 7-8 (same); Chad Capogna Decl. ¶¶ 7-8 (same); Justin Capogna Decl. ¶ 8 (same); Olivia Capogna Decl. ¶¶ 6-7 (same); Kirsten Carrasco Decl. ¶¶ 10, 16, 18-19 (same); Coleman Decl. ¶ 10 (same); Coleman-Wiggins Decl. ¶ 9 (same); Demetrius Coleman Decl. ¶ 9 (same); Charlie Coleman Decl. ¶¶ 10-11 (same); Cornelius Coleman Decl. ¶¶ 9-10, 12 (same); Teresa Conrad Decl. ¶¶ 14, 16, 20 (same); Juli Croft Decl. ¶¶ 12, 14-15, 18-19 (same); Dallas Croft Decl. ¶ 8 (same); Andrew Croft Decl. ¶¶ 8, 12-13 (same); Kathleen Dick Decl. ¶¶ 8-10 (same); Craig Dick Decl. ¶¶ 11-12 (same); Brett Dick Decl. ¶¶ 8-10 (same); Cory Dick Decl. ¶¶ 8, 11 (same); Donna Dixon Decl. ¶¶ 8, 10-12 (same); Edward Dobos Decl. ¶¶ 12-13 (same); Molly Dobos Decl. ¶ 9 (same); Rust Decl. ¶¶ 8-10 (same); Phillips Decl. ¶ 9;  French Decl. ¶¶ 8, 10 (same); Charles French Decl. ¶¶ 7, 9 (same); Judge Decl. ¶¶ 12, 14 (same); Brenda French Decl. ¶¶ 9, 11-12 (same); DeJoe Decl. ¶¶ 14-15 (same); Alyxandra Doggett Decl. ¶¶ 9-10, 12 (same); McBride Decl. ¶¶ 8, 12 (same); Skinner Decl. ¶¶ 10-11 (same); Dunn Decl. ¶¶ 8-9 (same); Vicki Dunn Decl. ¶¶ 8, 10 (same);  Dunn Sr. Decl. ¶¶ 7-9 (same); Gambill Decl. ¶¶ 10-11 (same); Fox, Decl. ¶¶16-19 (same); Fox Jr. Decl. ¶¶ 11-12 (same); Garcia Sr. Decl. ¶¶ 9-10, 12-13 (same); Garcia Decl. ¶ 10, Ex. 5, Personal Statement of Virginia Garcia (same); Michael Garcia Decl. ¶¶ 17-19 (same); Rainville Decl. ¶¶ 14, 16 (same); Dennis Rainville Decl. ¶¶ 18, 21-22 (same); Glenn Decl. ¶¶ 12, 14 (same); O'Brien Decl. ¶¶ 14, 25-29, 32 (same); Fulton Decl. ¶¶ 11-12 (same); Jane Hillabrant Decl. ¶¶ 11, 23, 24 (same); Stephen Hillabrant Decl. ¶¶ 7-8, 13-15 (same); Ferguson Decl. ¶¶ 8-9 (same); Cindy Houston Decl. ¶¶ 9 (same); Patricia Houston Decl. ¶ 6 (same); Henry Houston Decl. ¶¶ 7-8 (same); Nathan Houston Decl. ¶ 8 (same); Lombardo Decl. ¶¶ 13-14 (same); Brandy Jiron Decl. ¶¶ 38-40, 42-43, 51 (same); Kimberly Jiron Decl. ¶¶ 7, 11-12, 16, 18 (same); Randall R. Jiron Decl. ¶¶ 8, 10 (same); Mary Jiron Decl. ¶ 12 (same); Randall Jiron Decl. ¶ 13 (same); Adrian Jiron Decl. ¶ 11 (same); Alvin Jiron Decl. ¶¶ 10-11 (same); Lewis Decl. ¶¶ 13-15 (same); Matthew Jiron Decl. ¶¶ 10-11 (same); Johnson Decl. ¶¶ 12-13 (same); Valerie Kaalekahi Decl. ¶¶ 20, 22 (same); Kiana Kaalekahi Decl. ¶¶ 8-9, 11 (same); Long Decl. ¶¶ 15-19, 24-25, 27-28 (same); Long Jr. Decl. ¶¶ 13-14 (same); Ortiz Decl. ¶ 9 (same); Byes Decl. ¶ 9 (same); Oliver Decl. ¶¶ 15, 18-20 (same); Paul Oliver Decl. ¶ 13 (same); Stacey O'Toole Decl. ¶¶ 10-12 (same); Kasten Decl. ¶¶ 10-12, 15 (same); Kelsie O'Toole Decl. ¶¶ 8, 10 (same); Bradley Decl. ¶¶ 10-13 (same); Hall Decl. ¶¶ 12-14 (same); Talena Spencer Decl. ¶¶ 11, 14 (same);  Thot Decl. ¶¶ 14, 17-18, 22-23 (same); Weimer Decl. ¶¶ 15, 17 (same); Widdis Decl. ¶¶ 15, 17 (same); Yeichner Decl. ¶¶ 8-9, 12 (same); Robert Yeichner Decl. ¶¶ 16-17 (same).

As just outlined, the service-member plaintiffs and the immediate-family member plaintiffs have established the defendant's liability under the federal private right of action against state sponsors of terrorism, 28 U.S.C. § 1605A(c), for the torts of assault, battery, and intentional infliction of emotional distress.

### D.  Damages

Turning to the allowable damages, service-member plaintiffs seek damages for pain and suffering and economic losses, under 28 U.S.C. § 1605A(c), and their family members seek solatium damages under 28 U.S.C. § 1605A(c).  FAC ¶¶ 385-411 (Counts I-V).  All plaintiffs also seek prejudgment interest, postjudgment interest, punitive damages, reasonable costs and expenses, reasonable attorney's fees, and any further relief as the Court determines is just and equitable.  *See* FAC at 119-20.  The damage award to which each plaintiff is entitled is described below.

### A.  Legal Standard for Damages under Section 1605A(c)

In actions brought under the FSIA's terrorism exception, foreign states may be liable for money damages, including "economic damages, solatium, pain and suffering and punitive damages."  28 U.S.C. § 1605A(c).  To recover, plaintiffs "must prove that the consequences of the foreign state's conduct were reasonably certain (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a reasonable estimate."  *Roth*, 78 F. Supp. 3d at 402 (quotation marks omitted); *see also Fraenkel*, 892 F.3d at 353 (same).  Courts may look to expert testimony and prior awards in determining whether the amount of damages has been proven by a reasonable estimate.  *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).  The D.C. Circuit

"review[s] the District Court's FSIA damages awards for abuse of discretion." *Fraenkel*, 892 F.3d at 356.

The evidence presented in *Blais* and *Heiser I*, of which this Court has taken judicial notice and reviewed above, has satisfactorily shown that the plaintiffs' injuries were reasonably certain and were the intended consequences of defendant's material support of Saudi Hezbollah. *See also Aceto*, 2020 WL 619925, at *18 (concluding the same); *Schooley*, 2019 WL 2717888, at *74 (same); *Akins I*, 332 F. Supp. 3d at 39 (same).  With this conclusion reached, whether plaintiffs have shown the amount of economic, pain and suffering, and solatium damages by a reasonable estimate will be considered next.

### B.  Economic Losses and Medical Expenses

The fifty-one service-member plaintiffs seek to recover for "past and future economic losses including medical expenses, lost income, and loss of earning capacity."  FAC ¶ 388.  This demand is unaccompanied by any documentation of medical bills, payments or by any evidence of lost wages or other economic injury, and so plaintiffs have failed to prove the amount of damages for economic loss by a reasonable estimate.  *See Aceto*, 2020 WL 619925, at *19 (concluding the same where plaintiffs failed to estimate economic losses from Khobar Towers bombing); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015) (concluding the same where plaintiff had estimated economic loss without documentation); *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 41 (D.D.C. 2016) (denying economic damages where plaintiffs did not provide documents "lending credence" to claims of lost income); *Akins I*, 332 F. Supp. 3d at 39-40 (denying economic losses for failure to support claims with sufficient evidence). "Unlike damages for pain and suffering, lost earnings" and incurred medical expenses "are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost

earnings" and medical expenses "with competent evidence." *Moradi*, 77 F. Supp. 3d at 71.

Indeed, plaintiffs themselves concede that they "have not presented evidence for lost wages or

other economic losses and therefore no economic damages may be awarded." Pls.' Proposed

Findings of Fact and Conclusions of Law at 177. Their claims for economic losses and medical

expenses are therefore denied.

### C.  Pain and Suffering

As discussed, of the fifty-one service-member plaintiffs, defendant is liable to the 44

service-member plaintiffs present at the Khobar Towers complex at the time of the attack for

battery, assault, and intentional infliction of emotional distress, and defendant is liable to the

remaining seven service-member plaintiffs who were not on site for intentional infliction of

emotional distress alone. The bar on multiple recoveries allows plaintiffs to recover only under

one theory for the single underlying harm. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 77 ("The Court

notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only

one of any such theories, as multiple recovery is prohibited."). Within this single-recovery

framework, the "baseline assumption" applied in previous cases under the FSIA's terrorism

exception is that "persons suffering injuries in terrorist attacks are entitled to $5 million in

damages." *Kaplan*, 213 F. Supp. 3d at 35 (quoting *Davis v. Islamic Republic of Iran*, 882 F.

Supp. 2d 7, 12 (D.D.C. 2012)). The baseline may be adjusted either upward or downward. An

upward departure would be warranted "in the presence of 'severe instances of physical and

psychological pain, such as where victims suffered relatively more numerous and severe injuries,

were rendered quadriplegic . . . or were mistaken for dead.'" *Id.* at 35-36 (quoting *Valore*, 700 F.

Supp. 2d at 84). A downward departure would be warranted "in the face of 'minor shrapnel

injuries or minor injury from small-arms fire.'" *Id.* at 36 (quoting *Valore*, 700 F. Supp. 2d at 84).

Pain and suffering damages are by their nature difficult to quantify.  In *Schooley*, this Court relied in part on an "objective metric"— the VA disability rating — to "determin[e] the relative degree of injury suffered by each service-member plaintiff."  *Schooley*, 2019 WL 2717888, at *74.  That rating is the "agency's official determination regarding the extent of disabling injury sustained by service-members in connection with military service."  *Id.*  (internal quotation marks omitted).  As *Schooley* explained, "[t]he VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that similar injuries yield similar awards.  *Id.*; *cf. Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 33 (D.D.C. 2014) ("When calculating damages amounts, 'the Court must take pains to ensure that individuals with similar injuries receive similar awards.'" (quoting *Peterson*, 515 F. Supp. 2d at 54).  *Schooley*'s basic rubric is adopted in this case for the forty-nine service-member plaintiffs with relevant VA disability ratings.  *See Christie*, 2020 WL 3606273, at *23 (using *Schooley*'s "basic rubric" of VA disability ratings to calculate damages amounts); *Aceto*, 2020 WL 619925, at *18 (same).  Thus, service-member plaintiffs rated by the VA up to 30% disabled receive a baseline award of $5,000,000; plaintiffs rated 40-60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and service-member plaintiffs rated 70-100% disabled by the VA will receive a further upward departure, for a total of $7,000,000.  *Id.* at *75.  The remaining two service-member plaintiffs, Rita Ackley and David Ackley, Jr., will be awarded damages based on the descriptive and documentary evidence presented about their injuries.  *See Christie*, 2020 WL 3606273, at *23 (using this approach); *see also Aceto*, 2020 WL 619925, at *18 (same); *Akins I*, 332 F. Supp. 3d at 40-41 (same).

118

Review of the affidavits and supporting evidence submitted by the service-member plaintiffs who did not receive VA disability ratings, David Ackley, Jr. and Rita Ackley, demonstrates that both plaintiffs are entitled to awards of $3,000,000 for the cuts and lacerations they received in the bombing and the psychological symptoms they have suffered since. *See* Ackley Jr. Decl. ¶¶ 10-11, 13 (describing "cuts and lacerations from shattered glass all over" and describing psychological symptoms); Ackley Decl. ¶¶ 10-11 (describing "lacerations from glass shrapnel" and psychological symptoms). Both Ackleys suffered the sort of "'minor shrapnel injuries or minor injury from small-arms fire,'" *Kaplan*, 213 F. Supp. 3d at 36 (quoting *Valore*, 700 F. Supp. 2d at 84), which, under prior FSIA cases, receive an award of $3,000,000, *see, e.g.*, *Schooley*, 2019 WL 2717888, at *75 (awarding $3,000,000 to plaintiffs with similar, "comparatively minor" injuries); *Akins I*, 332 F. Supp. 3d at 41 (awarding $2,500,000 to victims who sustained cuts from flying glass and psychological injury).

The following eight plaintiffs who received VA disability ratings of up to 30% can each recover $5,000,000: Andre L. Bedgood, Dallas W. Croft, Carrie L. Dobos, Terry M. Dunn, Jr., Alfredo R. Guerrero, the Estate of Gregory M. Hillabrant, Steven Jaronsky, and Shane Rechcygl. This finding is supported by the following:

1. Andre L. Bedgood received a 20% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing. Bedgood Decl. ¶ 13; *id.*, Ex. 6, Letter from VA.

2. Dallas W. Croft was rated by the VA as 90% disabled, but only 30% of that rating is attributable to effects of the Khobar Towers bombing. Croft Decl. ¶ 14; *id.*, Ex. 7, Letter from VA.

3. Carrie L. Dobos received a 50% VA disability rating, but only 30% of that rating was attributable to PTSD from the bombing. Dobos Decl. ¶ 17; Ex. 10, Letter from VA.

4. Terry M. Dunn, Jr. received a 30% VA disability rating from PTSD as a result of the Khobar bombing. Dunn Jr. Decl. ¶ 19; *id.*, Ex. 8, Letter from VA.

119

5. Alfredo R. Guerrero received a 30% VA disability rating that he avers is attributable to injuries he sustained at Khobar Towers.  Guerrero Decl. ¶ 12; *id.*, Ex. 4, Letter from VA.

6. Gregory M. Hillabrant received a 30% VA disability rating attributable to the PTSD he developed from the Khobar Towers bombing, Hillabrant Decl. ¶ 15; *id.*, Ex. 8, Letter from VA.

7. Steven Jaronsky received a VA disability rating of 10% due to PTSD which he avers resulted from the Khobar Towers attack. Jaronsky Decl. ¶ 25; *id.*, Ex. 3, Letter from VA.

8. Shane Rechcygl received a 90% disability rating from the VA, but just 30% is attributable to his experience at Khobar Towers.  Rechcygl Decl. ¶ 14; *id.*, Ex. 6, Letter from VA.

Fourteen service-member plaintiffs can recover in the 40-60% disabled category: Sandra J. Beneway, Benjamin C. Depweg, Craig J. Dick, George G. Dyer III, Steven D. Garcia, Richard R. Jiron, Christopher E. Marsh, Jason L. Melvin, Morris M. Myers, Jr., William G. Neff, Elisha J. Novell, Pascha R. Payton, Andre L. Stanton, and Anthony J. Whiting.  This finding is supported by the following:

1. Sandra Beneway's overall VA disability rating is 80%, but she avers that only 60% is attributable to harm caused by the Khobar Towers bombing.  Beneway Decl. ¶ 34. The 60% is broken down with 40% attributable to the loss of her left eye, 10% for scars on the left side of her face, and 10% for depression.  *Id.*, Ex. 9, Letter from VA.

2. Benjamin C. Depweg received a 60% disability rating from the VA, with 10% due to right knee patelloformal arthritis and 50% due to PTSD, which he avers both stem from the Khobar Towers bombing.  Depweg Decl. ¶ 18; *id.*, Ex. 4, Letter from VA.

3. Craig J. Dick's disability rating from the VA is 50% based on a left ear injury deformity, shrapnel that remains embedded in his body, and a foot injury.  Dick Decl. ¶ 14; *id.*, Ex. 7, Letter from VA.

4. George G. Dyer III received a 60% disability rating from the VA, with 30% due to PTSD, 20% for post traumatic injury and ankle fracture, and 10% for post traumatic injury and fracture of his knees and cervical spine he sustained at the bombing.  Dyer III Decl. ¶ 15; *id.*, Ex. 9, Letter from VA.

5. Steven D. Garcia received a 50% disability rating from the VA for PTSD developed after the bombing.  Garcia Decl. ¶ 28; *id.*, Ex. 9, Letter from VA.

6. Richard R. Jiron received a 60% disability rating from the VA with 50% attributable to PTSD and 10% attributable to tinnitus from the Khobar Towers bombing. Jiron Decl. ¶ 36; *id.*, Ex. 11, Letter from VA.

7. Christopher E. Marsh received a combined disability rating from the VA of 70%, but only 50% is attributable to PTSD from the Khobar Towers bombing. Marsh Decl. ¶ 11; *id.*, Ex. 5, Letter from VA.

8. Jason L. Melvin was rated 60% disabled by the VA based on injuries incurred at the Khobar Towers bombing, with 50% for PTSD and 10% for tinnitus. Melvin Decl. ¶ 16.; *id.*, Ex. 6, Letter from VA.

9. Morris M. Myers, Jr. received a 50% disability rating from the VA for PTSD from the Khobar Towers. Myers Jr. Decl. ¶ 26; *id.*, Ex. 6., Letter from VA.

10. William G. Neff was rated 80% disabled by the VA, but only 50% is owed to the PTSD he developed in the wake of the Khobar Towers bombing. Neff Decl. ¶ 17; *id.*, Ex. 8, letter from VA.

11. Elisha Novell has a combined disability rating of 80% by the VA, including 50% for an adjustment disorder stemming from the Khobar Towers bombing. Novell Decl. ¶ 19; *id.*, Ex. 10, Letter from VA.

12. Pascha R. Payton received a 100% disability rating from the VA, including 50% for PTSD from the Khobar Towers attack. Payton Decl. ¶ 22; *id.*, Ex. 10, Letter from VA.

13. Andre L. Stanton received a 50% disability rating from the VA, with 30% due to scarring on his right cheek, neck, and ear, 10% due to eye issues, 10% due to facial nerve impairment, 10% due to nerve damage on right leg, and 10% due to tinnitus attributed to Khobar Towers. Stanton Decl. ¶ 14; *id.*, Ex. 4., Letter from VA.

14. Finally, Anthony J. Whiting was rated 80% disabled by the VA, with 50% attributable to the PTSD caused by the Khobar Towers bombing. Whiting Decl. ¶ 33; *id.*, Ex. 11, Letter from VA.

These fourteen service-member plaintiffs are each entitled to an upward departure from the baseline award for a total award to each of $6,000,000 for their pain and suffering as survivors of the bombing.

Finally, twenty-seven of the service-member plaintiffs can recover in the 70-100% disabled category: Lisa M. Cafiero, Zachary J. Capogna, Jason D. Carley, Manuel J. Carrasco, Jeffrey Conrad, Jason B. Dixon, Christopher O. Doggett, Bryan W. Fox, John P. Garcia, Jr., Carl

R. Hamilton, Jr., Jeffrey L. Hill, Rodney Houston, Roger K. Kaalekahi IV, David A. Krueger, David W. Long, Sr., John G. McCarthy, Flor D. Morales, Mark W. O'Toole, Eldred E. Pailin, Jeremy L. Parratt, Michael J. Perfetti, Rafael Rivera, Jr., David C. Robinson, Trena M. Schmidt, Michael S. Spencer, Billy J. Stewart, and Robert K. Young.  This finding is supporting by the following:

1. Lisa M. Cafiero's VA disability rating is 100%, Cafiero Decl. ¶ 50; *id.*, Ex. 23, Letter from VA, attributable entirely to injuries from the Khobar Towers bombing.  Cafiero Decl. ¶ 50 (100% for PTSD; 40% for fibromyalgia; 30% for bronchial asthma; 30% for irritable colon; 20% for intervertebral disc syndrome; 10% for chronic maxillary sinusitis; 10% for labyrinthitis; 10% for degenerative arthritis of the spine; 10% for limited motion of the jaw; and 10% for tinnitus).

2. Zachary J. Capogna received a disability rating of 100%, Capogna Decl. ¶ 30; *id.* ¶ 31, Ex. 7, Letter from VA, and all injuries contributing to that rating stemmed from the Khobar Towers attack, Capogna Decl. ¶ 30 (10% for chronic left costochondritis; 30% for chronic residuals of right thigh penetrating muscle and soft tissue injury/lacerations; 30% for obstructive sleep apnea; 30% for PTSD; 10% for tinnitus; and 10% for residuals of right-hand soft tissue laceration).

3. Jason D. Carley's VA disability rating is 100%, Carley Decl. ¶ 15; *id.*, Ex. 7, Letter from VA, and he avers it all stems from the Khobar Towers bombing.  Carley Decl. ¶ 15; Carley Decl., Ex. 7, Letter from VA (10% for left lower extremity femoral nerve radiculopathy; 10% for right lower extremity femoral nerve radiculopathy, 30% for migraines and variants; 30% for irritable bowel syndrome; 10% for lateral subluxation of the right knee with instability; 10% for lateral subluxation of the right knee; 10% for lumbosacral strain; 10% for right eye macular scar; 10% for tinnitus; 10% for right ankle lateral collateral ligament sprain; and 70% for PTSD and traumatic brain injury).

4. Manuel J. Carrasco received a disability rating from the VA of 90%, Carrasco Decl. ¶ 17; *id.*, Ex. 10, Letter from VA.  Neither his declaration nor the VA letter itemize his disability rating, but a letter from the Air Force Disability Operations Branch indicates that at least 70% of Carrasco's injuries are attributable to the Khobar Towers bombing.  Carrasco Decl., Ex. 9, Letter from Air Force Disability Operations Branch.

5. Jeffrey Conrad's VA disability rating is 80%, with 70% attributable to PTSD and 10% attributable to tinnitus developed from the attack.  Conrad Decl. ¶ 26; *id.*, Ex. 6, Letters from VA.

6. Jason B. Dixon received a VA disability rating of 80%, (including 70% for PTSD; 10% for tinnitus; and 10% for residuals of lacerations and foreign bodies), which he avers all resulted from the Khobar Towers bombing.  Dixon Decl. ¶ 19; *id.*, Ex. 7, Letter from VA.

7. Christopher O. Doggett was rated 100% disabled by the VA for injuries sustained in the Khobar Towers attack: 50% for PTSD with insomnia, 50% for post-traumatic headaches, 30% for restless leg syndrome, 10% for traumatic brain injury, 10% for facial scars, and 30% for Meniere's disease with bilateral hearing loss, vertigo, and tinnitus.  Doggett Decl. ¶ 12; *id.*, Ex. 6, Letter from VA.  These injuries render Doggett "totally and permanently disabled."  Doggett Decl. ¶ 12.

8. Bryan W. Fox has a combined 100% disability rating from the VA for the severe PTSD he developed in the aftermath of the Khobar Towers bombing.  Fox Decl. ¶ 43; *id.*, Ex. 13, Letter from VA.

9. John P. Garcia, Jr.'s VA disability rating is 100%, including 50% for PTSD, 50% for obstructive sleep apnea, 40% for traumatic brain injury, 10% for left trigeminal neuropathy (facial numbness), 10% for right trigeminal neuropathy (facial numbness), 10% for tinnitus, and 30% for left and right cheek scar—all resulting from the Khobar Towers bombing.  Garcia Jr. Decl. ¶ 25; *id.*, Ex. 7, Letter from VA.

10. Carl R. Hamilton was rated 100% disabled by the VA as a result of his severe PTSD from the Khobar Towers bombing.  Hamilton Jr. Decl. ¶ 21; *id.*, Ex. 4, Letter from VA.

11. Jeffrey L. Hill received a 100% disability rating from the VA, with 100% attributable to the PTSD he developed from the bombing.  Hill Decl. ¶ 20; *id.*, Ex. 8, Letter from VA.

12. Rodney Houston received a VA disability rating of 100%, including 70% for PTSD and 10% for scars, both connected with Khobar Towers bombing.  Houston Decl. ¶ 15.  The VA considers Houston "totally and permanently disabled."  *Id.*, Ex. 8, Letter from VA.

13. Roger K. Kaalekahi IV has a 70% overall VA disability rating comprised of individual ratings of 50% for PTSD, 10% for residual of a skull fracture, and 10% for residual of right knee injury, status post fragmentation wound—all of which are attributed to the Khobar Towers bombing.  Kaalekahi IV Decl. ¶ 16; *id.*, Ex. 4, Letter from VA.

14. David A. Krueger received a 100% disability rating from the VA based on the severe PTSD, anxiety, and depressive disorder he has experienced since surviving the bombing.  Krueger Decl. ¶ 18; *id.*, Ex. 10, Letter from VA.

15. David W. Long, Sr. was rated 90% disabled for injuries he sustained at Khobar Towers, including 70% for PTSD, 30% for bilateral vestibular weakness, 10% for bilateral constant tinnitus, 10% for paresthesia of the iliofemoral nerve with scar, and

10% for contusion of the left hand, with scars.  Long Sr. Decl. ¶ 18.  Long is considered "totally and permanently disabled" as a result of these injuries.  *Id.*, Ex. 8, Letter from VA.

16. John G. McCarthy received a combined 80% disability rating from the VA (including 50% for obstructive sleep apnea, 30% for coronary artery disease, 10% for PTSD, 10% for chronic lumbar spine strain, 10% for surgical scars, anterior neck, 10% for cervical spine degenerative disc disease, status post-surgery, and 10% for tinnitus). McCarthy Decl. ¶ 21; *id.* Ex. 7, Letter from VA.  McCarthy avers that all injuries were sustained in or otherwise stemmed from the Khobar Towers attack.  McCarthy Decl. ¶ 21.

17. Flor D. Morales received a 100% disability rating from the VA—comprised of 50% for PTSD, 40% for lumbar spine degenerative disc disease, 10% for tinnitus, 10% for left leg radiculopathy, 10% for right leg radiculopathy, 20% for radiculopathy affecting the left upper extremity, and 20% for cervical spine degenerative disease— all of which she avers was caused by the Khobar Towers bombing.  Morales Decl. ¶ 23; *id.*, Ex. 8, Letter from VA.

18. Mark W. O'Toole was rated 80% disabled by the VA for injuries sustained at the attack, including 50% for PTSD and traumatic brain injury, 50% for post-concussion headaches, and 10% for tinnitus.  O'Toole Decl. ¶ 15; *id.*, Ex. 6, Letter from VA.

19. Eldred E. Pailin received a 70% disability rating from the VA, including 50% for PTSD, 10% for tinnitus, and 10% for painful laceration scars on his left elbow and left calf, all of which are attributed to the Khobar Towers bombing.  Pailin Decl. ¶ 16; *id.*, Ex. 13, Letter from VA.

20. Jeremy L. Parratt was designated 90% disabled by the VA, including 70% for PTSD, 50% for obstructive sleep apnea secondary to PTSD, and 10% for tinnitus, all of which are also attributable to Khobar Towers.  Parratt Decl. ¶ 24; *id.*, Ex. 5, Letter from VA.

21. Michael J. Perfetti was rated 70% disabled by the VA for the PTSD he has developed since the attack.  Perfetti Decl. ¶ 16; *id.*, Ex. 5, Letter from VA.

22. Rafael Rivera, Jr., who is considered "totally and permanently disabled," received a 100% disability rating from the VA—including 100% for PTSD, 20% for left shoulder status post acromion and scapula fracture, arthroscopic surgery, and shrapnel injury, 40% for lumbar strain, 10% for tinnitus, and 20% for left ankle lateral collateral ligament sprain—that are traced back to the bombing.  Rivera Jr. Decl. ¶ 15; *id.*, Ex. 6, Letter from VA.

23. David C. Robinson was rated 70% disabled by the VA, including 30% for PTSD, 10% for chondromalacia left knee, 10% for chondromalacia right knee, 10% for gastroesophageal reflux disease, and 10% for tension headaches, all of which he avers stemmed from the Khobar Towers bombing.  Robinson Decl. ¶ 45; *id.*, Ex. 10, Letter from VA.

24. Trena M. Schmidt received a 100% disability rating from the VA, with 70% of her injuries stemming from the Khobar Towers bombing: 50% for PTSD and 20% for degenerative arthritis.  Schmidt Decl. ¶ 28; *id.*, Ex. 9, Letter from VA.

25. Michael S. Spencer received a combined 80% disability rating from the VA, including 70% for PTSD and 10% for tinnitus, both of which resulted from the bombing.  Spencer Decl. ¶ 22; *id.*, Ex. 7, Letter from VA.

26. Billy J. Stewart received a disability rating of 90% from the VA—including 50% for PTSD, 50% for sleep apnea, 20% for right knee pain, and 10% for tinnitus—all caused by the Khobar Towers attack.  Stewart Decl. ¶ 30; *id.*, Ex. 13, Letter from VA.

27. Robert K. Young received a 90% disability rating from the VA, including 70% for PTSD experienced after the bombing.  Young Decl. ¶ 19; *id.*, Ex. 6, Letter from VA.

These 27 service-member plaintiffs are thus each entitled to an upward departure from the baseline award, for a total award to each of $7,000,000 for their pain and suffering as survivors of the bombing.

### D. Solatium

The 100 immediate-family member plaintiffs and the eight plaintiffs who are functional equivalents of immediate family members seek solatium damages to compensate for the emotional distress they experienced as family members of service-member victims.  *See* FAC ¶¶ 401-11.  "Solatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society," *Fraenkel*, 892 F.3d at 356 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998)), but solatium damages have also been awarded to compensate for the emotional distress of the family members of surviving victims, *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (explaining that "in the context of distress resulting from injury to loved ones — rather than death — courts have applied a framework where awards are valued at half of the awards to family members of the deceased."  (internal quotation marks omitted)); *see also Valore*, 700 F. Supp. 2d at 85 ("Relatives of surviving servicemen received awards valued at half

of the awards to family members of the deceased."). "Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED." *Flanagan*, 87 F. Supp. 3d at 115; *see also Fraenkel*, 892 F.3d at 357. Damages recoverable on the family members' claims of IIED thus will be discussed as claims for solatium damages.

"Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium." *Fraenkel*, 892 F.3d at 356-57 (alteration adopted) (quoting *Flatow*, 999 F. Supp. at 30). In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29. Commonly accepted in this Court is *Heiser I*'s standardized framework for solatium damages. *Heiser I*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)). Although the *Heiser* framework is not mandatory, *see Fraenkel*, 892 F.3d at 361 ("There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted."), it is adopted here for consistency, *see also Akins I*, 332 F. Supp. 3d at 43 (adopting the *Heiser* framework for awarding solatium damages); *Schooley*, 2019 WL 2717888, at *77 (same).

The *Heiser* framework, as a baseline, awards spouses of deceased victims $8,000,0000, parents and children of deceased victims $5,000,000, and siblings of deceased victims $2,500,000. *Valencia*, 774 F. Supp. 2d at 15. "[F]amilies of victims who have died are typically awarded greater damages than families of victims who remain alive," *Heiser I*, 466 F. Supp. 2d at 269 (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006)), and so

the courts have awarded family members of surviving victims approximately half the baseline

awards for family members of the deceased, *see Wultz*, 864 F. Supp. 2d at 39; *Valore*, 700 F.

Supp. 2d at 85.  Here, then, the applicable baseline solatium awards are $4,000,000 to spouses of

surviving victims and $2,500,000 to parents of surviving victims, *see Wultz*, 864 F. Supp. 2d at

39; "[c]hildren of a surviving victim receive $1.5 million on average," *Spencer v. Islamic*

*Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014), and siblings of surviving victims receive

$1,250,000, *see Valore*, 700 F.Supp.2d at 85.

These numbers serve as an anchor from which deviations may be made to compensate for

specific circumstances.  *See Fraenkel*, 892 F.3d at 362 ("While past solatium awards from

comparable cases are appropriate sources of guidance for district courts, different plaintiffs (even

under FSIA) will prove different facts that may well (and should) result in different damage

awards."  (internal quotation marks omitted)).  "Decisions to deviate from the starting points

provided by the *Heiser* framework are committed to the discretion of the particular court in each

case . . . ."  *Oveissi II*, 879 F. Supp. 2d at 26; *see also Fraenkel*, 892 F.3d at 351 ("District Court

judges have discretion . . . to grant solatium awards based on the particular facts of each case,

subject to abuse-of-discretion review for errors of law, clearly erroneous factual findings, and

faulty reasoning.").  Damages for plaintiff spouses are addressed first, followed by parents,

children, and siblings.

### a.  Spouses

Sixteen of the immediate family member plaintiffs were spouses or the functional

equivalent of spouses of service-member plaintiffs at the time of the bombing: Rita Ackley,

David J. Ackley, Jr., Mari E. DeLacy, Gretchen A. Capogna, Kirsten I. Carrasco, Teresa Conrad,

Juli A. Croft, Donna J. Dixon, Edward C. Dobos, Autumn Hamilton O'Brien, Brandy O. Jiron,

Valerie M. Kaalekahi, Cynthia A. Long, Stacey L. O'Toole, Talena M. Spencer, and April A. Widdis. As detailed above, each spouse describes fear for his or her spouse's physical well-being in the immediate aftermath of the bombing and the toll that the bombing has taken since on their sense of safety, on their spouses, or on their marriages.[19]

The *Heiser* framework awards spouses of surviving victims $4,000,000. Mari E. DeLacy, Gretchen A. Capogna, Kirsten I. Carrasco, Teresa Conrad, Juli A. Croft, Donna J. Dixon, Edward C. Dobos, Autumn Hamilton O'Brien, Brandy O. Jiron, Valerie M. Kaalekahi, Cynthia A. Long, Stacey L. O'Toole, and Talena M. Spencer all have surviving service-member spouses. As such, each is awarded the full amount given to spouses of surviving victims: $4,000,000.

Where attenuation in a relationship has occurred, such as spouses divorcing or siblings losing touch, a downward departure is appropriate. *See Valore*, 700 F. Supp. 2d at 87. Where evidence indicates, however, that, for example, a couple eventually divorced but remained married for years following the attack and the spouse "suffered compensable emotional trauma," the *Heiser* solatium framework may still be applied. *Spencer*, 71 F.Supp.3d at 28-29. Autumn Hamilton O'Brien will accordingly receive the full solatium award of $4,000,000 as the former spouse of Carl Hamilton, Jr. despite their divorce. They remained married for at least 25 years after the bombing, during which period she avers that the persistent impact of Hamilton's PTSD "destroyed" her, contributed to their divorce, and led to O'Brien's own PTSD diagnosis. O'Brien Decl. ¶¶ 14, 25-29, 32.

---

[19]     *See* Ackley Spouse Decl. ¶¶ 8,12; Ackley Jr. Spouse Decl. ¶¶ 8, 10; DeLacy Decl. ¶¶ 22-24, 27; Gretchen Capogna Decl. ¶¶ 7, 11, 13; Kirsten Carrasco Decl. ¶¶ 10, 16, 18; Teresa Conrad Decl. ¶¶ 14, 16, 20; Juli Croft Decl. ¶¶ 12, 14-15; Donna Dixon Decl. ¶¶ 8, 10-12; Edward Dobos Decl. ¶¶ 12-13; O'Brien Decl. ¶¶ 14, 25-29; Brandy Jiron Decl. ¶¶ 38-40, 42-43; Valerie Kaalekahi Decl. ¶¶ 20, 22; Long Decl. ¶¶ 15, 19, 27; Stacey O'Toole Decl. ¶¶ 10-12; Talena Spencer Decl. ¶¶ 11, 14; Widdis Decl. ¶¶ 13, 17-19, 26.

That said, where "a proposed solatium award would exceed the pain and suffering award received by a surviving victim," *Spencer*, 71 F.Supp.3d at 28, a "proportional" downward deviation from the *Heiser* framework is "appropriate," *Akins I*, 332 F. Supp. 3d at 44; *see also Estate of Bland v. Islamic Republic of Iran*, 831 F.Supp.2d 150, 158 (D.D.C. 2011) (holding that it would be inappropriate for family members to receive a larger award than a service-member). Rita Ackley and David J. Ackley, Jr., each compensated $3,000,000 as service-member plaintiffs, will thus each receive a solatium award of $2,000,000 for the emotional distress they suffered as one another's spouse. *See Davis*, 882 F. Supp. 2d at 16 (reducing spouse's solatium award to two-thirds of victim's pain and suffering award); *Spencer*, 71 F. Supp. at 28 (same); *Estate of Bland*, 831 F. Supp. 2d at 157 (same). April A. Widdis, whose husband, Douglas Widdis, was awarded $3,000,000 in *Schooley*, 2019 WL 2717888, at *75, is likewise entitled to an award of $2,000,000.

### b. *Parents*

Thirty-two of the immediate family member plaintiffs will receive awards as parents of service-members who were stationed at the Khobar Towers at the time of the bombing: Jane F. Boyle, David J. Ackley, Sr., Donald Stidham, Elizabeth A. Bedgood, Philip W. Brown, Karen M. Voie, John H. Capogna, Allia M. Coleman, Kathleen A. Dick, Craig W. Dick, Anne M. French, Charles D. French, Sherrie K. McBride, Vicki L. Dunn, Terry M. Dunn, Sr., Sylvetta E. Fox, Walter W. Fox, Jr., the estate of Virginia R. Garcia, John P. Garcia, Sr., Karen M. Rainville, Dennis A. Rainville, Jane M. Hillabrant, Elise Lombardo, Mary J. Jiron, Randall Jiron, Martina Ortiz, Sherry D. Byes, Donna L. Oliver, Paul Oliver, Priscilla R. Bradley, Stella L. Thot, and Kymberlye R. Yeichner. These parents and step-parents have attested to their panic upon learning about the attack and to the continued distress of witnessing their children deal with the

psychological after-effects of the attack.[20]  Their harms are consistent with those suffered by many parents of victims of terrorism.  *See Valencia*, 774 F. Supp. 2d at 16.

The parents of the injured service-members are each entitled to a baseline award of $2,500,000.  *See Akins I*, 332 F. Supp. 3d at 44 (awarding $2,500,000 to the parents of injured service-members).  Here, twenty-nine parent and step-parent plaintiffs, whose children were awarded between $5,000,000 and $7,000,000, will receive awards of $2,500,000: Elizabeth A. Bedgood, Philip W. Brown, Karen M. Voie, John H. Capogna, Allia M. Coleman, Kathleen A. Dick, Craig W. Dick, Anne M. French, Charles D. French, Sherrie K. McBride, Vicki L. Dunn, Terry M. Dunn, Sr., Sylvetta E. Fox, Walter W. Fox, Jr., the estate of Virginia R. Garcia, John P. Garcia, Sr., Karen M. Rainville, Dennis A. Rainville, Jane M. Hillabrant, Elise Lombardo, Mary J. Jiron, Randall Jiron, Martina Ortiz, Sherry D. Byes, Donna L. Oliver, Paul Oliver, Priscilla R. Bradley, Stella L. Thot, and Kymberlye R. Yeichner.

Three plaintiffs — Jane F. Boyle, David J. Ackley, Sr., and Donald Stidham — will receive awards of $1,875,000 each.  This downward departure is consistent with the $3,000,000 pain and suffering awards received by these parents' service-member children, David J. Ackley, Jr. and Rita Ackley, and with the Ackleys' solatium awards as one another's spouse.

### c.  Children

Seventeen plaintiffs are children of service-members injured in the bombing and each describes confusion or fear in the immediate aftermath of the attack or attribute difficult

---

[20]       Boyle Decl. ¶¶ 13, 15-16; Ackley Sr. Decl. ¶¶ 9-11; Stidham Decl. ¶¶ 8, 9-11; Elizabeth Bedgood Decl. ¶¶ 8-9; Brown Decl. ¶¶ 12, 18; Voie Decl. ¶¶ 10, 12; John Capogna Decl. ¶¶ 7-8; Coleman Decl. ¶ 10; Kathleen Dick Decl. ¶¶ 8-10; Craig Dick Decl. ¶¶ 11-12; French Decl. ¶¶ 8-10; Charles French Decl. ¶¶ 7-10; McBride Decl. ¶¶ 8-10, 12; Vicki Dunn Decl. ¶¶ 8-10; Dunn Sr. Decl. ¶¶ 7-9; Fox Decl. ¶¶ 16-19; Fox Jr. Decl. ¶¶ 11-12; Garcia Decl., Ex. 5, Personal Statement; Garcia Sr. Decl. ¶¶ 9-10, 12-13; Rainville Decl. ¶¶ 14, 16; Dennis Rainville Decl. ¶¶ 18, 20-22; Jane Hillabrant Decl. ¶¶ 11, 23-24; Lombardo Decl. ¶¶ 12-13; Mary Jiron Decl. ¶ 12; Randall Jiron Decl. ¶ 13; Ortiz Decl. ¶ 9; Byes Decl. ¶ 9; Oliver Decl. ¶¶ 15, 18-20; Paul Oliver Decl. ¶ 13; Bradley Decl. ¶¶ 10-13; Thot Decl. ¶¶ 14, 17-18; Yeichner Decl. ¶¶ 8-9, 12.

relationships with their service-member parents, at least in part, to the psychological mark the attack had on their parents: Christina L. Mattingly, Mackenzie E. Capogna, Kyle T. Capogna, Dallas T. Croft, Andrew K. Croft, Molly A. Dobos, Erika L. Rust, Kasey D. Phillips, Haley I. Dobos, Alyxandra L. Doggett, Markie B. Dunn, Kimberly J. Jiron, Randall R. Jiron, Kiana K. Kaalekahi, David W. Long, Jr., Kayla K. Kasten, and Kelsie E. O'Toole.[21]  Although at least eight of the children were too young at the time of the bombing to comprehend that their parents were harmed or had been in danger, but this lessened awareness does not lessen the distress they each experienced growing up with parents suffering from psychological symptoms from the attack.  *See* Mackenzie Capogna Decl. ¶¶ 8-12 (describing these effects on relationship with parent and her experience growing up); Kyle Capogna Decl. ¶¶ 8-9, 11 (same); Haley Dobos Decl. ¶¶ 7-8 (same); Alyxandra Doggett Decl. ¶¶ 9-12 (same); Kimberly Jiron Decl. ¶¶ 7, 11-12; 16-18 (same); Randall R. Jiron Decl. ¶¶ 8, 10 (same); Kaalekahi Decl. ¶¶ 8-9, 11 (same); O'Toole Decl. ¶¶ 8, 10 (same); *see also Schooley*, 2019 WL 2717888, at *78 (same).

As stated, "[c]hildren of a surviving victim receive $1.5 million on average" under the *Heiser* framework.  *Spencer*, 71 F. Supp. 3d at 28; *Aceto*, 2020 WL 619925, at *11 (awarding $1,500,000 to Kaylee Ziegler, whose father, Eric Dale Ziegler, received an award of $5,000,000 in *Akins I*, 332 F. Supp. 3d at 47).  All plaintiff children's parents received awards between $5,000,000 and $7,000,000, and as such, each child plaintiff will recover $1,500,000.

### d.  Siblings

---

[21]      *See* Mattingly Decl. ¶¶ 8, 10-12; Mackenzie Capogna Decl. ¶¶ 8-12; Kyle Capogna Decl. ¶¶ 8-9, 11; Dallas Croft Decl. ¶ 8; Andrew Croft Decl. ¶¶ 8, 12-13; Molly Dobos Decl. ¶ 9; Rust Decl. ¶¶ 8-19; Philips Decl. ¶ 9; Haley Dobos Decl. ¶¶ 7-8; Alyxandra Doggett Decl. ¶¶ 9-12; Dunn Decl. ¶¶ 8-9; Kimberly Jiron Decl. ¶¶ 7, 11-12; 16-18; Randall R. Jiron Decl. ¶¶ 8, 10; Kaalekahi Decl. ¶¶ 8-9, 11; Long Jr. Decl. ¶¶ 13-14; Kayla K. Kasten ¶¶ 10-12; 15; O'Toole Decl. ¶¶ 8, 10.

Forty-three of the immediate family member plaintiffs are siblings, step-siblings, or half-siblings of service-member plaintiffs: Scott H. Ackley, Sherry A. Bessette, Aleatha C. Harris, Abraham F. Ayala, Mariah C. Ayala, Shondrea R. Bedgood, Corey L. Bedgood, Marshall L. Beneway, Barbara A. Crocco, Carol Bruns-Beneway Smith, Chaunda E. Brooks, Ingrid K. Simpson, Chad N. Capogna, Justin A. Capogna, Olivia R. Capogna, Lana L. Coleman-Wiggins, Demetrius Coleman, Charlie E. Coleman, Cornelius Coleman, Brett M. Dick, Cory P. Dick, Tina M. Judge, Brenda J. French, Dena J. DeJoe, Sandra L. Skinner, Hope M. Gambill, Michael Garcia, Lisa M. Glenn, Adrienne L. Fulton, Stephen R. Hillabrant, Teresa Ferguson, Cindy Houston, Patricia Houston, Henry Houston, Nathan Houston, Adrian M. Jiron, Alvin G. Jiron, Carol M. Lewis, Matthew L. Jiron, Christopher M. Johnson, Amy P. Hall, Michael D. Weimer, and Robert B. Yeichner.  Each has described distress upon learning about the bombing and has suffered from the ongoing effects of the attack on their respective siblings and families.[22]  These harms are consistent with those suffered by many siblings of victims of terrorism.  *See Valencia*, 774 F. Supp. 2d at 16.  Within the *Heiser* framework, siblings of injured service-members awarded between $5,000,000 and $7,000,000 are each entitled to an award of $1,250,000, with no downward departure for proportionality required.  *See Akins I*, 332 F. Supp. 3d at 45 (awarding a baseline amount of $1,250,000 to siblings of injured service-members).

---

[22]      *See* Scott Ackley Decl. ¶ 11; Bessette Decl. ¶¶ 12, 14; Harris Decl. ¶¶ 9, 12-13; Ayala Decl. ¶¶ 8, 13, 24-27; Mariah Ayala Decl. ¶¶ 12-15; Shondrea Bedgood Decl. ¶¶ 9-10; Corey Bedgood Decl. ¶¶ 9, 11-12; Marshall Beneway Decl. ¶¶ 11-12; Crocco Decl. ¶¶ 12-13; Smith Decl. ¶¶ 7, 12-13; Brooks Decl. ¶¶ 7, 19, 27-29; Simpson Decl. ¶¶ 10-12; Chad Capogna Decl. ¶¶ 7-8; Justin Capogna Decl. ¶¶ 7-9; Olivia Capogna Decl. ¶ 7; Coleman-Wiggins Decl. ¶ 9; Demetirus Coleman Decl. ¶ 9; Charlie Coleman Decl. ¶¶ 10-11; Cornelius Coleman Decl. ¶¶ 9-10, 12; Brett Dick Decl. ¶¶ 8-10; Cory Dick Decl. ¶¶ 8, 11; Judge Decl. ¶¶ 12, 14; Brenda French Decl. ¶¶ 9, 11-12; DeJoe Decl. ¶¶ 14-15; Skinner Decl. ¶¶ 10-11; Gambill Decl. ¶¶ 10-11; Michael Garcia Decl. ¶¶ 17-19; Glenn Decl. ¶¶ 12, 14; Fulton Decl. ¶¶ 11-12; Stephen Hillabrant Decl. ¶¶ 7-8, 13-15; Ferguson Decl. ¶¶ 8-9; Cindy Houston Decl. ¶ 9; Patricia Houston Decl. ¶ 9; Henry Houston Decl. ¶ 7-8; Nathan Houston Decl. ¶ 8; Adrian Jiron Decl. ¶ 11; Alvin Jiron Decl. ¶¶ 10-11; Lewis Decl. ¶¶ 13-15; Matthew Jiron Decl. ¶¶ 10-11; Christopher Johnson Decl. ¶¶ 12-13; Hall Decl. ¶¶ 12-14; Weimer Decl. ¶¶ 15, 17; Robert Yeichner Decl. ¶¶ 16-17.

One sibling-plaintiff has a sibling-victim who was killed in the attack on Khobar Towers: Chaunda E. Brooks is the surviving step-sister of deceased airman Joseph E. Rimkus. In *Rimkus*, 575 F.Supp.2d at 198, Joseph E. Rimkus's father, Joseph Rimkus, was awarded $5,000,000 in compensatory damages based on the *Heiser* framework, which awards parents of deceased victims $5,000,000, and siblings of deceased victims $2,500,000. *See Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d at 15. Consistent with that framework, and with Brooks's attestation to the anguish and grief she felt and still feels at the loss of her step-brother, Brooks will be awarded $2,500,000. Brooks Decl. ¶¶ 17-29.

Three sibling-plaintiffs have sibling-victims given $3,000,000 awards: Scott H. Ackley and Sherry A. Bessette are siblings of David J. Ackley, Jr.; and Aleatha C. Harris is the sister of Rita G. Ackley. Applying the proportional downward departure described in *Spencer*, 71 F. Supp. 3d at 28, these three sibling-plaintiffs are each entitled to an award of $625,000. *See Blank*, 2021 WL 3021450, at *13 (awarding sibling-plaintiffs $625,000 where their sibling-victims were awarded $3,000,000); *cf. Aceto*, 2020 WL 619925, at *67 (applying downward departure to awards for plaintiff parents, who had a $2,500,000 award baseline, where their service-member children were awarded $3,000,000 pain and suffering awards).

E. Punitive Damages

In addition to compensatory damages, plaintiffs seek punitive damages under 28 U.S.C. § 1605A(c). *See* FAC ¶¶ 389, 393, 400, 407, 411. The Supreme Court has laid out three "guideposts" for "reviewing punitive damages" awards: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State*

*Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996)).  In addition, in *Philip Morris USA v. Williams*, the Supreme Court announced that "the Constitution's Due Process Clause forbids ... use [of] a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, i.e., injury that it inflicts upon those who are, essentially, strangers to the litigation."  549 U.S. 346, 353 (2007).

Weighing this precedent, *Christie* awarded "[p]unitive damages equal to compensatory damages" in light of the "identified flaws in the [other] methods" for determining punitive damages. 2020 WL 3606273, at *87.  Specifically, *Christie* determined that this method avoided "a singular focus on deterrence," *id.* at *89, as well as "elevat[ing] superficial similarities over meaningful ones" and "skim[ing] over analysis of plaintiffs' precise harms," *id.* at *88-89, and does not "yield an excessive award," *id.* at *89.  Awarding punitive damages equal to compensatory damages, *Christie* concluded, was most appropriate because "plaintiffs [were] already receiving substantial compensatory awards," *id.* at *91, "'the compensatory damages for the injury suffered' ... [were] 'based on a component which' would be 'duplicated in the punitive award,'" *id.* (quoting *State Farm*, 538 U.S. at 426, 123 S.Ct. 1513), and "[a]dding hundreds of millions of dollars to [the] amount [of outstanding court judgments already owed by Iran] ... [was] not likely to have a meaningful deterrent effect," *id.* at *93.

Given that *Christie* reached this conclusion based on the same event at issue in the present case, the *Christie* punitive damages approach analysis, which was likewise applied in *Blank*, 2021 WL 3021450, at *10, will also be applied here.  Plaintiffs urge no alternative approach.  *See* Pls.' Proposed Findings of Fact and Conclusions of Law at 184 (requesting "punitive damages . . . in an amount equal to compensatory damages.").  Accordingly, a punitive

damages award equal to compensatory damages is most appropriate.  Plaintiffs are entitled to a

total punitive damages award of $533,750,000 to be apportioned among plaintiffs according to

their compensatory damages.  *Onsongo v. Republic of Sudan*, 60 F. Supp. 3d 144, 153 (D.D.C.

2014); *see also Valore*, 700 F. Supp. 2d at 90 (apportioning in the same fashion).

        F.  Prejudgment Interest

      Plaintiffs next seek prejudgment interest on their damages.  *See* FAC at 119.  "Whether to

award such interest is a question that rests within this Court's discretion, subject to equitable

considerations."  *Oveissi II*, 879 F. Supp. 2d at 58.  At the same time, the majority of Judges

confronted with this issue have concluded—as this court did in *Akins I*—that "pain and suffering

and solatium damages are both designed to be fully compensatory" and prejudgment interest is

therefore unwarranted.  332 F. Supp. 3d at 46; *see Barry v. Islamic Republic of Iran*, 437 F.

Supp. 3d 15, 60 (D.D.C. 2020) (Contreras, J.) (quoting *Wyatt v. Syrian Arab Republic*, 908 F.

Supp. 2d 216, 232 (D.D.C. 2012)); *see Doe v. Democratic People's Republic of Korea*, No. 18-

cv-252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021) (Friedrich, J.) (denying

prejudgment interest because the award "in today's dollars fully compensates the crew members

and their estates for their time spent in captivity"); *Bathiard v. Islamic Republic of Iran*, Case

No. 16-cv-1549 CRC, 2020 WL 1975672, at *8 ( D.D.C. Apr. 24, 2020) (Cooper, J.) (holding

"prejudgment interest is not appropriate for nonpecuniary damages already designed to provide

complete compensation"); *Cohen v. Islamic Republic of Iran*, No. 17-1214 (JEB), 2019 WL

3037868, at *9 (D.D.C. Jul. 11, 2019) (Boasberg, J.) (denying prejudgment interest because

"direct-injury and solatium awards [are] to be fully compensatory" already); *Maupin v. Syrian

Arab Republic*, 405 F. Supp. 3d 79, 94, 99 (D.D.C. 2019) (Spec. Master Report), *adopted

by Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75 (D.D.C. 2019) (Kollar-Kotelly,

J.); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 54-55 (D.D.C. 2016) (Howell, J.). Thus, the overarching tide of persuasive precedent in this District plainly weighs against awarding prejudgment interest, and is even less warranted considering punitive damages are permissible in § 1605A cases, as prejudgment interest "does not apply to punitive damages because 'prejudgment interest is an element of complete compensation' and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Pugh*, 530 F. Supp. 2d at 264).

Consistent with this persuasive precedent, this Court concludes plaintiffs are not entitled to prejudgment interest on their compensatory or punitive damages. When denying prejudgment interest on compensatory damages in *Oveissi I*, Judge Lamberth explained that "[i]n adopting the *Heiser* framework, this Court determined that the values set by that scale represent the appropriate level of compensation, regardless of the timing of the attack." *Oveissi v. Islamic Republic of Iran* ("*Oveissi I*"), 768 F. Supp. 2d 16, 30 n.12; *see also Maupin*, 405 F. Supp. 3d at 94; *Thuneibat*, 167 F. Supp. 3d at 54. Indeed, nonpecuniary damages for pain and suffering and solatium "do not typically require prejudgment interest because they are 'designed to be fully compensatory.'" *Id.* (quoting *Wyatt*, 908 F. Supp. 2d at 232). As in *Oveissi I*, where "the Court s[aw] no reason to deviate from its standard practice" of relying on "the values set by the [*Heiser*] scale[, which] represent the appropriate level of compensation" and award prejudgment interest, *Oveissi I*, 768 F. Supp. 2d at 30 n.12, the instant plaintiffs "have not provided any reason why awards under [the *Heiser*] framework are insufficient to provide 'complete compensation,'" *Akins I*, 332 F. Supp. 3d at 46 (quoting *West Virginia*, 479 U.S. at 310, 107 S. Ct. 702). Plaintiffs are likewise not entitled to prejudgment interest on their punitive damages. "Prejudgment interest does not apply to punitive damages because 'prejudgment interest is an

element of complete compensation' and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz*, 864 F. Supp. 2d at 42). Accordingly, plaintiffs are awarded monetary damages in the amounts established above without prejudgment interest.

### G.  Post-judgment Interest

Plaintiffs also seek post-judgment interest. *See* FAC at 119. Postjudgment interest may be awarded against a foreign sovereign when the FSIA provides jurisdiction. *See, e.g., Winternitz v. Syrian Arab Republic*, No. 17-2104 (TJK), 2022 WL 971328, at *12 (D.D.C. Mar. 31, 2022) (awarding postjudgment interest because "[a]pplication of section 1961(a) is mandatory, not discretionary") (quoting *Schooley*, 2019 WL 2717888, at *79); *Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-0252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 127 (D.D.C. 2015) (Contreras, J.); *Lanny J. Davis & Assocs. v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013); *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 324 (D.D.C. 2005). By federal statute, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court[,]" and that "[s]uch interest shall be calculated from the date of the entry of judgment. . . ." 28 U.S.C. § 1961(a). Application of section 1961(a) is mandatory, not discretionary. *See Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012); *Lanny J. Davis & Assocs.*, 962 F. Supp. 2d at 165. The Court will therefore award post-judgment interest at the statutory rate.

### H.  Attorneys' Fees and Costs and Expenses

Plaintiffs also seek "[r]easonable costs and expenses" and "[r]easonable attorneys' fees," FAC at 119, but because plaintiffs have not provided any information regarding the fees and costs sought, the request is denied without prejudice. Plaintiffs may file post-judgment motions

for attorneys' fees in accordance with Federal Rule of Civil Procedure 54(d)(2)(B) and for costs in accordance with Federal Rule of Civil Procedure 54(d)(1).

## IV.     CONCLUSION

For the foregoing reasons, plaintiffs' motions for default judgment as to liability, ECF No. 24, and damages, ECF No. 27, are granted.  Defendant Iran is liable for the pain and suffering inflicted on the fifty-one service-member plaintiffs and for the emotional distress inflicted on their 108 immediate family member plaintiffs, and for punitive damages equal to compensatory damages.

Plaintiffs are awarded monetary damages in the following amounts:

1.  Service-member plaintiffs Lisa M. Cafiero, Zachary J. Capogna, Jason D. Carley, Manuel J. Carrasco, Jeffrey Conrad, Jason B. Dixon, Christopher O. Doggett, Bryan W. Fox, John P. Garcia, Jr., Carl R. Hamilton, Jr., Jeffrey L. Hill, Rodney Houston, Roger K. Kaalekahi IV, David A. Krueger, David W. Long, Sr., John G. McCarthy, Flor D. Morales, Mark W. O'Toole, Eldred E. Pailin, Jeremy L. Parratt, Michael J. Perfetti, Rafael Rivera, Jr., David C. Robinson, Trena W. Schmidt, Michael S. Spencer, Billy J. Stewart, and Robert K. Young, who each suffered injuries resulting in a VA disability rating at or above 70%, are each entitled to $7,000,000 in pain and suffering damages and $7,000,000 in punitive damages;

2.  Service-member plaintiffs Sandra J. Beneway, Benjamin C. Depweg, Craig J. Dick, George G. Dyer III, Steven D. Garcia, Richard R. Jiron, Christopher E. Marsh, Jason L. Melvin, Morris M. Myers, Jr., William G. Neff, Elisha J. Novell, Pascha R. Payton, Andre L. Stanton, and Anthony J. Whiting, who each suffered injuries resulting in 40-60% VA disability rating are each entitled to $6,000,000 in pain and suffering damages and $6,000,000 in punitive damages;

3. Service-member plaintiffs Andre L. Bedgood, Dallas W. Croft, Carrie L. Dobos, Terry M. Dunn, Jr., Alfredo R. Guerrero, the estate of Gregory M. Hillabrant, Steven Jaronsky, Shane Rechcygl, who each suffered injuries resulting in a 30% or lower VA disability rating, are each entitled to $5,000,000 in pain and suffering damages and $5,000,000 in punitive damages;

4. Service-member plaintiffs David J. Ackley, Jr. and Rita G. Ackley, who did not receive VA disability ratings and sustained comparatively less severe injuries, are each entitled to $3,000,000 in pain and suffering damages and $3,000,000 in punitive damages;

5. Plaintiff spouses David J. Ackley, Jr., Rita G. Ackley, and April A. Widdis are each entitled to $2,000,000 in solatium damages and $2,000,000 in punitive damages;

6. Plaintiff spouses Mari E. DeLacy, Gretchen A. Capogna, Kirsten I. Carrasco, Teresa Conrad, Juli A. Croft, Donna J. Dixon, Edward C. Dobos, Autumn Hamilton O'Brien, Brandy O. Jiron, Valerie M. Kaalekahi, Cynthia A. Long, Stacey L. O'Toole, and Talena M. Spencer are each entitled to $4,000,000 in solatium damages and $4,000,000 in punitive damages;

7. Plaintiff parents Elizabeth A. Bedgood, Philip W. Brown, Karen M. Voie, John H. Capogna, Allia M. Coleman, Kathleen A. Dick, Craig W. Dick, Anne M. French, Charles D. French, Sherrie K. McBride, Vicki L. Dunn, Terry M. Dunn, Sr., Sylvetta E. Fox, Walter W. Fox, Jr., the estate of Virginia R. Garcia, John P. Garcia, Sr., Karen M. Rainville, Dennis A. Rainville, Jane M. Hillabrant, Elise Lombardo, Mary J. Jiron, Randall Jiron, Martina Ortiz, Sherry D. Byes, Donna L. Oliver, Paul Oliver, Priscilla R. Bradley, Stella L. Thot, and Kymberlye R. Yeichner are each entitled to $2,500,000 in solatium damages and $2,500,000 in punitive damages;

8. Plaintiff parents Jane F. Boyle, David J. Ackley, Sr., and Donald Stidham are each entitled to $1,875,000 in solatium damages and $1,875,000 in punitive damages;

9. Plaintiff children Christina L. Mattingly, Mackenzie E. Capogna, Kyle T. Capogna, Dallas T. Croft, Andrew K. Croft, Molly A. Dobos, Erika L. Rust, Kasey D. Phillips, Haley I. Dobos, Alyxandra L. Doggett, Markie B. Dunn, Kimberly J. Jiron, Randall R. Jiron, Kiana K. Kaalekahi, David W. Long, Jr., Kayla K. Kasten, and Kelsie E. O'Toole are each entitled to $1,500,000 in solatium damages and $1,500,000 in punitive damages;

10. Plaintiff sibling Chaunda E. Brooks is entitled to $2,500,000 in solatium damages and $2,500,000 in punitive damages;

11. Plaintiff siblings Scott H. Ackley, Sherry A. Bessette, and Aleatha C. Harris are each entitled to $625,000 in solatium damages and $625,000 in punitive damages;

12. Plaintiff siblings Abraham F. Ayala, Mariah C. Ayala, Shondrea R. Bedgood, Corey L. Bedgood, Marshall L. Beneway, Barbara A. Crocco, Carol Bruns-Beneway Smith, Ingrid K. Simpson, Chad N. Capogna, Justin A. Capogna, Olivia R. Capogna, Lana L. Coleman-Wiggins, Demetrius Coleman, Charlie E. Coleman, Cornelius Coleman, Brett M. Dick, Cory P. Dick, Tina M. Judge, Brenda J. French, Dena J. DeJoe, Sandra L. Skinner, Hope M. Gambill, Michael Garcia, Lisa M. Glenn, Adrienne L. Fulton, Stephen R. Hillabrant, Teresa Ferguson, Cindy Houston, Patricia Houston, Henry Houston, Nathan Houston, Adrian M. Jiron, Alvin G. Jiron, Carol M. Lewis, Matthew L. Jiron, Christopher M. Johnson, Amy P. Hall, Michael D. Weimer, and Robert B. Yeichner are each entitled to $1,250,000 in solatium damages and $1,250,000 in punitive damages.

Thus, the total damages award is $1,067,500,000.

An appropriate Order accompanies this Memorandum Opinion.

Date: August 12, 2022

_____
BERYL A. HOWELL
Chief Judge